1   **Michael J. Esler**, OSB No. 71056
    Email:  esler@eslerstephens.com
2   **John W. Stephens**, OSB No. 77358
    Email:  stephens@eslerstephens.com
3   **Kim T. Buckley**, OSB No. 78158
    Email:  buckley@eslerstephens.com
4   **ESLER, STEPHENS & BUCKLEY**
5   700 Pioneer Tower
    888 SW Fifth Avenue
6   Portland, OR  97204-2021
    Fax:  503 294 3995
7   Telephone:  503 223 1510

8                          Of Attorneys for Plaintiffs

9

10                 UNITED STATES DISTRICT COURT

11                      DISTRICT OF OREGON

| 12 | **AFTCS-PREFERRED ENDOWMENT CARE-OREGON/WASHINGTON; AFTCS-PREFERRED ENDOWMENT CARE-CALIFORNIA; CAROLYN L. ARNTSON; ARNTSON FAMILY HOLDINGS, L.L.C.; MARY ARNTSON; JERRY L. BAKER; MARY BETH BAKER; KAREN LYNN BENSON; RODERICK A. LIVESAY; BRIX DeARMOND, L.L.C.; JOHN R. CHANEY; J. DAVID COUGHLIN; JENNIFER LEE COUGHLIN TRUST, J. DAVID COUGHLIN, TRUSTEE; ROBERT J. DeARMOND; MARLENE DUTCHER; ROBERT DUTCHER; DAVOL FAMILY TRUSTS A and B, ANN HAZEN FRANCIS, TRUSTEE; FREMONT LAND COMPANY, L.L.C.; FUNERAL ASSOCIATES, L.L.C.; JAY A. HINTZE;, KENNETH E. and ROSELLA G. HOLTZ; PAULA J. KING; SHELLEY KING; LABORERS INTERNATIONAL UNION OF NORTH AMERICA LOCAL 296; ELIZABETH McNALLY; VIRGINIA B. MUDD REVOCABLE TRUST, VIRGINIA B. MUDD, TRUSTEE; JAMES and PATRICIA J. MURPHY; WAYNE MUSGROVE; ESTATE OF BENNIE KAY MUSGROVE, WAYNE MUSGROVE, PR; BETTY** | Case No.  01-CV-1428-HA  PLAINTIFFS' COMPLAINT  RICO and Supplemental State Law Claims (28 U.S.C. § 1331)  DEMAND FOR JURY TRIAL |

PLAINTIFFS' COMPLAINT
                           RICO and Supplemental State Law
                           Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1  **NORRIE; INTERTRIBAL TIMBER COUNCIL; P.J. BRIX L.L.C.: KENNETH**
2  **R. POORMAN: THE POORMAN FAMILY. L.L.C.; QUALITY ELECTRIC, INC.;**
3  **QUALITY ELECTRIC MONEY PURCHASE PLAN; SCOTT THOMASON;**
4  **DONALD E. TYKESON TRUST, DONALD E. TYKESON, TRUSTEE; DONALD E.**
5  **TYKESON FOUNDATION; BOYD VAN NESS; WAUD'S FUNERAL HOME**
6  **DEFINED BENEFIT PENSION PLAN; ROBERT J. WILHELM TRUST; ALLEN**
7  **AND ESTHER WILSON REVOCABLE TRUST; LESLIE R. WOLF and JANICE**
8  **WOLF; MARTIN and DEBORAH WOLF; JELD-WEN FOUNDATION; NOEL B.**
9  **FLYNN; IBEW LOCAL UNION 1245; G.S. GUTTERMAN and S.M. GUTTERMAN;**
10 **G.S. GUTTERMAN, M.D., TRUSTEE OF THE GSG, MD, PC, PROFIT-SHARING**
11 **PLAN; S.M. GUTTERMAN, MA, JD, PROFIT-SHARING PLAN; ROBERT B.**
12 **GUTTERMAN TRUST; JOSEPH L. GABRIEL and NANCY M. GABRIEL and**
13 **THOMAS F. LENNON, as Receiver for Capital Consultants, LLC, and as Court-**
14 **Appointed Representative for the following clients of Capital Consultants, LLC:**
15 ARIZONA CHAPTER NATIONAL ELECTRICAL CONTRACTORS
16 ASSOCIATION; I.B.E.W. LOCAL 332 WORKING DUES; A.G.C. RETROSPECTIVE
17 RATING PLAN TRUST; A.G.C. - I.U.O.E. LOCAL 701 PENSION TRUST FUND;
18 ALLAN AND JUANITA STEAGALL, JTWROS; ANTHONY C. AND SHIRLEY B.
19 SIMMONS, JTWROS; ARIZONA SHEET METAL PENSION TRUST FUND; ARIZONA
20 SHEET METAL TRADE TRUST FUND; ARIZONA STATE CARPENTERS H&W
21 TRUST FUND; BAY POINT PROPERTIES; BLAKE FAMILY TRUST; BONE
22 RECONSTRUCTION ASSOCIATION; CARL E. SHRADER, M.D. – IRA; CARL E.
23 SHRADER, M.D. - PERSONAL ACCOUNT; CAROLE J. LA CHAPELLE IRA
24 ROLLOVER; CEMENT MASONS & PLASTERERS JOINT SAVINGS ACCOUNT;
25 CHARLES R. AND ANN M. SIMMONS, JTWROS; CHASE UNTERMEYER IRA

PAGE 2 of 122          PLAINTIFFS' COMPLAINT
                      RICO and Supplemental State Law
                      Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1  ROLLOVER; COLORADO SPRINGS S.M.W.
   TRAINING FUND; D.C.K. UNTERMEYER
2  TTEE, D.C.K. UNTRMYR REVOCABLE
   TRUST; D.C.K. UNTERMEYER, TTEE, E.C.
3  UNTERMEYER IRREVOCABLE TRUST;
   D.C.K. UNTERMEYER CUSTODIAN, E.C.
4  UNTERMEYER; DONALD E. BARNARD
   AND MAXINE E. BARNARD; DONALD L.
5  MOORE; DONALD T. MURDOCK;
   DONALD T. MURDOCK ROLLOVER IRA;
6  DR. GARY D. LICHTEN ROLLOVER IRA;
   DRAKE MANAGEMENT COMPANY; E.
7  CALVIN THOMAS; EDISON PENSION
   TRUST; ERICKSON GROUP, LTD. -
8  PRIVATE PLACEMENTS; ERIK L.
   BUIJTENDORP AND PAULUS A. ULEMAN,
9  JTWROS; EUGENE JOHNSON IRA; EUNICE
   BARGER PERSONAL ACCOUNT;
10 EVANELL E. MOORE; FRANCIS W.
   KENDRICK; GARY THOMAS GREGG
11 EDUCATION TRUST; GOLD PLUME, LTD.;
   GRANT W. ELLIOTT IRA ROLLOVER;
12 GUARD PUBLISHING CO. PRIVATE
   PLACEMENT; H.K. CAMPBELL, TRUSTEE,
13 KENDRICK CAMPBELL TRUST; HELEN K.
   CAMPBELL, CUSTODIAN, KENDRICK
14 CAMPBELL; HELEN K. CAMPBELL,
   TRUSTEE FOR HUGH BARTON; HENRY
15 CLAY MEYERS TRUST DATED JANUARY
   13, 1995; I.B.E.W. LOCAL UNION 640;
16 I.B.E.W. LOCAL UNION #1141; I.B.E.W.
   LOCAL #68; I.B.E.W. LOCAL 113 GENERAL
17 RESERVE FUND; I.B.E.W. LOCAL 193;
   IDAHO CHAPTER - NATIONAL
18 ELECTRICAL CONTRACTORS
   ASSOCCIATION, INC.; ILWU LOCAL 9
19 WELFARE TRUST FUND; IRONWORKERS
   LOCAL NO. 1; JACK S. GRIGGS AND JUNE
20 B. GRIGGS; JAMES W. PRITCHETT, M.D.;
   JEAN K. HUBBARD; JULIE CARTER; L.M.
21 JOHN REVOCABLE TRUST UNDER
   AGREEMENT DATED 2/9/95; LAURA A.
22 COMRIE PERSONAL ACCOUNT; LINDA E.
   ZAPP; LORA L. AND MARTIN N. KELLEY
23 FAMLY FOUNDATION TRUST; LUCKY
   CONCRETE PUMPING, INC.; LUCKY
24 CONCRETE, INC.; M.G. KENDRICK-
   SHRADER IRA ROLLOVER DATED
25 12/21/99; M.G. KENDRICK TRUSTEE / M.G.
   KENDRICK UT 5/26/78; M.G. KENDRICK

PAGE 3 of 122         PLAINTIFFS' COMPLAINT
                      RICO and Supplemental State Law
                      Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1   TRUSTEE / M.G. KENDRICK UDT 12/28/73;
    M.O. WIESE TRUSTEE AND TRUSTOR /
2   M.O.W. REVOCABLE LIVING TRUST;
    MATTHEW COOPER WEINER; MICHAEL J.
3   MCDERMOTT; MICHIGAN U.P. I.B.E.W.
    PENSION PLAN; MODOC LUMBER CO.
4   PROFIT SHARING PLAN AND TRUST;
    MORSE BROS., INC. FIXED INCOME
5   FUND; OBIE MEDIA, INC., PROFIT
    SHARING PLAN; OKLAND
6   INVESTMENTS; OKLAND PROPERTIES,
    LTD.; OPEIU LOCAL 11 GENERAL
7   RESERVE FUND; OREGON FUNERAL
    DIRECTORS ASSOCIATION; OREGON
8   HISTORICAL SOCIETY; OREGON LABOR
    PRESS PUBLISHING COMPANY; PACIFIC
9   FIBRE PRODUCTS, INC.; PAINTERS
    LOCAL UNION NO. 86; PATRICK T. FILES
10  AND P.L. FILES, TRUSTEES OF THE;
    PATRICK T. FILES, JR.; PETER JACOBSEN
11  PRODUCTIONS - COLLATERAL NOTES
    ACCOUNT; PHILIP L. STEVENS AND
12  VIRGINIA H. STEVENS; PUGET SOUND
    ELECTRICAL WORKERS PENSION TRUST;
13  RAGLAND RIFE FOUNDATION; RAY AND
    BONNIE SESSLER; REGISTER GUARD
14  NEWSPRINT FUND; RENO SPARKS
    READY MIX, INC. PROFIT SHARING
15  PLAN; RETAIL DRUG EMPLOYEES
    PENSION TRUST; RICHARD AND CAROL
16  J. MILLS; ROBERT C. BRODINE; ROBERT
    S. WALSH - REAL ESTATE ACCOUNT;
17  RONALD B. TONKIN; S.E. COHEN AND J.
    COHEN, TRUSTEES FOR S.E. COHEN;
18  S.M.W. LOCAL NO. 9 HEALTH AND
    WELFARE TRUST; S.M.W. LOCAL UNION
19  359 PCT ACCOUNT; S.M.W. LOCAL UNION
    359 YOUTH TO YOUTH; SHAVER
20  CONSTRUCTION, INC.; SHEET METAL
    WORKERS #9 GENERAL RESERVE FUND;
21  SHEET METAL WORKERS UNON 359
    EQUALITY FUND; SHOPMEN'S
22  IRONWORKERS RETIREMENT FUND OF
    SOUTHERN CALIFORNIA; SHOPMEN'S
23  IRONWORKERS H & W TRUST FUND; S.W.
    OHIO REGIONAL COUNCIL OF
24  CARPENTERS; T.L. & KAREN D.
    ANDERSON LIVING TRUST 4/28/88; THE
25  NELSON TRUST GENERAL FUND;
    THOMAS M. SHAW; TKR TRUST FUND -

PAGE 4 of 122          PLAINTIFFS' COMPLAINT
                      RICO and Supplemental State Law
                      Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1  PRIVATE PLACEMENT ACCOUNT; TODD
   KIESZ; TRI-COUNTY BUILDING TRADES
2  HEALTH FUND; UNION LABOR
   RETIREMENT ASSOCIATION; UTAH
3  CARPENTERS J.A.T.C.; WALTER A. AND
   CAROLE LA CHAPELLE; WALTER A. LA
4  CHAPELLE IRA ROLLOVER;
   WAREHOUSEMEN'S PENSION TRUST;
5  WASHINGTON STATE PLUMBING &
   PIPEFITTING PENSION PLAN; WESTERN
6  PENNSYLVANIA REGIONAL DISTRICT
   COUNCIL OF CARPENTERS; WYOMING
7  CHAPTER NATIONAL ELECTRICAL
   CONTRACTORS ASSOCIATION;
8  VICTORIA MUDD,

9                    Plaintiffs,

10         v.

11  **BARCLAY GRAYSON, STOEL RIVES,
    LLP; and MARK PETERMAN**,

12                  Defendants.

13  _____

14              JURISDICTION, VENUE, AND PARTIES

15      1.  This court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question),

16  the Racketeer Influenced and Corrupt Organizations provisions of Title IX of the Organized

17  Crime Control Act of 1970, 18 U.S.C. § 1961-1965 ("RICO"), and supplemental jurisdiction

18  under 28 U.S.C. § 1367.  This court also has subject matter jurisdiction pursuant to (1) the

19  Stipulation and Order re: Preliminary Injunction, Asset Freeze and Appointment of a Permanent

20  Receiver in *Securities and Exchange Commission v. Capital Consultants, LLC, et al.*, Case No.

21  00-1290-KI entered by this court on September 21, 2000; and (2) the Order Authorizing

22  Summary Procedure for Administration of Claims By and Against Capital Consultants, LLC,

23  entered by this court in Case No. 00-1290-KI.

24      2.  Plaintiffs and those CCL clients represented by the Receiver purchased securities that

25  Capital Consultants, Inc. and its successor Capital Consultants, LLC (together referred to

PAGE 5 of 122          PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                       RICO and Supplemental State Law   Attorneys at Law
                       Claims (28 U.S.C. § 1331)         700 Pioneer Tower
                                                         888 SW Fifth Avenue
                                                         Portland, OR  97204-2021
                                                         503 223 1510

1  hereinafter as "CCL"), Jeffrey Grayson, Barclay Grayson, Andrew Wiederhorn, Lawrence

2  Mendelsohn, Wilshire Credit Corporation ("Old WCC"), Brooks Financial, LLC, Beacon

3  Financial, LLC, and Timothy Gamwell unlawfully sold.  Capital Consultants was plaintiffs'

4  registered investment adviser.

5      3.  Andrew Wiederhorn ("Wiederhorn") is an Oregon resident and one of the only two

6  shareholders who owned and controlled Wilshire Credit Corporation and affiliated and

7  subsidiary companies.

8      4.  Lawrence Mendelsohn ("Mendelsohn") is an Oregon resident and one of the only two

9  shareholders who owned and controlled Wilshire Credit Corporation and affiliated and

10  subsidiary companies.

11      5.  Jeffrey L. Grayson ("Grayson") is a resident of Portland, Oregon.  He is the founder,

12  principal owner (62.5%), chairman of the board, and chief executive officer of CCL.

13      6.  Barclay L. Grayson ("Barclay Grayson") is a resident of Portland Oregon.  He is an

14  18.75 percent owner, director, and president of CCL.  He is a son of Jeffrey L. Grayson.

15      7.  Capital Consultants, LLC ("CCL"), a limited liability company formed on June 30,

16  1999, is the successor to Capital Consultants, Inc.  Unless otherwise indicated, Capital

17  Consultants, LLC and Capital Consultants, Inc. are referred to collectively as "CCL."

18      8.  Capital Consultants, Inc ("CCI"), an Oregon corporation, was the predecessor to

19  CCL.

20      9.  Old WCC.  Capital Wilshire Holdings, a Nevada corporation ("Old WCC"), was a

21  closely held corporation owned by Wiederhorn and Mendelsohn, formerly known as Wilshire

22  Credit Corporation.  Old WCC was purportedly engaged in the business of acquiring and

23  servicing loan portfolios.  Between 1994 and October 16, 1998, Old WCC borrowed, and as of

24  October 16, 1998 had outstanding, approximately $160 million of the Investors' money, which

25  was raised by successive related securities offerings conducted and managed by CCL ("the Old

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1  WCC debt"). On September 1, 1999, Old WCC changed its corporate name to Capital Wilshire

2  Holdings.

3      10. <u>New WCC</u>. Wilshire Credit Corporation ("New WCC"), a Nevada corporation,

4  originally named WCC, Inc., was formed on February 4, 1999. It is liable to plaintiffs for all

5  obligations owed by Old WCC because New WCC is the successor to the loan servicing business

6  of Old WCC. It changed its name to Wilshire Credit Corporation on September 1, 1999.

7      11. <u>Wilshire Financial Services Group, Inc.</u> Wilshire Financial Services Group Inc.

8  ("WFSG") is a publicly traded Delaware corporation. It was created in 1996 as part of a

9  reorganization of various Wilshire entities. The stock of WFSG first became traded on the

10  NASDAQ after an initial public offering on December 18, 1996. WFSG filed for protection

11  from creditors under Chapter 11 of the Bankruptcy Code on April 12, 1999, in Delaware.

12  WFSG's Chapter 11 Plan of Reorganization was confirmed by the Bankruptcy Court for the

13  District of Delaware on June 10, 1999.

14      12. <u>Wilshire Servicing Corporation</u>. Wilshire Servicing Corporation ("WSC") is a

15  Delaware corporation and wholly-owned subsidiary of WFSG created in late 1996. WSC is in

16  the business of servicing loan portfolios.

17      13. <u>Portland Servicing Corporation</u>. Portland Servicing Corporation ("PSC") is a Nevada

18  corporation registered to do business as a foreign corporation in Oregon. Andrew A. Wiederhorn

19  is the President and Secretary. PSC also received funds from plaintiffs.

20      14. <u>Capital Wilshire Holding</u>. ("CWH"). CCL formed a new corporation, which in turn

21  formed a wholly owned corporate subsidiary (Mergeco) that was merged into Old WCC. The

22  surviving entity, Old WCC, changed its name to Capital Wilshire Holding (old WCC). CWH

23  was owned 1 percent by Wiederhorn and Mendelsohn and 99 percent by CCL. CWH then

24  changed its name to WCC (New Servicer), and was owned by CCL (49%) and by WFSG (51%).

25  It is a Nevada corporation.

PAGE 7 of 122        PLAINTIFFS' COMPLAINT        **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law        Attorneys at Law
                        Claims (28 U.S.C. § 1331)        700 Pioneer Tower
                                                    888 SW Fifth Avenue
                                                  Portland, OR 97204-2021
                                                    503 223 1510

1    15. Sterling Capital, LLC.  Sterling Capital, LLC ("Sterling"), is a New Jersey limited

2    liability company with its principal place of business in New Jersey.  Sterling was formed on

3    November 24, 1998, for the purported purpose of purchasing the Old WCC $160 million debt.

4    In December 1998, Sterling entered into an agreement purportedly to purchase the Old WCC

5    debt from CCL.  Sterling had no business purpose other than to serve as an agent for the

6    Wiederhorn, Mendelsohn, the related Wilshire entities, CCL, and the Graysons.

7    16. Daniel Dyer ("Dyer") is a Washington resident.  Dyer formed Sterling for the

8    purported purpose of purchasing the Old WCC debt.

9    17. Ted Wiederhorn is a Maine resident and principal of Specialty Finance Investors

10   LLC.  He is the brother of Andrew Wiederhorn.

11   18. Specialty Finance Investors LLC.  Specialty Finance Investors LLC ("SFI") is an

12   Oregon limited liability company.  At all times relevant in this complaint, the Manager of SFI

13   was Chris Tassos, a WFSG officer.  Ted Wiederhorn was at one time the managing member of

14   SFI.

15   19. Tiffany Wiederhorn is an Oregon resident and the wife of Andrew Wiederhorn.

16   20. Joyce Mendelsohn is an Oregon resident and is the wife of Lawrence Mendelsohn.

17   The only claims against her are based on her marital status and as a potential transferee of funds

18   from her husband.

19   21. Wilshire Real Estate Investment Trust, Inc.  Wilshire Real Estate Investment Trust,

20   Inc. ("WREIT") is an Oregon corporation controlled and operated by Wiederhorn and

21   Mendelsohn.

22   22. First Bank of Beverly Hills.  First Bank of Beverly Hills ("BH Bank") is a California

23   financial institution with its primary place of business in Beverly Hills, California.  BH Bank is a

24   wholly owned subsidiary of WFSG.

25

PLAINTIFFS' COMPLAINT                    **ESLER, STEPHENS & BUCKLEY**
                             RICO and Supplemental State Law           Attorneys at Law
                             Claims (28 U.S.C. § 1331)                 700 Pioneer Tower
                                                                       888 SW Fifth Avenue
                                                                       Portland, OR  97204-2021
                                                                       503 223 1510

1    23. <u>Wilshire Acquisition Corporation</u>.  Wilshire Acquisition Corporation ("WAC") is a

2  Nevada corporation, formed on or about July 6, 1993, registered to do business in Oregon.  WAC

3  is the sole owner of BH Bank, and became a wholly owned subsidiary of WFSG when WFSG

4  was formed in 1996.

5    24. <u>Wilshire Funding Corporation</u>.  Wilshire Funding Corporation ("WFC") is a

6  Delaware corporation, formed on or about November 12, 1996, with its principal place of

7  business in Portland, Oregon.

8    25. <u>CF Credit, LLC</u>.  CF Credit, LLC ("CF Credit"), is a California limited liability

9  company with its principal place of business in California.  CF Credit was formerly known as CF

10  Credit Inc., but was re-formed in January 1996 to provide a $1.76 million loan to Grayson.

11    26. <u>Bud Coleman</u> ("Coleman") is a California resident and a co-owner of CF Credit,

12  which provided the $1.76 million loan to Grayson.

13    27. <u>David Frey</u> ("Frey") is a California resident and a co-owner of CF Credit, which

14  provided the $1.76 million loan to Grayson.  Frey is a partner at the law firm of Foley McIntosh

15  Frey & Claytor Professional Corporation.

16    28. <u>Foley McIntosh Frey & Claytor Professional Corporation</u>.  Foley McIntosh Frey &

17  Claytor Professional Corporation ("Foley McIntosh") is a California corporation formed on April

18  23, 1970.   Foley McIntosh provided legal services in connection with $1.76 million loan from

19  CF Credit to Grayson.

20    29. <u>Oxbow Capital Partners, LLC</u>.  Oxbow Capital Partners, LLC ("Oxbow Partners"), a

21  Washington limited liability company, was formed June 5, 1998.  It is the promoter and manager

22  of Oxbow Fund I and Oxbow Fund B.

23    30. <u>Oxbow Capital 1999 Fund I, LLC</u>.  Oxbow Capital 1999 Fund I, LLC ("Oxbow Fund

24  I"), a New Jersey limited liability company, was formed January 12, 1999.  From March 1999

25

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1   through October 1999, Oxbow Fund I conducted a $25 million offering, raising $4.6 million

2   from investors.  The Oxbow Fund I offering was promoted and managed by Oxbow Partners.

3         31. Oxbow Capital 1999 Fund B, LLC.  Oxbow Capital 1999 Fund B, LLC ("Oxbow

4   Fund B"), a New Jersey limited liability company, was formed March 22, 2000.  Since July

5   1999, it has attempted a $25 million offering promoted and sold by Oxbow Partners, and has

6   raised at least $8.86 million from Brooks Financial, LLC and Beacon Financial, LLC.

7         32. Brooks Financial, LLC.  Brooks Financial, LLC ("Brooks"), an Oregon limited

8   liability company, was formed June 4, 1999.  It agreed to borrow up to $50 million (the "Brooks

9   Loan") through CCL from CCL's investors to purchase $108 million of the Old WCC debt from

10   Sterling.

11         33. Beacon Financial, LLC.  Beacon Financial, LLC ("Beacon"), a California limited

12   liability company, was formed October 30, 1998.  Beacon is under common control with Brooks,

13   and agreed in January 2000 to borrow up to $50 million (the "Beacon Loan") through CCL from

14   CCL's investors to acquire the Old WCC debt from Sterling.

15         34. Creditmart, Inc.  Creditmart, Inc. ("Creditmart"), a Nevada corporation formed on

16   November 13, 1997.  Creditmart is under common control with Beacon and Brooks, and agreed

17   in May 1998 to borrow up to $50 million (the "Creditmart Loan") through CCL from CCL's

18   investors to acquire the Old WCC debt from Sterling.

19         35. Timothy Gamwell ("Gamwell") is a resident of Florida.  Gamwell was the principal

20   of Brooks and Beacon, and Creditmart.  He controlled Brooks and Beacon.

21         36. Bear Stearns & Co.  Bear Stearns & Co. ("Bear Stearns") is a Delaware corporation.

22   Bear Stearns held the cash collateral for the Old WCC debt that was released in October 1998.

23         37. Moss Adams LLP.  Moss Adams LLP ("Moss Adams"), a Washington limited

24   liability partnership, is a regional accounting firm headquartered in Seattle, Washington with

25   offices in various cities, including Portland, Oregon.  Moss Adams provided auditing services for

        PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    CCL (and its predecessors), and accounting services for CCL, its affiliates (including Grayson),

2    and its predecessors.  Moss Adams provided appraisals of the servicing rights collateral in the

3    collateralized note program for CCL, Old WCC, and WFSG.

4         38. Consilium, Inc.  Consilium, Inc. ("Consilium") was a Washington corporation that

5    was dissolved on June 30, 1999.  Consilium performed appraisal services for CCL from at least

6    1994 until certain of Consilium's appraisal services and related activities were acquired by Moss

7    Adams in 1997.  Thereafter, Moss Adams continued to provide the appraisal services previously

8    provided by Consilium.

9         39. Suzanne Perkins and Larry Tapanen, husband and wife, were shareholders of

10   Consilium and received a distribution of its net assets on dissolution.  Tapanen was the chief

11   executive officer of Consilium and directly performed and supervised Consilium's professional

12   services relevant to this case.

13        40. O'Melveny & Myers LLP.  O'Melveny & Myers LLP ("O'Melveny"), is a California

14   limited liability partnership.  O'Melveny is a law firm headquartered in Los Angeles, California,

15   with offices worldwide.  O'Melveny provided legal services to CCL, the Graysons, and Lucas

16   concerning federal and state regulation of sales of securities, registration of securities, and

17   securities fraud; the Investment Adviser Act and Securities and Exchange Commission ("SEC")

18   regulations governing "Investment Advisers"; government regulation of the sale of investments

19   to entities subject to the Employee Retirement Income Security Act of 1974 ("ERISA"); and the

20   form and substance of information and disclosures to be provided to CCL's clients concerning

21   CCL's and the Graysons' track record as Investment Adviser and sellers of securities.

22        41. Robert N. Eccles ("Eccles") a partner at O'Melveny with responsibility for the legal

23   services O'Melveny provided to the CCL Group. When CCL was the target of investigations

24   regarding its practices and fees by the United States Department of Labor, CCL hired Robert

25

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                              RICO and Supplemental State Law          Attorneys at Law
                              Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                                888 SW Fifth Avenue
                                                                Portland, OR  97204-2021
                                                                503 223 1510

1  Eccles and O'Melveny & Myers because Eccles had previously been Associate Solicitor of

2  Labor in charge of U.S. Department of Labor attorneys who conducted litigation under ERISA.

3      42. McCarter & English, LLP, a New Jersey limited liability partnership ("McCarter"),

4  and Seth Taube, one of its partners, represented Dan Dyer, Oxbow Capital Partners, LLC, a

5  Washington limited liability company, Sterling Capital, LLC, a New Jersey limited liability

6  company, and Oxbow Capital 1999 Fund B, LLC, a New Jersey limited liability company, from

7  at least January 1999 until at least September 20, 2000.

8      43. Weiss Jensen Ellis & Howard, P.C. ("Weiss Jensen"), an Oregon professional

9  corporation, is a law firm with its principal place of business in Portland, Oregon.  Weiss Jensen

10  provided services for CCL as described below.  CCL and Grayson retained Weiss Jensen to

11  provide consultation and advice to CCL in connection with the West State, Inc. transaction and

12  the Cascade General transaction.

13      44. Stoel Rives, LLP, an Oregon limited liability partnership, is a law firm with its

14  principal place of business in Portland, Oregon.  Mark Peterman was a partner with Stoel Rives.

15  Stoel Rives and Peterman provided legal services described below.

16      45. This complaint uses the following additional defined terms:

17          a.  The "The CCL Group" means Jeff Grayson, Barclay Grayson, CCL, Lucas, and

18              Kirkland.

19          b.  The "Wilshire Group" means Old WCC, New WCC, Wiederhorn, Mendelsohn,

20              WSC, PSC, WFSG, CWH, Ted Wiederhorn, Tiffany Wiederhorn, SFI, Joyce

21              Mendelsohn, WREIT, BH Bank, WAC, and WFC.

22          c.  "Investors" means the plaintiffs and other CCL clients.

23          d.  The collateralized note program means participations in notes made by Old WCC

24              and others to CCL as agent for CCL's clients, where the obligation to repay was

25              supposed to be secured by collateral or credit insurance.

PLAINTIFFS' COMPLAINT
                                  RICO and Supplemental State Law
                                  Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1      e.  The <u>"Old WCC Debt"</u> means the aggregate borrowing of the Investors' money by

2      Old WCC under the Master Loan Agreement.

3      f.  <u>"Master Loan Agreement"</u> means the Master Loan Agreement originally entered

4      into by Old WCC and CCL as agent on July 7, 1995, as it was supplemented and

5      amended from time to time.

6                      FACTS REGARDING TRANSACTIONS

7      46. This action arises from unlawful sales of securities, most of which were sold pursuant

8  to the collateralized note program, which was developed and implemented by Andrew

9  Wiederhorn, Lawrence Mendelsohn, and the companies they controlled, Jeffrey Grayson

10  ("Grayson"), Barclay Grayson, and the companies they controlled, and their lawyers.

11      47. Most of the securities at issue in this action were participations in "collateralized

12  notes" that Wilshire Credit Corporation ("Old WCC") and others made.

13      48. CCL and the Graysons sold the securities and breached their common law fiduciary

14  and reasonable care duties to plaintiffs.

15      49. Grayson, Barclay Grayson, Wiederhorn, Mendelsohn, Old WCC, WFSG, Dyer,

16  Sterling, Gamwell, Brooks, Beacon, Creditmart, Bear Stearns, Tapanan, Consilium, Moss

17  Adams, Eccles, and O'Melveny & Myers participated in or materially aided the sale of some or

18  all of the securities, and they assisted CCL and the Graysons in breaching their common law

19  fiduciary and reasonable care duties to plaintiffs.

20      50. Wiederhorn and Mendelsohn owned Old WCC, a company engaged in the complex,

21  high risk business of acquiring, servicing, and selling pools of loans made to bad credit risk,

22  "sub-prime" homeowners who were unable to obtain conventional loans for first or second

23  mortgages.  Old WCC did not have money of its own to acquire these loan pools; it needed to get

24  the money from others.  CCL's clients were the source of the highest risk money for Wiederhorn,

25  Mendelsohn, and Old WCC.

         PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    51. CCL and CCL were companies that Grayson and Barclay Grayson owned and were

2    registered investment advisers.

3    52. Before the collateralized note program began in 1995, Grayson asked Wiederhorn and

4    his companies to help CCL and Grayson secretly use CCL's clients' money to bail CCL and

5    Grayson out of trouble in earlier transactions.  Wiederhorn's agreement to provide secret help

6    had two effects.  First, the bailouts established the pattern of "circular" loan transactions later

7    used to hide foreseeable problems in the collateralized note program.  These were transactions in

8    which CCL, with help from Wiederhorn and Mendelsohn's company Old WCC, would use

9    money newly obtained from plaintiffs and CCL's other clients to create the illusion that income

10   was being received from, and payments were being made on, loans, participations in which CCL,

11   Grayson, Barclay Grayson, Old WCC, Wiederhorn, and Mendelsohn had sold to CCL's clients.

12   Second, as a result of the secret bailout transactions, Grayson and CCL became beholden to

13   Wiederhorn and Old WCC, out of fear that their improper conduct would be revealed.

14   53. CCL represented to plaintiffs and other investors that it earned revenue by charging

15   management fees to its clients.  Historically, CCL offered its clients two broad categories of

16   securities:  (1) publicly traded securities for which it charged only a small percentage fee (*e.g.*,

17   less than one percent), and (2) "private investments," for which it charged a substantially higher

18   percentage fee, typically three percent.  As a result, CCL was motivated to convince its current

19   and potential clients to purchase private securities.

20   54. CCL, Grayson, Barclay Grayson, Old WCC, Wiederhorn, and Mendelsohn did not

21   disclose material facts concerning the collateralized note program to plaintiffs or most, if not all,

22   of CCL's other clients.  Among other things, CCL, Old WCC, Grayson, Barclay Grayson,

23   Wiederhorn, and Mendelsohn did not disclose the risk that the purchasers of participations in Old

24   WCC notes were taking on, that a large percentage of the loans that Old WCC pledged as

25   collateral were in default, and that the ultimate source of repayment was individual borrowers

PAGE 14 of 122        PLAINTIFFS' COMPLAINT        **ESLER, STEPHENS & BUCKLEY**
                      RICO and Supplemental State Law    Attorneys at Law
                      Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                         888 SW Fifth Avenue
                                                         Portland, OR  97204-2021
                                                         503 223 1510

1  with poor credit ratings.  CCL, Grayson, Barclay Grayson, Old WCC, Wiederhorn, and

2  Mendelsohn overstated the value of the servicing rights that Old WCC pledged as collateral.

3  When a loan pool is securitized, the owner of servicing rights to the loans in that pool can lock in

4  those rights.  However, if the loan pool is not securitized, the initial lender (*i.e.*, not Old WCC)

5  generally retains the right to servicing, as well as the right to prompt return of servicing rights.

6  CCL, Grayson, Barclay Grayson, Old WCC, Wiederhorn, and Mendelsohn never explained this

7  to the investors, nor did they disclose that Old WCC's servicing rights were not for loan pools

8  that had been securitized.  If all relevant information had been disclosed, plaintiffs would not

9  have purchased participations in loans to Old WCC, and Wiederhorn and Grayson would not

10  have gotten plaintiffs' money.

11      55. While continuing to sell private securities to plaintiffs and other CCL clients, CCL,

12  Grayson, Barclay Grayson, Old WCC, Wiederhorn, Mendelsohn, and others engaged in a series

13  of cover-ups to hide material facts concerning the collateralized note program and to disguise the

14  failure of the program through what became the largest Ponzi-like scheme ever perpetrated by an

15  investment adviser.  To do this, Grayson, Barclay Grayson, Wiederhorn, Mendelsohn, and the

16  companies they controlled were helped by lawyers, accountants, and appraisers.  Consilium, Inc.,

17  and its successor Moss Adams LLP, appraised collateral that Old WCC pledged to secure its

18  loans from CCL's investors.  The appraisals did not accurately state the true value of the

19  collateral.  Lawyers developed several "restructurings" of the initial investment that to concealed

20  massive defaults on obligations owed to plaintiffs, and resulted in the release of collateral, the

21  misleading of plaintiffs and others, and the release of obligors, including Wiederhorn and others,

22  from guarantees and personal liability.  Moss Adams performed audits that the SEC required for

23  investment adviser licensing.

24      56. Consilium performed appraisal services for Old WCC, WFSG, and CCL from at least

25  1994 until Moss Adams took over in 1997.  Thereafter Moss Adams continued those activities.

PLAINTIFFS' COMPLAINT            **ESLER, STEPHENS & BUCKLEY**
                                     RICO and Supplemental State Law     Attorneys at Law
                                     Claims (28 U.S.C. § 1331)           700 Pioneer Tower
                                                                         888 SW Fifth Avenue
                                                                         Portland, OR  97204-2021
                                                                         503 223 1510

1  Moss Adams hired the same individuals (Stephen Olson and Shawn Olson) who had done this

2  work for Consilium.  Moss Adams wore multiple hats for multiple clients because it performed

3  audit and accounting services for CCL and the Grayson family, and appraisal services for CCL,

4  WFSG, and Old WCC.

5      57. As a result of its auditing work from 1994 through 1998, Moss Adams participated in

6  or materially aided the unlawful sales of securities and substantially assisted CCL's breaches of

7  fiduciary duties described in plaintiffs' complaint.  In performing its appraisal services for Old

8  WCC, WFSG, and CCL while performing auditing services for CCL, Moss Adams knew or

9  should have known details of the arrangements between CCL, the Graysons, Old WCC, WFSG,

10  Wiederhorn, and Mendelsohn.  Therefore, it knew or should have known that the appraisals it or

11  Consilium had provided on the value of the collateral in the collateralized note program were

12  significantly overstated and negligently prepared.

13      58. The collateralized note program was accompanied by and connected to other

14  misconduct for which recovery also is sought.

15      59. The relationships that operated to damage plaintiffs in the collateralized note program

16  among CCL, Grayson, Barclay Grayson, Wilshire, Wiederhorn, and Mendelsohn, all of their

17  lawyers, and Moss Adams and Consilium, originated and grew before that program.  Beginning

18  in 1995 or before, CCL, Grayson, Barclay Grayson, Wiederhorn, Mendelsohn, all of their

19  lawyers, Moss Adams, and Consilium began working together to create the false appearance that

20  CCL was an effective and competent investment adviser and fiduciary, and that the

21  "collateralized note program was a safe, secure, and rare investment, the kind of investment that

22  only the best and brightest investment advisers could find.

23      60. Grayson founded CCL in 1968.  CCL developed long-term relationships with its

24  Portland-based law firm that continued until CCL was taken over by a court-appointed receiver

25  in September 2000.

PAGE 16 of 122        PLAINTIFFS' COMPLAINT        **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law        Attorneys at Law
Claims (28 U.S.C. § 1331)        700 Pioneer Tower
                                 888 SW Fifth Avenue
                                 Portland, OR  97204-2021
                                 503 223 1510

1   61. Wiederhorn, who grew up in the southwest Portland neighborhood where Grayson

2   lives, achieved apparent business successes early in life in Southern California where he operated

3   on Wilshire Boulevard in Los Angeles.  He founded Old WCC there but later moved its

4   headquarters to Portland.

5   62. Old WCC initially engaged in the high-risk business of purchasing pools of loans

6   made to bad credit risk homeowners who were unable to obtain conventional loans for first or

7   second mortgages.  In addition, Old WCC contracted for rights to service loans.  A company that

8   services loans charges a fee for collecting loan payments, late fees, and prepayment penalties

9   from borrowers.

10                         THE WSI TRANSACTION

11   63. From 1993 through 1995, CCL sold securities to some of the plaintiffs and other CCL

12   clients.  The securities consisted of participations in a series of loans that CCL's clients made to

13   West State, Inc. ("WSI"), a corporation conducting business in Portland, Oregon at the Port of

14   Portland.  By late 1993 or early 1994, WSI became unable to meet its obligations as they became

15   due.  By 1994, it owed CCL $11 million.  CCL and Grayson concluded that WSI could not meet

16   its repayment obligations.

17   64. CCL and Grayson knew that if WSI did not make the payments called for, the

18   plaintiffs who had purchased participations in the loans, and various investment adviser-rating

19   services who evaluated CCL and others, would learn of this default.  CCL and Grayson knew

20   discovery of this default would (1) reflect negatively on CCL and him, (2) lead investors,

21   including plaintiffs, to question this loan and investigate other investments with CCL, (3) reduce

22   CCL's standing as reported by various rating services, (4) probably be reported in local

23   newspapers, thereby alerting plaintiffs and other then current and potential future investors to the

24   risky nature of securities consisting of participations in private loans that CCL was selling to its

25   clients.

PAGE 17 of 122          PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law    Attorneys at Law
                        Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                           888 SW Fifth Avenue
                                                           Portland, OR  97204-2021
                                                           503 223 1510

1    65.  To create the illusion that WSI was capable of making loan repayments on its own,

2    CCL and Grayson arranged with Wiederhorn and Mendelsohn for Old WCC to borrow

3    approximately $10 million from CCL, who, together with Old WCC, Wiederhorn, and

4    Mendelsohn, would sell participations in the loan to plaintiffs and other CCL clients.

5    Wiederhorn, Mendelsohn, and Grayson understood and agreed that Old WCC would then loan

6    $3.645 million to a company related to WSI called Astoria Metals Corporation ("AMC").  Old

7    WCC charged a $576,750 loan fee for this loan.  AMC would in turn loan the money to WSI,

8    and WSI would in turn appear to be capable of making payments back to CCL on WSI's loan.

9    AMC and its principal owner guaranteed the loan payment to Old WCC.  However, CCL and the

10   Graysons knew that AMC and its principal owner were insolvent.  CCL, Grayson, Barclay

11   Grayson, Wiederhorn, and Mendelsohn kept secret from CCL's clients who purchased, and

12   provided the money for, the loan to Old WCC, that the money would be used to create the

13   illusion that WSI was current on its obligation to repay the money it owed CCL.  The insolvency

14   of AMC and its principal owner was not disclosed.

15   66. The transactions were set to take place on June 27, 1994.  To effectuate an agreement

16   between CCL and Grayson, and Old WCC and Wiederhorn, on June 22, 1994, Mark Peterman,

17   an attorney at Stoel Rives representing Old WCC, wrote a letter to Grayson attaching a proposed

18   letter that CCL was to sign and return to Old WCC on June 27, 1994.  The proposed letter set

19   forth terms that would effectively nullify Old WCC's obligation to repay the loan and

20   Wiederhorn and Mendelsohn's obligation to guarantee the loan and eliminate the collateral for

21   the loan and make the loan one in which the only recourse for payment and collateral to secure

22   the loan was the AMC note and guaranties from insolvent guarantors.  Grayson and CCL kept

23   the June 22, 1994 letter and its contents secret from CCL's clients.  CCL signed the June 22,

24   1994, letter at the closing of the loan.

25

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                                 RICO and Supplemental State Law     Attorneys at Law
                                 Claims (28 U.S.C. § 1331)           700 Pioneer Tower
                                                                     888 SW Fifth Avenue
                                                                     Portland, OR  97204-2021
                                                                     503 223 1510

1     67. The preparation of documents that say one thing, and a side letter that says another, is

2     a badge of subterfuge, and that someone—plaintiffs in this case—was being fooled.

3     68. As planned, on June 27, 1994, CCL as agent loaned $3.645 million of Investors'

4     money to Old WCC.  Wiederhorn and Mendelsohn did not guarantee this loan, and the collateral

5     described in the sale materials was not furnished.  By a letter that CCL signed and dated June 27,

6     1994, which accompanied the loan documents, the loan was made nonrecourse as to Old WCC,

7     Mendelsohn, and Wiederhorn, and the collateral described in the agreement was released.  The

8     only collateral provided was a security interest in the old AMC note.  The letter was substantially

9     identical to the letter that Peterman proposed five days earlier.

10    69. This was the beginning of a pattern involving a series of circular loans, reciprocal

11    loans, and favors by and among Wiederhorn, Mendelsohn, WCC, WFSG, Grayson, Barclay

12    Grayson, and CCL to make it appear as if an existing loan was performing.

13    70. When CCL, Grayson, Barclay Grayson, Old WCC, Wiederhorn, and Mendelsohn

14    sold participations in loans to plaintiffs, they did not disclose their history of using Investor

15    money to conceal the failure of an earlier loan.

16    71. CCL's and the Graysons' concealment of the default of the WSI loans continued

17    through September 2000 because the loans were never paid off.  Instead, CCL and the Graysons

18    sold participations in new notes that were made when the loans were extended.

19                    THE CASCADE GENERAL LOAN AND STOCK SALE

20    72. Less than two months after the WSI loan was funded on June 27, 1994, WSI was in

21    default.  Consequently, AMC was in default on its loan from Old WCC, and Old WCC was in

22    default on its loan from CCL's clients.  CCL and the Graysons concealed these defaults by

23    entering into a series of transactions that resulted in a loan of $8 million of CCL clients' funds to

24    a new corporation, Cascade General, which assumed most or all of the indebtedness that WSI

25    owed.  CCL and the Graysons then reported to CCL's clients that the WSI loan was repaid.

PLAINTIFFS' COMPLAINT
                                          RICO and Supplemental State Law
                                          Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    73. When Cascade General faltered under its huge debt load, CCL and the Graysons

2    concealed Cascade General's impending default by loaning as agent CCL client funds to Old

3    WCC, which in turn loaned that money to Cascade General, which in turn used that money to

4    make payments due on the loan.

5    74. More specifically, less than two months after the WSI bail out loan was funded by

6    CCL through WCC and AMC on June 27, 1994, WSI was in default, which in turn caused AMC

7    to default on its obligation to Old WCC. Old WCC made formal demand on AMC on August

8    19, 1994. AMC asked Grayson to tell AMC how to respond to WCC. Grayson responded by

9    creating another circular transaction to conceal the defaulting loans which enabled CCL to loan

10   further funds to a new borrower, Cascade General, which was one of WSI's competitors. In this

11   complex transaction, Grayson, and his agent, took control of Cascade through a leveraged buy

12   out by Ponderosa Acquisition Corporation (Ponderosa).

13   75. In preparation for the buy out, Grayson, through his agent, terminated WSI's business

14   operations on or about October 17, 1994. Grayson, through his agent, also organized Ponderosa

15   for the purpose of acquiring Cascade. On October 21, 1994, Ponderosa acquired all of the

16   outstanding shares of Cascade, which at that time had little or no debt on its corporate books.

17   Within a week of acquiring control of Cascade, Marine Finance Corporation (a bankruptcy

18   remote corporation set up at the direction of Grayson in an earlier WSI transaction), Cascade,

19   WSI and CCL entered into a Consent, Assumption, Modification and Consolidation Agreement

20   (Consolidation Agreement) at the direction of Grayson.

21   76. Under the terms of the Consolidation Agreement, Cascade agreed to assume

22   $6,244,431 of debts owed by Marine Finance Corporation to CCL, as well as other debts that

23   WSI owed to CCL's clients. The assumption of debt was documented by CCL as a satisfaction

24   of debts owed by Marine Finance Corporation and WSI and a new loan to Cascade General, so

25   CCL and Grayson could falsely assert that the loans were paid off in full.

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1        77. CCL then provided Cascade an $8.645 million line of credit taken out in two loans

2    pursuant to the agreement entered into on or about October 21, 1994:  a $5 million commitment

3    secured by approved accounts receivables and a $3.645 million loan which was in fact an

4    assignment and assumption of the debt owed by AMC to Old WCC.  CCL had taken Old WCC's

5    AMC note and had given full credit for it, and simply transferred its clients from the Old WCC

6    note to the AMC note.  The Ponderosa Transaction allowed Grayson to conceal the true nature of

7    the WSI loans, to report the WSI loans as satisfied in full, and to loan more money to a new

8    borrower and therefore collect a larger fee on these distressed loans.

9        78. Cascade, however, was now encumbered with new debt and had difficulty performing

10   on the loans.  Rather than report to its clients the loans were distressed, CCL again enlisted the

11   aid of Weiss Jensen and Old WCC to conceal a failing investment.  By June of 1995, CCL had

12   loaned more than $10 million to Old WCC.  At that time, Old WCC wanted to borrow more of

13   the funds under the control of CCL, and Grayson knew he needed assistance in covering up the

14   failing Cascade investment.

15       79. Grayson, CCL, and Weiss Jensen devised a plan to convert most of the Cascade

16   General debt into a preferred class of stock.  Pursuant to this plan, 90% of the almost $8 million

17   in debt that had been invested by CCL clients was exchanged for Class C Preferred Stock of

18   Cascade General, and the balance–about $800,000–was retained as debt.  The plan included an

19   agreement by Old WCC to purchase the Cascade General Class C Preferred Stock and debt from

20   CCL's clients, with the purchase price to be financed by new loans from CCL's clients.

21       80. Weiss Jensen participated in and materially aided the sale of the Cascade General

22   Class C Preferred Stock to CCL's clients and the subsequent sale of the Cascade General Class C

23   Preferred Stock to Old WCC by negotiating, preparing, and revising the necessary

24   documentation for the transactions.

25

      PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1      81. On November 20, 1995, Weiss Jensen, CCL's attorneys, sent Stoel Rives a proposal

2  for the Cascade General Stock Purchase Agreement, *i.e.* the agreement concerning the sale of the

3  Class C Preferred Stock.  Weiss Jensen prepared the documentation for CCL, issued opinion

4  letters approving the stock sale and purchase, and advised CCL in all aspects of the Cascade

5  General Stock Purchase Agreement and related transactions from 1995 through early 1998.  The

6  initial funding for the Purchase Agreement occurred on December 21, 1995.  The funding was

7  made with plaintiffs' assets and pursuant to the terms of the MLA.  In early 1996, Wilshire

8  borrowed $3 million from CCL under the MLA to purchase additional shares of the Cascade

9  General stock.  In 1997, WCC loaned a WCC-affiliated company, Wilshire Ventures

10  Corporation (WVC), some of the money borrowed from CCL under the MLA for the purpose of

11  enabling WVC to buy Cascade General shares held by CCL.  On August 15, 1997 WVC paid

12  $4.261 million to CCL for Cascade General stock.  WVC paid an additional $1.5 million to CCL

13  for a 59.9994% undivided participation interest in a loan made by CCL to Cascade General in an

14  original principal amount of $8.353 million.   At the completion of the WVC transaction, WCC

15  owned and/or controlled 95% of the Cascade General stock and CCL retained 5%.  During the

16  same time period, WCC made direct loans, funded with money borrowed from CCL, to Cascade

17  General and two of Cascade General's principal owners.

18      82. In December 1997, CCL funded its largest single loan to WCC in the amount of

19  $17.378 million.  The collateral pledged by WCC on this loan included notes from one of

20  Cascade General's principal owners totaling $8.696 million, a note from WVC to WCC

21  evidencing the $4.735 million originating from CCL loan proceeds, 2.486 million shares of

22  Cascade General stock and a Cascade note to WCC in the amount of $276,220.  The collateral

23  was determined to be insufficient so CCL, WCC and Cascade General conspired to create

24  "replacement" collateral, which they substituted for the original collateral in August of 1998.

25

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                                RICO and Supplemental State Law          Attorneys at Law
                                Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                                    888 SW Fifth Avenue
                                                                    Portland, OR  97204-2021
                                                                    503 223 1510

1    83. By the end of August 1998, CCL had loaned to WCC and Cascade General more than

2    three times the amount originally extended to WSI, all in an effort to hide from Plaintiffs the fact

3    that the original loan to WSI was incapable of being repaid by WSI.  This cover up by Grayson

4    cost the plaintiffs substantial sums of money and benefited Grayson, WCC, Wiederhorn and

5    Mendelsohn.

6    84. When CCL, Grayson, Barclay Grayson, Old WCC, Wiederhorn, and Mendelsohn

7    sold participations in loans plaintiffs, they did not disclose their history of using Investor money

8    to conceal the failure of earlier loans.

9                              THE CF CREDIT LOAN

10    85. In December 1995, Grayson and CCL were ordered to pay $2 million to the Oregon

11    Laborers-Employers Pension Trust ($1.7 million in cash, and $300,000 in deferred payments) in

12    settlement of a civil suit filed by the U.S. Department of Labor ("DOL").  The payment was a

13    disgorgement of profits received by CCL and the Graysons in collecting excessive management

14    fees for ERISA funds under their control.

15    86. In the fall of 1995, but before December 5, 1995, Grayson approached Wiederhorn

16    obtain a loan to pay the expected obligation because Grayson understood that it was likely the

17    DOL would require him to pay a substantial sum.  Wiederhorn agreed to make a loan to Grayson

18    if Grayson figured out a way to also make a loan to Wiederhorn using CCL's Investors' money.

19    87. A loan from Old WCC to Grayson or CCL, and a loan of CCL Investors' money to

20    CCL or Grayson, Barclay Grayson, under these circumstances, was a conflict of interest, a

21    breach of fiduciary duty, and also a prohibited transaction under ERISA, which if discovered

22    would have led to governmental investigation, civil lawsuits, and possible civil and criminal

23    sanctions.

24    88. Old WCC, Wiederhorn, Grayson, Barclay Grayson, and CCL arranged a cover up,

25    along with CF Credit, David Frey, and "Bud" Coleman to conceal the loan of Investor money to

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                          RICO and Supplemental State Law          Attorneys at Law
                          Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                          888 SW Fifth Avenue
                                                          Portland, OR  97204-2021
                                                          503 223 1510

1   Grayson.  Coleman is Wiederhorn's uncle.  Frey is an attorney in California with Foley

2   McIntosh Frey & Claytor, P.C.  Frey was also a principal of the defunct CF Credit.  He wrote a

3   letter falsely stating that his law firm had a client (CF Credit) "prepared to make a loan to" CCL

4   for the DOL obligation.  He further stated that the client was not involved with CCL or Grayson.

5   Frey knew the money CF Credit would loan to CCL and Grayson would come from Old WCC,

6   and Frey knew or should have known that the source of Old WCC funds were CCL's investors.

7   During two weeks in December 1995, CCL as agent loaned $10,000,000 of CCL Investor money

8   to Old WCC.  Part of that $10 million was $4.5 million of CCL Investor money that CCL loaned

9   as agent to Old WCC on December 27, 1995.  That same day, Old WCC loaned $5 million to CF

10  Credit, and CF Credit in turn immediately loaned $1,763,000 to Grayson.  Specifically, Old

11  WCC loaned approximately $5 million to Coleman, who later re-formed CF Credit.  CF Credit

12  then opened a line of credit for Grayson in the approximate amount of $5 million.  Apart from

13  this sham transaction, CF Credit had no business, assets, or liabilities.

14       89. Subsequently, CF Credit loaned Grayson $1,763,000 to pay the DOL obligation.

15  Grayson, Barclay Grayson, CCL, Wiederhorn, Mendelsohn, and Old WCC knew or should have

16  known that the money loaned to Grayson by CF Credit was money invested by some of the

17  plaintiffs and other CCL clients that had come from CCL via Old WCC.

18       90. CF Credit later transferred its Grayson loan to Old WCC, which then loaned Grayson

19  additional sums of $400,000 (January 1997), $400,000 (April 1997), $500,000 (December 1997),

20  $500,000 (January 1998) and $400,000 (April 1999).

21       91. When CCL, Grayson, Barclay Grayson, Old WCC, Wiederhorn, and Mendelsohn

22  sold participations in loans to plaintiffs, they did not disclose their history of using Investor

23  money in secret transactions to fund an  obligation of CCL and Grayson to pay a settlement of

24  DOL of charges of excessive management fees.

25

PLAINTIFFS' COMPLAINT            **ESLER, STEPHENS & BUCKLEY**
                                      RICO and Supplemental State Law            Attorneys at Law
                                      Claims (28 U.S.C. § 1331)            700 Pioneer Tower
                                                            888 SW Fifth Avenue
                                                            Portland, OR  97204-2021
                                                            503 223 1510

1      92. When CCL, Grayson, Barclay Grayson, Old WCC, Wiederhorn, and Mendelsohn

2    sold participations in loans to plaintiffs, they did not disclose their history of using Investor

3    money to conceal Grayson's misappropriation of Investor money.

4                            "THE HAND THAT FEEDS YOU!" LOAN

5      93. When Consilium was providing appraisal services to Old WCC and CCL, one of

6    Consilium's principals, Larry Tapanen, asked for and received substantial loans through CCL

7    and Grayson from CCL clients to his wife to operate a food business known as "The Hand that

8    Feeds You!"

9      94. As *quid pro quo* for the loans, Consilium and Tapanan provided overstated appraisals

10   of collateral for various loans, participations in which CCL, Grayson, Barclay Grayson, Old

11   WCC, Wiederhorn, and Mendelsohn sold to some of the plaintiffs and other CCL clients.

12     95. CCL, Grayson, Barclay Grayson, Old WCC, WFSG, Wiederhorn, and Mendelsohn

13   knew or should have known of, and benefited from, this arrangement, which overstated the value

14   of the Old WCC collateral.

15     96. In 1994 and thereafter, CCL as agent made two loans of Investor funds to The Hand

16   That Feeds You!, each in the approximate amount of $2 million to $2.5 million—one

17   collateralized, and one a private unsecured note.  After approximately $650,000 was repaid, one

18   of the loans went into default.

19     97. In 1997, CCL believed that The Hand That Feeds You! was falsifying its books to

20   substantiate collateral necessary to continue the line of credit.

21     98. To hide the loss on the two loans from CCL's clients for the reasons described above

22   in connection with hiding the WSI transaction, Grayson asked Wiederhorn if Old WCC would

23   purchase these two loans at face value.  Wiederhorn and Old WCC agreed, but only if Grayson

24   provided his personal guarantee for those two loans.  Old WCC's source of funds to purchase the

25   two loans was another loan through CCL of CCL's Investors' money.  To satisfy the requirement

        PLAINTIFFS' COMPLAINT
                               RICO and Supplemental State Law
                               Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1  for a personal guaranty, Grayson pledged his stock in CCL and other personal assets, including

2  his house.

3       99. When CCL, Grayson, Barclay Grayson, Old WCC, Wiederhorn, and Mendelsohn

4  sold participations in loans to plaintiffs, they did not disclose their history of loaning money to

5  an insider in exchange for overstated appraisals, or of the above-described steps taken to conceal

6  the failure of the loan to an insider.

7       100.    Consilium, Moss Adams, and other professional advisers to CCL and Old WCC

8  knew or in the exercise of reasonable care should have known these facts, and knew or in the

9  exercise of reasonable care should have known that CCL and the Graysons were keeping these

10  facts secret from present and future investors.

11                      PERSONAL LOANS TO JEFFREY GRAYSON

12       101.    The Graysons were aware by January 1997 that Old WCC had materially

13  breached the terms of the collateralized note program Master Loan Agreement described below.

14  The Graysons also knew that if information about Old WCC's default were provided to plaintiffs

15  and CCL's other clients, CCL's relationship with its clients would be damaged, and its ability to

16  raise money for further agency loans to Old WCC, and thus make enhanced management fees,

17  would be severely impaired.

18       102.    By February 13, 1997, Linda Lucas, chief operating officer of CCL, prepared a

19  draft of a letter to Wiederhorn setting forth numerous serious and significant breaches of the

20  Master Loan Agreement.  These breaches included impairment of collateral, entering into

21  prohibited transactions that reduced Old WCC's ability to repay the loans, and inappropriate and

22  massive distributions of cash and property from Old WCC to Wiederhorn and Mendelsohn

23  ($42,970,000).  The letter also described numerous material misrepresentations that Old WCC,

24  Wiederhorn, and Mendelsohn made to CCL.  At Grayson's direction, this letter was never put in

25  final form.

PLAINTIFFS' COMPLAINT         **ESLER, STEPHENS & BUCKLEY**
                         RICO and Supplemental State Law    Attorneys at Law
                         Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                            888 SW Fifth Avenue
                                                            Portland, OR  97204-2021
                                                            503 223 1510

1       103.     Simultaneously with CCL's and Grayson's decision not send formal notice to Old

2    WCC of the breaches of the Master Loan Agreement, Grayson borrowed $400,000 from Old

3    WCC, which loan was followed by a series of additional loans to Grayson from entities owned or

4    controlled by Wiederhorn and Mendelsohn:

5          a.   On or about January 30, 1997, Grayson borrowed $400,000 from Old WCC and

6               executed a promissory note in that amount in favor of Old WCC and agreed to

7               repay the principal and interest on March 1, 1997.  As security for that note,

8               Grayson pledged all his interest in 925 Park Avenue Associates, LLC, including

9               his 100 percent membership interest and 100 percent of his right, title, and interest

10              in the management contract between Grayson and West Coast Hotels, Inc.

11         b.   On or about April 18, 1997, Grayson borrowed $400,000 from Old WCC or

12              another entity owned or controlled by Wiederhorn and Mendelsohn.

13         c.   On or about December 18, 1997, Grayson borrowed $500,000 from Old WCC or

14              another entity owned or controlled by Wiederhorn and Mendelsohn.

15         d.   On or about January 8, 1998, Grayson borrowed $500,000 from Old WCC or

16              another entity owned or controlled by Wiederhorn and Mendelsohn.

17         e.   On or about April 1, 1999, Grayson borrowed $411,587.72 from Wilshire

18              Funding Corporation (WFC) and executed a promissory note in that amount in

19              favor of WFC and agreed to repay the principal and interest over 180 months.  As

20              security for that note, Grayson provided a trust deed to his residence at 5315 S.W.

21              Patton Road, Portland Oregon 97201.

22       104.     At the time the loans were made, Grayson, Barclay Grayson, Wiederhorn,

23    Mendelsohn, and the involved Wilshire entities knew that the loans and the concealment of Old

24    WCC's defaults were breaches of the fiduciary duty that CCL and the Graysons owed plaintiffs.

25

      PLAINTIFFS' COMPLAINT      **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law    Attorneys at Law
                        Claims (28 U.S.C. § 1331)         700 Pioneer Tower
                                              888 SW Fifth Avenue
                                            Portland, OR  97204-2021
                                            503 223 1510

1   105. The loans were made by Wiederhorn and Mendelsohn via the Wilshire entities in

2 exchange for CCL's and the Graysons (1) hiding from plaintiffs and other CCL clients the living

3 proof of the risks associated with purchasing private investment securities that CCL had offered,

4 and (2) inducing plaintiffs and other CCL clients to continue and increase their purchases of loan

5 participations in the collateralized notes.  Many of the plaintiffs purchased collateralized note

6 securities after Old WCC's above-described breaches of the Master Loan Agreement.

7   106. When CCL, Grayson, Barclay Grayson, Old WCC, Wiederhorn, and Mendelsohn

8 sold participations in loans to plaintiffs, they did not disclose their history of Old WCC's

9 personal loans to Grayson in exchange for concealment of Old WCC's breaches of the Master

10 Loan Agreement, or of their history of engaging in the above-described breaches of fiduciary

11 duty to CCL clients.

12        THE COLLATERALIZED NOTE PROGRAM

13   107. Plaintiffs sustained nearly all of the damages they seek in this action because

14 CCL, Grayson, Barclay Grayson, Old WCC, Wiederhorn, Mendelsohn, their professional

15 advisers, and others sold or participated in or materially aided the unlawful sale of securities that

16 consisted of loan participations in the collateralized notes.

17   108. By the time of CCL's collapse and the appointment of a receiver by the court in

18 September 2000, CCL approximately 340 clients consisting of union trust funds and other

19 investors.  CCL managed about $1 billion.  Of this $1 billion, CCL sold approximately $319

20 million in loan participations in the collateralized notes, and approximately $161 million in

21 various other private placement investments.  For clients who purchased private placement

22 investments, CCL had discretionary authority and control to invest their funds in specific private

23 placement investments.

24   109. In the collateralized note program, CCL, as agent, invested specific clients' funds

25 in participation interests in loans that CCL made as agent for specific clients.  The borrowers

PAGE 28 of 122   PLAINTIFFS' COMPLAINT   **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law  Attorneys at Law
Claims (28 U.S.C. § 1331)   700 Pioneer Tower
                 888 SW Fifth Avenue
                 Portland, OR  97204-2021
                 503 223 1510

1    pledged collateral to secure the loans made by CCL as agent for specific clients.  For clients who

2    participated in the collateralized note program, CCL had discretionary authority and control to

3    invest their funds in specific loan participation interests.  CCL charged the specific clients who

4    participated in the program a 3% annual management fee based on the appraised value of the

5    loans, which was dependent upon the appraised value of the collateral securing the loans.

6        110.    Although the securities that CCL sold in the collateralized note program were

7    participations in loans that CCL made as agent for specific clients to WCC where the collateral

8    was notes and residential mortgages of sub-prime borrowers and servicing rights, CCL and the

9    Graysons represented to plaintiffs and other investors, to persuade them to invest, that the

10   investment they purchased had a risk level comparable to government issued securities, money

11   market funds, or guaranteed investment contracts.  In fact, most of the loans were made to high-

12   risk borrowers that were either new companies with no operating or financial history to support

13   loan repayment requirements, or were involved in economically risky industries such as sub-

14   prime auto loans, South American wood products, and travel agencies.

15       111.    CCL and the Graysons also stated that the loans in the collateralized note program

16   would be insured with credit insurance or a 15 percent cash holdback, and could be liquidated in

17   30 days or less.

18       112.    CCL and the Graysons also stated to the Investors that there were multiple

19   primary obligors on the collateralized notes, and that CCL used a large committee of

20   professionals (instead of only Grayson, and perhaps at times Barclay Grayson) to conduct an

21   evaluation of the borrower before underwriting a loan.  The evaluation would include assessing

22   the economics of the borrower's business, analyzing the projected cash flow, assessing the

23   borrower's repayment plans, and analyzing the credit reports, collateral, tax returns, and financial

24   statements of the borrower.  The committee of "10+ investment professionals" was to include

25   portfolio managers, investment analysts, loan administrators, and servicing individuals.

PLAINTIFFS' COMPLAINT
                    RICO and Supplemental State Law
                    Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

## THE JULY 1995 MASTER LOAN AGREEMENT

113.    On July 7, 1995, CCL and Old WCC entered into a Master Loan Agreement, under which CCL agreed to loan, as agent, its clients' money, including some of plaintiffs' money, to Old WCC to begin the collateralized note program.  The loans to Old WCC were to be in amounts equal to the lesser of:

    a.    The sum of 90% of the net present value of pledged servicing rights plus 85% of certain eligible loan receivables plus the face amounts of certificates of deposit held by CCL for the benefit of WCC; or

    b.    $10,527,500.  (Pursuant to a series of amendments to the Master Loan Agreement, the Maximum Amount of the loan from CCL to Old WCC increased to $150,000,000.

114.    In determining the present value of servicing rights, the Master Loan Agreement required the use of a fixed discount rate of 9%.  Given that the resulting value of the collateral was dependent upon the discount rate used, the use of a mandated low discount rate led to a significant overvaluation of the servicing rights collateral given the risk associated with that kind of collateral under the circumstances.  Advances under the Master Loan Agreement were originally at an interest rate of prime + 4%, and were made in a series of 11 separate loans, each individually documented and secured by discrete loan pools and servicing rights.  This overvaluation was not disclosed to plaintiffs.  Wiederhorn and Mendelsohn personally guaranteed the loans.

115.    Before executing the Master Loan Agreement, CCL as agent for specific clients made loans to Old WCC, some or all of which were incorporated into the Master Loan Agreement.

116.    The Master Loan Agreement contained the following restrictions and conditions, which were designed to protect plaintiffs' investment:

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1      a.  The loan proceeds were to be used for loan expenses and general operating capital

2         of Old WCC;

3      b.  Independent appraisals were to be done quarterly on the value of the collateral

4         securing the loans;

5      c.  Old WCC was at all times to maintain a positive net worth;

6      d.  Old WCC was not at any time to do anything which would impair the collateral;

7      e.  Loans to Old WCC would be for a relatively short term (two to five years), to be

8         extended only if the borrower was not in default;

9      f.  Loans to Old WCC would be adequately secured with cash collateral, credit

10        insurance, contract rights, and the borrower's loan receivables; and

11     g.  Old WCC was not to do anything fraudulent.

12     h.  Each loan was to be secured by a "first position security interest in separate

13        collateral.

14    117.  When CCL originally entered into the Master Loan Agreement, Old WCC was in

15 the business of acquiring and servicing loan portfolios and mortgage-backed securities.  As

16 originally contemplated, CCL, in making loans as agent for specific clients to WCC, would take

17 as collateral all of WCC's rights in the loans and loan pools acquired within a portfolio, as well

18 as all servicing rights related thereto.  The main collateral pledged by Old WCC under the

19 Master Loan Agreement were the Servicing Fees that Old WCC expected to earn pursuant to

20 Servicing Contracts that granted Servicing Rights to Old WCC.  "Servicing Rights" are rights

21 under Servicing Contracts under which Old WCC provided billing, portfolio administration, and

22 collection services with respect to loans and loan pools in exchange for Servicing Fees.  The

23 loans and loan pools were owned by Old WCC and others.  "Servicing rights" and "Servicing

24 contracts" have value that depends on the fees to be generated by the service provider.

25

PAGE 31 of 122        PLAINTIFFS' COMPLAINT       **ESLER, STEPHENS & BUCKLEY**
                       RICO and Supplemental State Law    Attorneys at Law
                       Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                 888 SW Fifth Avenue
                                               Portland, OR  97204-2021
                                             503 223 1510

118.    The Master Loan Agreement defined the term "Servicing Contracts" to mean "the participation and servicing agreements between Borrower and the party or parties named therein under which Borrower is entitled to collect Servicing Fees in consideration for Borrower's providing of loan portfolio management services (including billing, portfolio administration and collection services."

119.    The Master Loan Agreement defined the term "Servicing Fees" to consist of "any and all amounts payable to Borrower under the Servicing Contracts."

120.    The Master Loan Agreement provided for a professional appraiser to appraise the collateral that Old WCC pledged.  The appraiser was agreed to be Consilium.  By amendment to the Master Loan Agreement dated December 26, 1995, the parties agreed that the appraisals were to be performed each quarter.

121.    The Master Loan Agreement provided the following valuation criteria with respect to Servicing Fees:  "Present Value of Servicing Fees means the net present value of those Servicing Fees that, by terms of the applicable Servicing Contract, are guaranteed to be paid to Borrower notwithstanding that such Servicing Contract may be canceled or terminated."

122.    Pursuant to provisions in the Master Loan Agreement and the actual course of performance, Old WCC, Wiederhorn, and Mendelsohn exercised authority and control respecting the management and control of the Investors' assets.  For example, the Master Loan Agreement provides:

a.    Old WCC is delegated the authority and duty to hire and supervise appraisers to value the collateral for the benefit of the Investors, and upon which loan advances were made;

b.    Old WCC is delegated the authority and duty to provide estimates of the value of the collateral for the benefit of the Investors, and upon which loan advances were made;

PAGE 32 of 122          PLAINTIFFS' COMPLAINT
                        RICO and Supplemental State Law
                        Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    c. Old WCC is delegated the authority to prevent the outstanding balance from

2      exceeding the Borrowing Base or the Maximum Loan Amount; and

3    d. Old WCC is delegated the authority and duty to act exclusively for the benefit of

4      the Investors regarding the advance and handling of funds, remittance of funds,

5      and the preservation of collateral.

6  123. As a result, Old WCC, Wiederhorn, and Mendelsohn were fiduciaries with respect

7 to plaintiffs.

8  124. CCL represented to plaintiffs that these protections were in the Master Loan

9 Agreement, and they would be enforced. Old WCC was aware that these representations would

10 be made to, and relied upon by, plaintiffs.

11  125. Old WCC, Mendelsohn, and Wiederhorn knew that the Master Loan Agreement

12 would be funded by CCL's clients.  They knew that the collateral appraisal requirement in the

13 contract was for the purpose of protecting the collateral and providing for a meaningful

14 evaluation of whether the loans were properly, safely, and adequately secured.

15  126. The accountants, appraisers, and lawyers hired by Old WCC and CCL to assist

16 them in connection with the to the Master Loan Agreement and the transactions flowing from the

17 Master Loan Agreement also knew this purpose of the collateral appraisal requirement.

18  127. From July 1995, through September 27, 1996, Old WCC borrowed approximately

19 $75 million from CCL's clients including plaintiffs.  Old WCC was supposed to use this money

20 to purchase loan pools, for which it provided servicing rights, and to acquire servicing rights

21 from third parties.  Much of the money, however, went to Wiederhorn and Mendelsohn, who

22 removed in excess of $60 million from Old WCC during this period.

23       FIRST IMPAIRMENT OF COLLATERAL

24

25

   PLAINTIFFS' COMPLAINT   **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law  Attorneys at Law
Claims (28 U.S.C. § 1331)    700 Pioneer Tower
               888 SW Fifth Avenue
               Portland, OR  97204-2021
               503 223 1510

1    128.    From July 1995 through December 1996, the collateral pledged by Old WCC as

2    security pursuant to the Master Loan Agreement consisted of a combination of loans, loan pools,

3    and servicing rights.

4    129.    In 1996, Wiederhorn and Mendelsohn formed a new corporation named Wilshire

5    Financial Services Group, Inc. ("WFSG").  Before WFSG was incorporated in 1996, Old WCC

6    and various affiliated entities did business as Wilshire Financial Services Group.

7    130.    As of December, 24, 1996, Old WCC stopped purchasing mortgage loan pools,

8    and instead engaged primarily in the business of servicing mortgage loan pools owned by WFSG

9    and others.

10    131.    As a result, after the end of 1996, servicing rights and servicing contracts became

11    the only kind of collateral that Old WCC pledged as security under the Master Loan Agreement.

12    132.    Most of Old WCC's loan servicing was done for WFSG and its affiliates,

13    including Wilshire Financing Corporation ("WFC") and Wilshire Servicing Corporation

14    ("WSC").

15    133.    In the fall of 1996, Wiederhorn and Mendelsohn decided to take WFSG public

16    through an initial public offering.  Following that offering, WFSG and its subsidiaries would

17    acquire loan portfolios and mortgage-backed securities instead of Old WCC.  Old WCC would

18    only service loans for WFSG.  It would no longer purchase any loan portfolios.

19    134.    In accordance with this strategy, in the fourth quarter of 1996, WFSG made its

20    initial public offering, and formed new subsidiaries to undertake the loan acquisition and

21    servicing business then conducted by Old WCC and its affiliates.

22    135.    Mendelsohn and Wiederhorn used the Investors' funds they took from Old WCC

23    to create and fund WFSG.  This violated the Master Loan Agreement.  In the WFSG registration

24    statement for its initial public offering, filed in October 1996, Wiederhorn and Mendelsohn

25    falsely represented that they were investing $30 million of their own money in the new company.

PAGE 34 of 122          PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law          Attorneys at Law
                        Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                          888 SW Fifth Avenue
                                                          Portland, OR  97204-2021
                                                          503 223 1510

1    136.    In conjunction with the WFSG initial public offering in November 1996,

2    Wiederhorn, Mendelsohn, Old WCC, and WFSG entered into a Loan Servicing Agreement dated

3    as of November 15, 1996 requiring that:

4        a.   Old WCC would not compete with WFSG for loan portfolios;

5        b.   Old WCC would cease servicing its loans and loan pools within two years;

6        c.   WFSG had the option of using or not using Old WCC to service WFSG's loans;

7        d.   Old WCC was not guaranteed any servicing fees within the meaning of the

8            definition of "present value of servicing fees" in the Master Loan Agreement;

9        e.   The amount of Old WCC's monthly fee for servicing any particular loan portfolio

10            was to be negotiated on a portfolio by portfolio basis;

11        f.   Any loan servicing rights owned by Old WCC would be transferred within two

12            years to a newly created company, Wilshire Servicing Company (wholly owned

13            by WFSG), thereby terminating Old WCC's servicing rights.

14    137.    The Loan Servicing Agreement contained no restriction on WFSG selling or

15    otherwise transferring loan pools to third parties, who could then use someone other than Old

16    WCC to service the loans.  Because WFSG could terminate Old WCC's servicing operation or

17    sell the servicing rights, Old WCC's servicing rights were largely compromised following the

18    Loan Servicing Agreement.

19    138.    From November 1996 forward, Old WCC's right, title, and interest in the Loan

20    Servicing Agreement was the primary collateral that Old WCC pledged pursuant to the Master

21    Loan Agreement.

22    139.    The separation of servicing rights from the ownership of the loans, the transfer of

23    servicing rights to Wilshire Servicing Company, and the requirement that Old WCC not compete

24    with WFSG for loan portfolios each materially impaired the value of the collateral which

25    supported the Old WCC debt.  These agreements breached the Master Loan Agreement.

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1        140.    Because of its lending arrangements, WFSG did not own any servicing rights.

2    Therefore, it could not convey any servicing rights to Old WCC.

3        141.    Under its lending arrangements, WFSG did not own any loans or loan pools other

4    than loans or loan pools that WFSG had pledged in their entirety to a lender.  WFSG could not

5    convey any interest in the loans or loan pools to any person other than WFSG's lenders.

6        142.    WFSG and its subsidiaries purchased mortgage loan pools and loans on margin,

7    borrowing up to 95% of the purchase price from lenders such as Bear Stearns, CS First Boston

8    Mortgage Capital, and Prudential Securities Realty Funding Corp.

9        143.    To borrow the money to purchase the loans and loan pools, WFSG was required

10    to convey pursuant to a repurchase agreement, or pledge to the lender, or grant a first priority

11    security interest in, all right, title, and interest in the mortgage loan pool or loans being

12    purchased.  Such conveyances or pledges or grants of security interests included all servicing

13    rights associated with the loan pools or loans.

14        144.    For example, in November 1996, WFC entered into a Master Repurchase

15    Agreement with CS First Boston, under which WFC borrowed money and conveyed all right,

16    title, and interest in certain loans and loan pools to First Boston via a third party custodian.  WFC

17    agreed to repurchase those loans and loan pools at a future date.  Following that conveyance by

18    WFC to First Boston, WFC's rights in the loans and loan pools were set forth in a Custodial and

19    Servicing Agreement.  The Repurchase Agreement required WFC to maintain specific values in

20    its margin account, which was based on the then current market value of the loan pools and loans

21    conveyed to First Boston.  In the event of a default by WFC—such as failure to remain solvent

22    or make up deficiencies in the margin account—First Boston retained ownership of the loans and

23    loan pools, together with all servicing rights and income.

24        145.    WFSG entered into a similar arrangement involving a pledge agreement rather

25    than a repurchase agreement with Prudential Securities in November 1996.  This arrangement

    PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1  involved the delivery of all papers evidencing ownership of the loans to a third party custodian.

2  In the event of default, Prudential had the right to seize and sell the loans and loan pools and the

3  associated servicing rights.

4      146.    These agreements breached the Master Loan Agreement, and they materially

5  impaired the value of the servicing rights collateral.

6      147.    At the end of October 1996, the value of Old WCC was negative $1.1 million, and

7  Old WCC was operating at a net loss for the third quarter of 1996.  That Old WCC had a

8  negative value breached the Master Loan Agreement.

9      148.    CCL, Old WCC, Grayson, Barclay Grayson, Wiederhorn, Mendelsohn, and their

10  professional advisers did not disclose any of these facts to plaintiffs.

11      149.    CCL did not do any serious due diligence or analysis of the impacts of Old

12  WCC's 1996 restructuring upon CCL's collateral value or loan repayment risk.  Following the

13  restructure, CCL as agent for specific clients including plaintiffs lent over $81,000,000 in new

14  additional loans to Old WCC secured by Old WCC's servicing rights, and, together with

15  Grayson, Barclay Grayson, Old WCC, Wiederhorn, and Mendelsohn, sold participations in those

16  loans to some or all of the plaintiffs and other CCL clients.

17  RELEASES OF CASH COLLATERAL

18      150.    Following its initial public offering, WFSG used the funds raised to significantly

19  expand its acquisition of loan pools and mortgage-backed securities.  From September 1998

20  forward, the market value of the loans and loan pools that WFSG had pledged to its lenders as

21  collateral began to drop.  As of October 1998, WFSG was indebted to its lenders in the principal

22  amount of $184 million.

23      151.    In the fourth quarter of 1998, adverse interest rate fluctuations caused WFSG to

24  have to liquidate a substantial portion of its loan portfolios to pay margin or capital calls imposed

25  by its lenders.

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    152.    On or about October 15, 1998, just weeks before CCL, Old WCC, and their

2    respective principals began maneuvering toward WFSG's bankruptcy and reorganization, Old

3    WCC received margin or capital calls from its creditors in excess of $40 million, and was

4    required to make payments to its creditors.  Old WCC was unable to make those payments due to

5    its lack of capital.  CCL, the Graysons, Old WCC, Wiederhorn, Mendelsohn, Moss Adams, and

6    Consilium were aware that Old WCC was unable to meet the calls.

7    153.    In addition, because of WFSG's practice of using certain funds collected on

8    account of loans it serviced for its wholly owned banking subsidiary, First Bank of Beverly Hills,

9    F.S.B. ("First Bank"), WFSG was forced by the Office of Thrift Supervision to return

10   immediately $15 million in funds to First Bank.  WFSG and Old WCC went to CCL for

11   assistance with this crisis.

12   154.    Due to the margin calls, WFSG and its subsidiaries lost substantially all of their

13   loans and loans pools and the accompanying service business.

14   155.    In addition, pursuant to their agreements with WFSG and WFSG's subsidiaries,

15   WFSG's lenders seized other loans and loan pools, and transferred the servicing business to

16   other servicers.

17   156.    Pursuant to the Loan Servicing Agreement, each time one of WFSG's loans or

18   loan pools was sold or seized by a lender, Old WCC lost servicing business.

19   157.    In response to the margin calls, CCL, as agent for specific plaintiffs and other

20   CCL clients, loaned Old WCC an additional $25.3 million to cover margin calls and monies the

21   WFSG owed to First Bank.  These new loans were made pursuant to the Seventh Amendment to

22   the Master Loan Agreement dated October 15, 1998.

23   158.    As part of the collateralized note program, Bear Stearns held $19.3 million in a

24   cash collateral account as of October 15, 1998.  The cash collateral account was established to

25

PAGE 38 of 122          PLAINTIFFS' COMPLAINT              **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law    Attorneys at Law
                        Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                           888 SW Fifth Avenue
                                                           Portland, OR  97204-2021
                                                           503 223 1510

1   secure the loans, participations in which CCL, Old WCC, Grayson, Barclay Grayson,

2   Wiederhorn, and Mendelsohn sold to some or all of the plaintiffs.

3       159.    Pursuant to the Seventh Amendment to the Master Loan Agreement, CCL, Old

4   WCC, and their respective principals caused Bear Stearns to release funds in the cash collateral

5   account to pay Old WCC's general creditors.  As a result of these transactions, CCL and Old

6   WCC and their principals arranged for the release of most of the cash collateral, and increased

7   Old WCC's debt by $25 million.

8       160.    The principals and professional advisers of CCL and Old WCC, including Bear

9   Stearns, knew of this breach of fiduciary duties by CCL at or before the time the breach

10  occurred, but did not disclose it to the Investors or take any action to prevent it from happening.

11  In fact, CCL's and Old WCC's professional advisers assisted them in developing and arranging

12  this breach.

13      161.    When CCL, the Graysons, Old WCC, WFSG, Wiederhorn, and Mendelsohn sold

14  participations in loans to plaintiffs and others, they did not disclose the risk that the collateral

15  securing the loans could be lost by adverse interest rate changes and margin calls by WFSG's

16  lenders.  In addition, they did not disclose that the loans that CCL was making as agent for

17  specific plaintiffs to Old WCC were ones that WFSG's lenders refused to make.  In other words,

18  there was no disclosure that the loan participations that plaintiffs purchased were of the highest

19  risk and collateralized by collateral that was either unacceptable to WFSG's other lenders or

20  junior to WFSG's senior security or ownership interests.

21                          FAKE NOTES FROM SPECIALTY FINANCE

22      162.    On September 30, 1998, Ted Wiederhorn, (brother of Andrew Wiederhorn),

23  ostensibly on behalf of Specialty Finance Investors, LLC ("SFI") executed promissory notes in

24  favor of Andrew Wiederhorn for $5,210,853, and in favor of Tiffany Wiederhorn (wife of

25  Andrew Wiederhorn) for $380,147.  Ted Wiederhorn had resigned as Manager of SFI on

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law      Attorneys at Law
                        Claims (28 U.S.C. § 1331)            700 Pioneer Tower
                                                             888 SW Fifth Avenue
                                                             Portland, OR  97204-2021
                                                             503 223 1510

1   September 1, 1998, one month before executing the promissory notes.  Thus, he was not

2   authorized to sign notes for SFI.

3      163. As of September 30, 1998, SFI was worth not more than $300,000, the amount

4   shown in the capital accounts of the three initial members.  In addition, as of then, the Capital

5   Manager of SFI was Chris Tassos, who was also an officer of WFSG.  Ted Wiederhorn,

6   Wiederhorn, Tiffany Wiederhorn, and Mendelsohn were aware of the financial status of SFI.

7      164. The promissory notes from SFI were not valid or enforceable because Andrew

8   and Tiffany Wiederhorn had not given value for them.  Rather, they were created to obtain

9   additional funds from CCL's clients including plaintiffs for Andrew Wiederhorn and

10  Mendelsohn or companies they controlled.

11     165. On October 15, 1998, to secure a loan from CCL's clients, Andrew Wiederhorn

12  entered into a pledge and security agreement, under which he pledged 3,242,128 shares of

13  WFSG stock and the "SFI" promissory note to CCL.  On the same date, to secure the loan from

14  CCL, Tiffany Wiederhorn pledged her "SFI" note to CCL.

15     166. The next day, on October 16, 1998, CCL and Old WCC entered into the Eighth

16  Amendment to Master Loan and Security Agreement ("Eighth Amendment"), under which CCL,

17  as agent, agreed to lend $6 million to Old WCC. The purpose of the loan was, at least in part, to

18  fund SFI.  Approximately $5.4 million of the $6 million loaned by CCL, as agent, to Old WCC

19  was transferred to SFI.

20          THE RESTRUCTURING AND BANKRUPTCY

21     167. As a part of the Eighth Amendment to the Master Loan Agreement, Old WCC,

22  Wiederhorn, and Mendelsohn represented that the Wilshire entities had no intention of filing or

23  initiating bankruptcy proceedings.  In fact, they were already contemplating a prepackaged

24  bankruptcy, which was ultimately filed in March 1999.

25

   PLAINTIFFS' COMPLAINT   **ESLER, STEPHENS & BUCKLEY**
          RICO and Supplemental State Law  Attorneys at Law
          Claims (28 U.S.C. § 1331)     700 Pioneer Tower
                        888 SW Fifth Avenue
                        Portland, OR  97204-2021
                        503 223 1510

1    168.    As a part of the Eighth Amendment to the Master Loan Agreement, Old WCC,

2    Wiederhorn, and Mendelsohn represented that WFSG and WREIT had an aggregate

3    shareholder's equity of above $200 million.  In fact, they knew this was not true.

4    169.    As a part of the Eighth Amendment to the Master Loan Agreement, Old WCC,

5    Wiederhorn, and Mendelsohn represented that Old WCC was not insolvent.  In fact, they knew

6    this was not true.

7    170.    Despite the receipt of over $25 million from CCL's clients, WFSG's financial

8    condition continued to decline.  By November 1998, WFSG's lenders threatened to shut down

9    WFSG's operations unless Wiederhorn and Mendelsohn turned over the company.  By

10   December 1998, WFSG, certain of its affiliates, Old WCC, CCL, and WFSG's lenders agreed to

11   a new comprehensive restructure and reorganization of WFSG, Old WCC, and affiliated

12   companies.

13   171.    Pursuant to a restructure agreement formed in January 1999 between CCL, Old

14   WCC, WFSG, Grayson, Barclay Grayson, Wiederhorn, and Mendelsohn, a restructure of the Old

15   WCC loans was to be accomplished in conjunction with a prepackaged bankruptcy

16   reorganization filing by WFSG that would exchange the bond debt for 99% of the stock in

17   WFSG.

18   172.    Pursuant to the restructure agreement, CCL's borrowers, Portland Servicing

19   Corporation ("PSC") and Old WCC, merged, with Old WCC becoming the surviving entity.

20   PSC was a sister corporation to Old WCC, with the same owners and managers.  Wiederhorn and

21   Mendelsohn, the sole shareholders of PSC and Old WCC, transferred all of their existing shares

22   in the surviving Old WCC to W-M LLC, an Oregon limited liability company, of which

23   Wiederhorn and Mendelsohn were the sole members.

24   173.    Pursuant to the restructure agreement, CCL contemporaneously formed a new

25   wholly owned subsidiary, CWH Mergco Corp., an Oregon corporation ("CWH Mergco Parent"),

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1   which in turn formed its own wholly owned subsidiary, CWH Mergco Sub Corp., a Nevada

2   corporation (CWH Mergco Sub"). CWH Mergco Sub thereafter merged with Old WCC, with

3   Old WCC becoming the surviving entity. On September 1, 1999, Old WCC changed its

4   corporate name to Capital Wilshire Holdings, Inc. a Nevada corporation ("CWH").

5       174.   As a result of the merger, CCL became the owner of 99% of the issued and

6   outstanding shares of CWH Parent, which was the 100% owner of CWH. W-M LLC became the

7   owner of the remaining 1% of CWH Parent's outstanding shares. Thus, as a result of the merger,

8   CCL became the 99% owner of the 100% owner of CCL's borrower, now known as CWH.

9       175.   Pursuant to the restructure agreement, CCL released its lien on the existing

10   collateral held by CWH under the terms of the Master Loan Agreement, and CCL released

11   Wiederhorn and Mendelsohn from their personal guarantees.

12       176.   Pursuant to the restructure agreement, WCC, Inc., a Nevada corporation ("New

13   WCC"), was newly formed. CWH transferred all of its assets and liabilities to New WCC except

14   for obligations that CWH owed to CCL under the Master Loan Agreement. The transfer

15   included the collateral (*i.e.*, the servicing rights under the Loan Servicing Agreement) securing

16   the obligations that CWH owed to CCL. In exchange, New WCC granted to CWH (CCL's new

17   borrower) 1,000 shares of New WCC's Class B Non-Voting stock. The Class B Non-Voting

18   stock that CWH held represented 49.99% of New WCC's equity. The Class B stock was entitled

19   to participate pro rata with the other common stock (Class A) in dividends, and was entitled to a

20   minimum liquidation guarantee of $19.3 million. The Class B stock was convertible into such

21   number of Class A shares as would represent 49.99% of the outstanding shares of Class A stock

22   in New WCC. Finally, the Class B stock was convertible into up to 42.75% of the stock of

23   WFSG no earlier than June 2001.

24       177.   Pursuant to the restructure agreement, WFSG acquired all 900 shares of New

25   WCC's Class A stock, which represented 50.01% of the equity interests in New WCC. WFSG

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2021
503 223 1510

1    acquired the Class A stock in exchange for contributing all of WFSG's stock in Wilshire

2    Servicing Corporation ("WSC"), a Delaware corporation and wholly owned subsidiary of WFSG

3    created in late 1996.  WSC was in the business of servicing loan portfolios.  WFSG delivered to

4    CCL a $350,000 promissory note and a $2.2 million promissory note.  Wiederhorn and

5    Mendelsohn personally guaranteed the $2.2 million note.

6         178.    Pursuant to the restructure agreement, CWH then pledged its Class B New WCC

7    stock to CCL as collateral to secure the outstanding indebtedness to CCL of what was now $160

8    million under the Master Loan Agreement.  WFSG also executed a liquidation bond in favor of

9    CCL that guaranteed that CCL would be paid at least $19.3 million upon the liquidation of New

10   WCC.  The liquidation bond was to be secured by certain assets of WFSG.

11        179.    CCL then released Wiederhorn and Mendelsohn from liability for any claims not

12   covered by directors and officers liability insurance.

13        180.    The steps involved in the restructure were consummated contemporaneously with

14   the effective date of WFSG's prepackaged plan of reorganization.  WFSG filed a Chapter 11

15   bankruptcy petition in Bankruptcy Court in the District of Delaware on March 3, 1999.  WFSG's

16   Plan of Reorganization was confirmed on April 12, 1999, and the Plan became effective on June

17   10, 1999.

18        181.    On June 8, 1999, CCL, Wiederhorn, and Mendelsohn entered into a mutual

19   release under which numerous claims among the parties were released, including the SFI loans.

20   This was done with the assistance and advice of the Graysons and CCL's legal advisers, who,

21   like CCL, Grayson, Barclay Grayson, Wiederhorn, and Mendelsohn, knew that the mutual

22   release was a breach of fiduciary duties that they owed to plaintiffs and others, and impaired the

23   plaintiffs' ability to regain their funds.

24        182.    On June 21, 1999, CCL, with the assistance and advice of its legal advisers, filed

25   a form UCC-3, releasing its interest in the pledged shares described above.

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                              RICO and Supplemental State Law          Attorneys at Law
                              Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                          888 SW Fifth Avenue
                                                          Portland, OR  97204-2021
                                                          503 223 1510

1    183.   At all times material, the persons who acted as the professional advisers of CCL,

2    the Graysons, Old WCC, WFSG, Wiederhorn, and Mendelsohn knew that their opinions and

3    work product were developed in part to be provided directly or indirectly to Investors so they

4    could make informed decisions on the management and preservation of their investments and on

5    making decisions regarding future investments.

6    184.   The net effect of the restructure transactions on the loans that CCL made as agent

7    for specific clients to Old WCC was to change the nature of the collateral and the borrower.

8    Loans totaling $160 million became secured only by CWH's Class B stock in New WCC, and

9    the liquidation bond.  CWH, the new borrower, was owned by an entity that CCL owned 99% of,

10   and it was no longer an operating company with assets or cash flow.  As a result, the transactions

11   converted the loan collateral into an equity interest in New WCC, and converted the borrower

12   into a company with no ability to repay principal.

13   185.   At all times relevant, the persons who were the professional advisers of CCL,

14   Grayson, Barclay Grayson, Old WCC, WFSG, Wiederhorn, and Mendelsohn knew or should

15   have known that the above-described restructure transactions constituted breaches of CCL's

16   fiduciary duties to the Investors, but did nothing to ensure that CCL, Grayson, Barclay Grayson,

17   Old WCC, WFSG, Wiederhorn, and Mendelsohn fully disclosed these breaches to the Investors.

18   186.   On March 3, 1999, WFSG filed for bankruptcy under Chapter 11.  Before filing

19   the WFSG bankruptcy, Wiederhorn and Mendelsohn transferred personal assets to their

20   respective wives.

21   187.   When some Investors eventually learned of the release of the Wiederhorn and

22   Mendelsohn guarantees, and questioned CCL's employees and professional advisers, CCL

23   maintained that the releases were required by the bankruptcy.  This was not true.

24   188.   In November and December 1998, WFSG provided to CCL projections

25   estimating that CCL's right to convert New WCC stock to WFSG stock would have a value in

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    1999 of $31.78 million.  As of January 26, 1999, WFSG had a market capitalization of $4.5

2    million (11,070,000 shares outstanding multiplied by $0.406 per share).  Therefore, assuming

3    CCL exercised its right to convert into 42.75 percent of WFSG stock and the market

4    capitalization did not increase, its stock would be worth only $1.9 million (*i.e.*, 42.75%

5    multiplied by $4.5 million).

6         189.    WFSG's bankruptcy reorganization plan valued the $160 million loan from CCL

7    to Old WCC at only $6.45 million on a liquidation basis.

8         190.    During WFSG's reorganization negotiations, CCL made the December, 1998, and

9    January, February, and March, 1999, payments on the WCC Loan (approximately $1.53 to

10   $1.73 million per month) out of cash collateral accounts of plaintiffs and other Investors.

11                              THE PONZI SCHEME

12                STERLING'S AGREEMENT TO PURCHASE THE WCC LOAN

13        191.    On November 15 and 16, 1998, CCL, Grayson, and their lawyers told Daniel D.

14   Dyer that WFSG would go through a prepackaged bankruptcy in the near future, and that he

15   should purchase the $160 million Old WCC loan of the collateralized note program.  Later, Dyer

16   founded Sterling and became Sterling's principal.

17        192.    After these discussions, Old WCC and CCL and their principals continued to

18   represent to the Investors that there were no problems with their participations in the Old WCC

19   loans, and they kept secret their plans for a prepackaged WFSG bankruptcy reorganization.

20        193.    During this same time period, up through and including the discussion of potential

21   bankruptcy, the principals, officers, appraisers, and professional advisers of CCL and Old WCC,

22   including Moss Adams, continued to value the servicing rights collateral of Old WCC at or near

23   100 percent of lifetime performance instead of at the true value, which was far less.

24        194.    On December 18, 1998, Grayson (on behalf of CCL) and Dyer (on behalf of

25   Sterling) signed a "Term Sheet," under which Sterling agreed to purchase from CCL the WCC

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                                RICO and Supplemental State Law          Attorneys at Law
                                Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                                  888 SW Fifth Avenue
                                                                  Portland, OR  97204-2021
                                                                  503 223 1510

1   Loan for the full $160 million balance owing and all accrued interest. Sterling agreed to pay

2   CCL no less than $2.5 million toward the purchase price beginning January 25, 1999, and on the

3   25th day of each month thereafter, until January 25, 2004, when the loan would be due and

4   payable in full.  The Term Sheet provided, however, that if Sterling failed to pay any amount due

5   under the agreement, the "agreement would be automatically terminated without further liability

6   to Sterling."

7       195.    On February 1, 1999, CCL and Sterling entered into a Master Loan Purchase

8   Agreement, which provided that Sterling would purchase the interest of CCL, as agent, in the

9   restructured Old WCC loans for $160 million, would begin monthly payments on March 25,

10  1999 (instead of January 25, 1999), would make a $3.11 million initial deposit to CCL on or

11  before March 31, 1999, and would pay the entire balance on January 25, 2004.  The purchase

12  price was evidenced by a nonrecourse promissory note that contained the above described

13  payment terms.  The Loan Purchase Agreement granted Sterling the ability to terminate the

14  purchase simply by giving written notice at any time after March 31, 1999.  In such event,

15  Sterling would have no further obligations under the Loan Purchase Agreement.  The interest

16  rate under the Loan Purchase Agreement exactly matched the then current interest rate under the

17  restructured Old WCC loans.  The transaction was scheduled to close on March 25, 1999.

18      STERLING'S FAILURE TO MAKE PAYMENTS AND THE GRAYSONS' PROPOSAL

19                    TO SELL A PORTION OF THE WCC LOAN

20      196.    At least by the time Dyer signed the Term Sheet, he frequently discussed with

21  Grayson that Sterling had no funds, and had no intention to pay under the Term Sheet until a

22  venture fund he was forming (Oxbow Fund I) began raising money; that the venture fund had not

23  been approved for sale; and that he was uncertain when the venture fund would be approved.

24  CCL's attorneys knew or should have known this.  Grayson, Barclay Grayson, Wiederhorn,

25  Mendelsohn, and CCL's and Old WCC's attorneys kept this information secret from plaintiffs

PAGE 46 of 122          PLAINTIFFS' COMPLAINT          ESLER, STEPHENS & BUCKLEY
                        RICO and Supplemental State Law   Attorneys at Law
                        Claims (28 U.S.C. § 1331)         700 Pioneer Tower
                                                          888 SW Fifth Avenue
                                                          Portland, OR  97204-2021
                                                          503 223 1510

1  and CCL other clients even though CCL and Old WCC were continuing to sell participations in

2  loans from CCL as agent for specific clients to Old WCC and affiliated companies.

3      197.    In March 1999, Oxbow Partners began a private placement offering of Oxbow

4  Fund I to raise $25 million.  By March 31, 1999 (by which time Sterling was already to have

5  paid CCL $5.61 million for the WCC Loan), Oxbow Fund I had not received any funds from

6  investors.  When the offering ceased in October 1999, Oxbow Fund I had raised only $4.6

7  million.  None of these monies were paid to CCL.

8      198.    On or about May 23, 1999, Dyer told CCL that Sterling could not make the

9  payments, and that he wanted to terminate the agreement to buy the loans.  CCL proposed

10  instead that Sterling decrease its payments by selling a portion of the WCC Loan to a third party.

11  The Graysons told Dyer that they had a borrower who was increasing its loan by $50 million and

12  that the borrower should be able to take some of its profits from use of the additional loan

13  proceeds to acquire a portion of the Old WCC debt that Sterling had acquired.  Dyer agreed to

14  the proposal to sell two-thirds of the debt to that party.

15      199.    On May 25, 1999, CCL and Sterling amended their Loan Purchase Agreement.

16  Under the amendment, Sterling's date for making an initial deposit was postponed from

17  March 31, 1999 to January 1, 2004, and its monthly payment was reduced from $2.5 million

18  principal and interest payments to $1.533 million interest-only payments.  CCL also waived its

19  right to receive $2.5 million payments due in March and April 1999.  CCL, Old WCC, Grayson,

20  Barclay Grayson, Wiederhorn, Mendelsohn, and their professional advisers kept this information

21  secret from plaintiffs and CCL's other clients even though CCL and Old WCC were continuing

22  to sell participations in loans to Old WCC and affiliated companies.

23      THE BROOKS LOAN, BROOKS' AGREEMENT TO BUY A PORTION OF THE WCC

24      LOAN, AND THE USE OF THE BROOKS LOAN PROCEEDS TO MAKE WCC LOAN

25                      INTEREST PAYMENTS

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                         RICO and Supplemental State Law     Attorneys at Law
                         Claims (28 U.S.C. § 1331)           700 Pioneer Tower
                                                             888 SW Fifth Avenue
                                                             Portland, OR  97204-2021
                                                             503 223 1510

1       200.    On June 4, 1999, at Gamwell's direction, Brooks entered into related and

2  dependent agreements with CCL and with Sterling.  In the first agreement, CCL, as agent, agreed

3  to loan Brooks up to $50 million to fund Brooks' purchase of receivables and a portion of the

4  WCC Loan.  CCL contemporaneously sold participations in loans to Brooks to some of the

5  plaintiffs and other CCL Investors.  Under this Brooks Loan, CCL was to make advances on the

6  loan as Brooks pledged pools of receivables as collateral.  Brooks also would use a portion of its

7  profits from use of the loan to acquire up to $108 million of the WCC Loan.

8       201.    In the second agreement, which Brooks entered into at Gamwell's direction,

9  Sterling agreed to sell up to $108 million of the WCC Loan to Brooks.  The agreement stated

10  that Sterling acknowledged that Brooks' obligation to purchase interests in the WCC Loan, and

11  to pay for an interest in the loan, was "limited solely to the availability of funds allocated

12  pursuant to [the Brooks Loan from CCL]."

13       202.    From June through December 1999, CCL, as agent and at Gamwell's request,

14  loaned Brooks a total of $38.1 million of Investors' funds through seven monthly advances in

15  amounts that ranged from $4.39 million to $6.73 million.  Again, CCL contemporaneously sold

16  participations in loans to Brooks to some of the plaintiffs and other CCL clients.  During the

17  same period, $7.843 million of the Brooks Loan proceeds were used to fund its payments on the

18  WCC Loan.  Specifically, from June through December, 1999, CCL, Brooks, Gamwell, and

19  Sterling took from $1.028 million to $1.53 million per month directly out of the Brooks Loan

20  escrow account, and applied the funds to satisfy a portion of the WCC Loan interest payments

21  for May through November, 1999, to make it appear as if the WCC Loan was performing to

22  conceal its actual status from the plaintiffs and other CCL clients.

23  THE BEACON LOAN AND THE USE OF BEACON LOAN PROCEEDS TO MAKE WCC

24                        LOAN INTEREST PAYMENTS

25

      PLAINTIFFS' COMPLAINT        **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law     Attorneys at Law
Claims (28 U.S.C. § 1331)             700 Pioneer Tower
                                        888 SW Fifth Avenue
                                        Portland, OR  97204-2021
                                        503 223 1510

1     203.    In or before January 2000, at Gamwell's direction, Beacon entered into an

2    agreement with CCL, pursuant to which CCL, as agent, agreed to loan Beacon up to $50 million

3    to fund Brooks' purchase of receivables and a portion of the WCC Loan.  Under this Beacon

4    Loan, CCL was to make advances on the loan as Beacon pledged pools of receivables as

5    collateral.  It was understood that Beacon also would use a portion of its profits from use of the

6    loan to acquire a portion of the WCC Loan.

7     204.    From January through July 2000, CCL, as agent and pursuant to Gamwell's

8    requests, loaned Beacon a total of $33.88 million.  CCL contemporaneously sold participations

9    in loans to Beacon to some of the plaintiffs and other CCL Investors.  $7.372 million of this was

10    used to fund Brooks' payments on the WCC Loan.  Specifically, from January through July

11    2000, $1.014 million to $1.115 million per month was taken directly out of the Beacon loan

12    escrow account and applied to satisfy a portion of the WCC Loan interest payments for

13    December 1999, through June 2000.  This was done to conceal from plaintiffs and other CCL

14    clients the actual facts and the non-performing loans.

15            USE OF BROOKS AND BEACON LOAN PROCEEDS TO MAKE

16             STERLING'S PORTION OF THE WCC LOAN PAYMENTS

17     205.    In early July 1999, Dyer told Grayson that Sterling could not make its monthly

18    WCC Loan payments.  Grayson proposed a plan in which Sterling could get money from the

19    Brooks Loan to make its WCC Loan payments. Grayson proposed that:  (1) Dyer could start a

20    new fund; (2) CCL and Gamwell would authorize Brooks to invest funds from its reserve

21    account into this new fund; (3) Oxbow Partners could sell to the new fund stock that Oxbow

22    already owned at a profit; and (4) Oxbow Partners could use that profit to make Sterling's WCC

23    Loan payment.

24     206.    In late July 1999, CCL, the Graysons, Brooks, Beacon, Gamwell, Sterling, and

25    Dyer implemented Grayson's, Gamwell's, and Dyer's plan.  The Brooks Loan agreement

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    provided that 15 percent of each advance would be held in a reserve account as security for CCL,

2    as agent.  The agreements further provided that CCL would invest the funds in the reserve

3    account in U.S. Treasury securities or money market investments.  In a July 28, 1999, letter

4    agreement, however, Barclay Grayson agreed with Gamwell and Brooks that Brooks could

5    invest the funds in its reserve account in "mutual funds or other pooled investments."

6         207.    Also in July 1999, Oxbow Fund B started a $25 million private placement

7    offering which was promoted and sold by Oxbow Partners.  Oxbow Fund B's offering

8    documents stated that it would use the offering proceeds to make equity and debt investments as

9    determined by Oxbow Partners.

10        208.    From July 1999, through July 2000, at Gamwell's direction, Brooks and Beacon

11   invested in Oxbow Fund B $8.86 million that was required to be maintained in the 15 percent

12   reserve accounts.  Gamwell caused these investments to be wired to Oxbow Fund B directly

13   from the escrow accounts for the Brooks and Beacon Loans.

14        209.    Pursuant to Graysons', Gamwell's, and Dyer's plan, Oxbow Fund B used the

15   Brooks- and Beacon-invested funds to purchase stock from Oxbow Partners that Oxbow Partners

16   had previously acquired.  Before July 1999, Oxbow Partners had acquired, for $1 per share, a

17   49.99 percent interest in a start-up technology company called Topia Ventures, Inc. ("Topia").

18   As of July 1999, Topia was still a start-up company and had (and still has had) no revenues.

19        210.    As Brooks and Beacon invested in Oxbow Fund B at Gamwell's direction,

20   Oxbow Fund B purchased Topia stock from Oxbow Partners at $12 per share.  From September

21   1999, through July 2000, Oxbow Fund B transferred $7.228 million of the invested funds to

22   Oxbow Partners.

23        211.    Oxbow Partners, purportedly with its profits from selling Oxbow Fund B Topia

24   stock at an $11 per share markup, used $5.5 million to pay Sterling's $500,000 WCC Loan

25

PLAINTIFFS' COMPLAINT
                RICO and Supplemental State Law
                Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    Interest payments of August 1999 through June 2000.  These transactions were designed to

2    conceal a non-performing loan to plaintiffs and other CCL clients.

3                    UNTRUE STATEMENTS AND MISLEADING OMISSIONS IN REPORTS

4            212.    In addition to untrue statements and misleading omissions described above (by

5    means of which the securities were sold and fiduciary duties were breached), from 1994 on,

6    CCL, Grayson, and Barclay Grayson, with the encouragement, participation, and substantial

7    assistance of Old WCC, Wiederhorn, Mendelsohn, and CCL's and Old WCC's professional

8    advisers, sent false and misleading investment reports each quarter to plaintiffs and other CCL

9    clients through means and instrumentalities of interstate commerce and the mails regarding the

10   risk, status, and valuation of the investments in the collateralized note program for the purpose of

11   selling more participations in loans that CCL was making as agent for specific clients.  Many of

12   the untrue statements and misleading omissions, including the valuations of collateral, were

13   based on, and made possible by, work performed by CCL's and Old WCC's professional

14   advisers including Moss Adams and Consilium.  CCL's and Old WCC's professional advisers

15   knew that CCL was sending out the investment reports to persuade plaintiffs and other CCL

16   clients to continue to purchase participations in CCL agency loans, to maintain their positions in

17   participations in CCL agency loans, and to lull them into believing that they had not been

18   unlawfully sold securities.  CCL's and Old WCC's professional advisers knew or in the exercise

19   of reasonable care should have known that the investment reports contained untrue statements of

20   material fact and misleading omissions.  CCL's and Old WCC's professional advisers

21   encouraged and assisted CCL to continue its business of raising money from CCL's clients by

22   selling loan participations by means of untrue statements and misleading omissions.

23           213.    From 1994 through 1997, CCL and the Graysons sent plaintiffs and other

24   investors who purchased participations in Old WCC loans quarterly reports on the status of the

25   Old WCC loans.  In the reports, CCL, the Graysons, Wiederhorn, Mendelsohn, WFSG, and Old

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                              RICO and Supplemental State Law          Attorneys at Law
                              Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                                888 SW Fifth Avenue
                                                                Portland, OR  97204-2021
                                                                503 223 1510

1  WCC, and Consilium appraised the market value of the WCC Loan participation interests for the

2  relevant quarters at the clients' full cost rather than its true value.  CCL billed the plaintiffs for its

3  services an annualized management fee for the quarter, based on the "appraised" market value,

4  rather than a market value that would have been obtained through the application of standard

5  accounting or appraisal procedures.  No management fees should have been due because CCL

6  and Old WCC were in substantial breach of their fiduciary duties, and CCL was in substantial

7  breach of its contracts to serve plaintiffs.

8      214.    Moreover, CCL continued to sell participation interests in the Old WCC Loan

9  priced at the face value of the loans, thereby funding principal and interest payments owed to the

10  plaintiffs and other investors with the plaintiffs' and other investors' own money.

11          THE THIRD AND FOURTH QUARTER 1997 REPORTS

12      215.    In 1998, CCL and the Graysons sent plaintiffs and other investors who purchased

13  participations in Old WCC loans reports on the status of the Old WCC loans.  In the reports,

14  CCL, the Graysons, Wiederhorn, Mendelsohn, WFSG, and Old WCC, and Moss Adams

15  appraised the market value of the WCC Loan participation interests for the third and fourth

16  quarters of 1997 at the clients' full cost rather than its true value.  CCL billed the plaintiffs for its

17  services an annualized management fee for the quarter, based on the "appraised" market value,

18  rather than a market value that would have been obtained through the application of standard

19  accounting or appraisal procedures.  No management fees should have been due because CCL

20  and Old WCC were in substantial breach of their fiduciary duties, and CCL was in substantial

21  breach of its contracts to serve plaintiffs.

22      216.    Moreover, CCL continued to sell participation interests in the Old WCC Loan

23  priced at the face value of the loans, thereby funding principal and interest payments owed to the

24  plaintiffs and other investors with the plaintiffs' and other investors' own money.

25      THE FIRST, SECOND, THIRD, AND FOURTH QUARTER 1998 REPORTS

PLAINTIFFS' COMPLAINT
                    RICO and Supplemental State Law
                    Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

217.   In 1998 and 1999, CCL and the Graysons sent plaintiffs and other investors who purchased participations in Old WCC loans reports on the status of the Old WCC loans.  In the reports CCL, the Graysons, Wiederhorn, Mendelsohn, WFSG, and Old WCC, and Moss Adams appraised the market value of the WCC Loan participation interests for the first, second, third, and fourth quarters of 1998 at the clients' full cost rather than its true value.  CCL billed the plaintiffs for its services an annualized management fee for the quarter, based on the "appraised" market value, rather than a market value that would have been obtained through the application of standard accounting or appraisal procedures.  No management fees should have been due because CCL and Old WCC were in substantial breach of their fiduciary duties, and CCL was in substantial breach of its contracts to serve plaintiffs.

218.   Moreover, CCL continued to sell participation interests in the Old WCC Loan priced at the face value of the loans, thereby funding principal and interest payments owed to the plaintiffs and other investors with the plaintiffs' and other investors' own money.

THE NOVEMBER 1998 REPORT

219.   In an undated letter sent on November 24 or 25, 1998, CCL and the Graysons provided those plaintiffs and other investors who purchased participations in Old WCC loans a report on the status of the Old WCC loans.  The report said:

    a.   CCL has a lending agreement with Old WCC, a company that services owned by WFSG;

    b.   Old WCC's servicing rights for the WFSG loans collateralize the loans that CCL made as agent for specific CCL clients;

    c.   WFSG was forced to liquidate some loans or loan pools to meet margin calls;

    d.   Old WCC was current in its obligations on the CCL client loans; and

    e.   CCL was pursuing an alternative of negotiating with someone to purchase the Old WCC loans.

PAGE 53 of 122       PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    220.    By November 24, 1998, however, CCL, the Graysons, Old WCC, WFSG,

2  Wiederhorn, Mendelsohn, and their professional advisers knew or in the exercise of reasonable

3  care should have known and disclosed the following material information:

4        a.  On October 15, 1998, CCL and the Graysons authorized the release of $19.3

5              million from the cash collateral account;

6        b.  On October 16, CCL made a loan as agent for specific CCL clients of another $6

7              million to Old WCC in violation of its duties of prudence and diversification, and

8              in violation of the Master Loan Agreement;

9        c.  CCL and the Graysons had already engaged in extensive restructure discussions

10              and negotiations that would impair CCL clients' ability to recover losses;

11        d.  Old WCC had already lost most of its servicing rights because WFSG had sold

12              the loans and loan pools associated with those servicing rights;

13        e.  CCL had not obtained enforceable rights to the servicing rights that Old WCC had

14              given to collateralize the loans;

15        f.  Wiederhorn and Mendelsohn had been misappropriating assets from Old WCC;

16        g.  Old WCC had no ability to continue making payments on the loans; and

17        h.  The evaporation of the collateral as consequence of WFSG's lenders' margin calls

18              had been a risk that was foreseeable, but had not been disclosed.

19                    THE JANUARY 1999 REPORT

20    221.    In a January 26, 1999, letter, CCL and the Graysons sent plaintiffs and other

21  investors who purchased participations in Old WCC loans a report on the status of the Old WCC

22  loans.  The report said:

23        a.  WCC's largest client, WFSG, was forced to liquidate significant pools of

24              mortgage loans that were serviced by Old WCC and that provided servicing rights

25              collateralizing the WCC Loan;

        PLAINTIFFS' COMPLAINT        **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law        Attorneys at Law
Claims (28 U.S.C. § 1331)                700 Pioneer Tower
                                          888 SW Fifth Avenue
                                          Portland, OR 97204-2021
                                          503 223 1510

1        b.  CCL had decided to sell the $160 million Old WCC Loan to Sterling.  Sterling's

2           rights under the loan would convert into 49.9 percent of the shares of a new

3           subsidiary of WFSG, with a right to convert those shares into 42.75 percent of the

4           stock of the publicly traded WFSG;

5        c.  Sterling agreed to buy the Old WCC Loan for $160 million, with interest at the

6           rate paid by Wilshire (prime rate + 3.75%);

7        d.  Sterling was an investment company associated with a broker-dealer that had

8           been in business over 27 years and had raised over $1 billion in capital;

9        e.  Sterling would begin making monthly interest payments on January 25, 1999;

10       f.  CCL made the December 1998, payment on the WCC Loan from its cash

11          collateral account of trust funds, but Sterling was obligated to reimburse the cash

12          collateral account for that payment.

13     222.    By January 26, 1999, however, CCL, the Graysons, Old WCC, WFSG,

14  Wiederhorn, Mendelsohn, and their professional advisers knew or in the exercise of reasonable

15  care should have known and disclosed the following material information:

16        a.  CCL had already agreed to release Old WCC from the $160 million loan in

17          exchange for the convertible shares;

18        b.  Based on WFSG's then current trading price, the convertible shares would be

19          worth, at most, $1.923 million;

20        c.  Sterling could terminate its agreement to purchase the WCC Loan at any time,

21          without further liability;

22        d.  Sterling was a start-up company that had no financial ability, or intention, to make

23          payments on the WCC Loan, except to the extent it raised funds through Oxbow

24          Fund I;

25        e.  Sterling had not made the interest payment that was due on January 25, 1999; and

      PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1          f.    More funds of CCL clients were being used to further this scheme.

2          223.    Moreover, CCL, the Graysons, Wiederhorn, Mendelsohn, and Old WCC, and

3    their professional appraisers appraised the market value of the WCC Loan participation interests

4    for the quarter ended December 31, 1999, at the clients' full cost rather than its true value.  CCL

5    billed the plaintiffs for its services an annualized management fee for the quarter, based on the

6    "appraised" market value, rather than a market value that would have been obtained through the

7    application of standard accounting or appraisal procedures.  No management fees should have

8    been due because CCL, the Graysons, Old WCC, Wiederhorn, and Mendelsohn were in

9    substantial breach of their fiduciary duties, and CCL was in substantial breach of its contracts to

10    serve plaintiffs.

11          224.    Moreover, CCL continued to sell participation interests in the Old WCC Loan

12    priced at the face value of the loans, thereby funding principal and interest payments owed to the

13    plaintiffs and other investors with the plaintiffs' and other investors' own money.

14                         THE FIRST QUARTER 1999 REPORT

15          225.    In April 1999, CCL and the Graysons sent plaintiffs and other investors who

16    purchased participations in Old WCC loans a report on the status of the Old WCC loans.  The

17    report said:

18          a.    Sterling's purchase of the Old WCC Loan was finalized; and

19          b.    Sterling agreed to make monthly interest payments at the prime interest rate plus

20                3.75 percent.

21          226.    By March 31, 1999, however, however, CCL, the Graysons, Old WCC, WFSG,

22    Wiederhorn, Mendelsohn, and their professional advisers knew or in the exercise of reasonable

23    care should have known and disclosed the following material information:

24          a.    Under the finalized agreement, Sterling was to begin making interest payments on

25                March 25, 1999 (instead of January 25, 1999, as had been stated in CCL's

PAGE 56 of 122          PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law          Attorneys at Law
                        Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                          888 SW Fifth Avenue
                                                          Portland, OR  97204-2021
                                                          503 223 1510

1    January 26, 1999, letter to clients), and to make a $3.11 million initial deposit by

2    March 31, 1999;

3    b.    Sterling did not have the financial ability to make, and did not make, the March

4    1999, interest payment and initial deposit;

5    c.    CCL made the January, February, and March 1999, WCC Loan payments from

6    the WCC Loan cash collateral account.

7    227.    Moreover, CCL, the Graysons, Wiederhorn, Mendelsohn, WFSG, and Old WCC,

8    and their professional appraisers appraised the market value of the WCC Loan participation

9    interests for the quarter ended March 31, 1999, at the clients' full cost rather than its true value.

10    CCL billed the plaintiffs for its services an annualized management fee for the quarter, based on

11    the "appraised" market value, rather than a market value that would have been obtained through

12    the application of standard accounting or appraisal procedures.  No management fees should

13    have been due because CCL and Old WCC were in substantial breach of their fiduciary duties,

14    and CCL was in substantial breach of its contracts to serve plaintiffs.

15    228.    Moreover, CCL continued to sell participation interests in the Old WCC Loan

16    priced at the face value of the loans, thereby funding principal and interest payments owed to the

17    plaintiffs and other investors with the plaintiffs' and other investors' own money.

18    THE SECOND QUARTER 1999 REPORT

19    229.    In July 1999, CCL and the Graysons sent plaintiffs and other investors who

20    purchased participations in Old WCC and Brooks loans a report for the quarter ended June 30,

21    1999.  The report said:

22    a.    Sterling "continued to make payments under its [agreement] with [CCL]."

23    b.    Sterling "continue[d] to provide our clients with a gross interest rate of [prime +

24    3.75%], payable monthly."

25

PAGE 57 of 122        PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1  c. Sterling sold a portion of the WCC Loan to an unrelated third party that had been

2  introduced to Sterling by CCL.

3  d. CCL approved the transaction and believed that it improved the overall

4  restructure of the WCC Loan while at the same time providing for the addition of

5  another desirable and viable party that should contribute to the overall strength of

6  CCL's existing borrower, Sterling.

7  e. Brooks was formed to facilitate future acquisitions of consumer-debt receivables.

8  f. CCL had agreed to loan Brooks up to $50 million.

9  g. The loan would be collateralized by the receivables that were themselves secured

10  by the consumer items purchased and a 15 percent reserve in the form of money

11  market funds or securities that could be liquidated in 30 days for cash.

12  h. Brooks had agreed to acquire a portion of the WCC Loan.

13  i. The Brooks Loan was performing in accordance with the terms of the lending

14  agreement.

15  230.  By July 1999, CCL, the Graysons, Old WCC, WFSG, Wiederhorn, Mendelsohn,

16  and their professional advisers knew or in the exercise of reasonable care should have known and

17  disclosed that representations described in the preceding paragraph were false or misleading and

18  that the following material information was true:

19  a. CCL had postponed Sterling's date for making the $3.11 million deposit from

20  March 31, 1999, to January 1, 2004.

21  b. CCL had waived its right to receive the March and April 1999, WCC Loan

22  payments from Sterling.

23  c. Brooks' obligation to purchase a portion of the WCC Loan was conditioned on

24  CCL's lending it $50 million; and the obligation was limited by funds available to

25

PAGE 58 of 122          PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law          Attorneys at Law
                        Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                          888 SW Fifth Avenue
                                                          Portland, OR 97204-2021
                                                          503 223 1510

1      Brooks from profit from use of the loan proceeds (and not the loan proceeds

2      themselves.

3      d.   CCL and Brooks had used $1.03 million advanced under the Brooks Loan (and

4           not Brooks' profit from use of the loan proceeds) to pay a portion of the $1.53

5           million May 1999, WCC Loan interest payment.

6      231.   Moreover, CCL, the Graysons, Wiederhorn, Mendelsohn, WFSG, and Old WCC,

7  and their professional appraisers appraised the market value of the WCC Loan participation

8  interests for the quarter ended June 30, 1999, at the clients' full cost rather than its true value.

9  CCL billed the plaintiffs for its services an annualized management fee for the quarter, based on

10  the "appraised" market value, rather than a market value that would have been obtained through

11  the application of standard accounting or appraisal procedures.  No management fees should

12  have been due because CCL and Old WCC were in substantial breach of their fiduciary duties,

13  and CCL was in substantial breach of its contracts to serve plaintiffs.

14      232.   Moreover, CCL continued to sell participation interests in the Old WCC and

15  Brooks Loans priced at the face value of the loans, thereby funding principal and interest

16  payments owed to the plaintiffs and other investors with the plaintiffs' and other investors' own

17  money.

18           THE THIRD AND FOURTH QUARTER 1999 REPORTS

19      233.   In October 1999 and January 2000, CCL and the Graysons sent to plaintiffs and

20  other investors who purchased participations in Old WCC and Brooks loans reports on the

21  quarters ended September 30 and December 31, 1999.  The reports said:

22      a.   Sterling "continued to make payments under its [agreement] with [CCL] .

23      b.   Sterling "continued to provide our clients with a gross interest rate of prime +

24           3.75%, payable monthly."

25

PLAINTIFFS' COMPLAINT        **ESLER, STEPHENS & BUCKLEY**
                           RICO and Supplemental State Law    Attorneys at Law
                           Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                              888 SW Fifth Avenue
                                                              Portland, OR  97204-2021
                                                              503 223 1510

1         c.   In the third quarter, CCL had made three more advances to Brooks totaling

2              another $15.872 million.

3         d.   In the fourth quarter, CCL had made another three advances to Brooks, bringing

4              the total amount of the loan to slightly more than $38 million; the loan's

5              outstanding balance was $36.965 million.

6         e.   The loan was performing in accordance with the terms of the lending agreement.

7      234.   By the times the reports were sent, however, CCL, the Graysons, Old WCC,

8  WFSG, Wiederhorn, Mendelsohn, Brooks, Dyer, Sterling, and their professional advisers knew

9  or in the exercise of reasonable care should have known and disclosed the following material

10  information:

11         a.   CCL and Brooks had used a total of $6.813 million advanced under the Brooks

12              Loan (and not Brooks' profit from use of the loan proceeds) to pay a portion of

13              the interest payments due on the WCC Loan from June through November 1999.

14         b.   CCL had allowed Brooks to invest the 15 percent reserve account for the Brooks

15              Loan in Oxbow Fund B, which had used the invested funds to purchase, from

16              Oxbow Partners, stock in a start-up high technology company that had no

17              revenues.

18         c.   Oxbow Partners had used profits from selling the start-up stock to Oxbow Fund B

19              to make Sterling's interest payments on the WCC Loan from August through

20              November 1999.

21      235.   Moreover, CCL, the Graysons, Old WCC, WFSG, Wiederhorn, Mendelsohn,

22  Dyer, Sterling, Brooks, Gamwell, and their professional appraisers appraised the market value of

23  the Wilshire and Brooks Loans participation Interests for the quarters ended September 30, 1999,

24  and December 31, 1999, at the full cost rather than its true value.  CCL billed the plaintiffs for its

25  services an annualized management fee for the quarter, based on the "appraised" market value,

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    rather than a market value that would have been obtained through the application of standard

2    accounting or appraisal procedures.  No management fees should have been due because CCL

3    and Old WCC were in substantial breach of their fiduciary duties, and CCL was in substantial

4    breach of its contracts to serve plaintiffs.

5        236.    Moreover, CCL continued to sell participation interests in the Old WCC and

6    Brooks Loans priced at the face value of the loans, thereby funding principal and interest

7    payments owed to the plaintiffs and other investors with the plaintiffs' and other investors' own

8    money.

9                        THE FIRST QUARTER 2000 REPORT

10        237.    In April 2000, CCL and the Graysons sent the plaintiffs and other investors who

11    purchased participations in Old WCC, Brooks, and Beacon loans a report for the quarter ended

12    March 31, 2000.  The report said:

13        a.    Sterling "continue[d] to make payments under its loan documents with [CCL]."

14        b.    Sterling "continue[d] to provide our clients with a gross interest rate of [prime +

15            3.75%], payable monthly."

16        c.    CCL had made seven advances to Brooks, totaling slightly more than $38 million,

17            and the loan's outstanding balance was $35.024 million.

18        d.    The Brooks loan was performing in accordance with the terms of the lending

19            agreement.

20        e.    CCL had agreed to lend Beacon up to $50 million.

21        f.    By the end of the quarter, CCL had made three advances to Beacon totaling

22            $22.225 million but had only funded $18.788 million of the advances.

23        g.    Beacon's principals have successfully been involved in the purchase and sale of

24            pools of consumer-debt receivables for 20 years.

25        h.    The loan was performing in accordance with the terms of the lending agreement.

PLAINTIFFS' COMPLAINT        **ESLER, STEPHENS & BUCKLEY**
                    RICO and Supplemental State Law        Attorneys at Law
                    Claims (28 U.S.C. § 1331)                700 Pioneer Tower
                                                            888 SW Fifth Avenue
                                                            Portland, OR  97204-2021
                                                            503 223 1510

1    238.    By Marcy 31, 2000, however, CCL, the Graysons, Old WCC, WFSG,

2    Wiederhorn, Mendelsohn, Dyer, Sterling, Brooks, Beacon, and their professional advisers knew

3    or should have known the following material information, which CCL and the Graysons had

4    omitted to disclose:

5         a.    CCL and Beacon had used a total of $3.311 million advanced under the Beacon

6              Loan to pay a portion of the December, 1999, and January and February, 2000,

7              WCC Loan interest payments.

8         b.    CCL had allowed Brooks and Beacon to invest funds from the 15 percent reserve

9              account for the Brooks and Beacon Loans in Oxbow Fund B, which used the

10             invested funds to purchase from Oxbow Partners stock in a start-up high

11             technology company that had no revenues.

12        c.    Oxbow Partners had used profits from selling the start-up stock to Oxbow Fund B

13             to make Sterling's interest payments on the WCC Loan from December 1999,

14             through February 2000.

15    239.    Moreover, CCL, the Graysons, Old WCC, WFSG, Wiederhorn, Mendelsohn,

16    Dyer, Sterling, Brooks, Beacon, and their professional appraisers appraised the market value of

17    the Wilshire, Brooks, and Beacon Loan participation Interests for the quarter ended March 31,

18    2000, at the full cost rather than its true value.  CCL billed the plaintiffs for its services an

19    annualized management fee for the quarter, based on the "appraised" market value, rather than a

20    market value that would have been obtained through the application of standard accounting or

21    appraisal procedures.  No management fees should have been due because CCL and Old WCC

22    were in substantial breach of their fiduciary duties, and CCL was in substantial breach of its

23    contracts to serve plaintiffs.

24    240.    Moreover, CCL continued to sell participation interests in the Old WCC, Brooks

25    and Beacon Loans priced at the face value of the loans, thereby funding principal and interest

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1   payments owed to the plaintiffs and other investors with the plaintiffs' and other investors' own

2   money.

THE SECOND QUARTER 2000 REPORT

4       241.    In July 2000, CCL and the Graysons sent plaintiffs and other investors who

5   purchased participation interests in Old WCC, Brooks, and Beacon loans a report for the quarter

6   ended June 30, 2000.  The report said

7       a.  Sterling "and its participants have made all payments due under the loan

8           agreement with CCL on this loan."

9       b.  CCL has "arranged for [an accounting firm] to perform . . . [a] full valuation of

10          the Sterling purchase contract."

11      c.  The accounting firm "concluded that [it was] not presently able to completely and

12          accurately state the current fair market value of [the] clients'

13          investment/collateral" because the "overhang" from the [WFSG] reorganization

14          and the new [WFSG] management "needs additional time to prove themselves

15          and the company's operating results to the investment community."

16      d.  The accounting firm "indicated that a full and accurate valuation should wait for

17          six to nine months to allow [WFSG] time to generate additional operating

18          results."

19      e.  CCL "has elected to reduce its fee on this investment to one-half of the normal fee

20          until such time as an accurate valuation is done.

21      f.  CCL will use the accounting firm's appraisal "as the basis for its fee, and if it is

22          less than par, which we do not anticipate, will make appropriate credits to pro-rate

23          its fee to all clients back to January 1, 1999."

24      g.  CCL had made seven advances to Brooks, totaling slightly more than $38 million,

25          and the loan's outstanding balance was $31.894 million.

PAGE 63 of 122          PLAINTIFFS' COMPLAINT              **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law       Attorneys at Law
                        Claims (28 U.S.C. § 1331)             700 Pioneer Tower
                                                             888 SW Fifth Avenue
                                                             Portland, OR  97204-2021
                                                             503 223 1510

1       h.   The loan was performing in accordance with the terms of the lending agreement.

2       i.   CCL had made five advances to Beacon totaling slightly more than $36.355

3          million, and the loan's outstanding balance was $32.455 million.

4       j.   The loan was performing in accordance with the terms of the lending agreement.

5    242.   By June 30, 2000, however, CCL, the Graysons, Old WCC, WFSG, Wiederhorn,

6 Mendelsohn, Dyer, Sterling, Brooks, Beacon, and their professional advisers knew or in the

7 exercise of reasonable care should have known and disclosed the following information:

8       a.   CCL and Beacon had used a total of $3.045 million advanced under the Beacon

9          Loan to pay a portion of the interest payments due from March through May,

10         2000, on the WCC Loan.

11      b.   CCL and Sterling used a total of $1.5 million from the Brooks and Beacon Loans'

12        15 percent reserve account to pay Sterling's portion of the interest payments on

13        the WCC Loan from March through May, 2000.

14    243.   Moreover, CCL, the Graysons, Old WCC, WFSG, Wiederhorn, Mendelsohn,

15 Dyer, Sterling, Brooks, Beacon, and their professional appraisers appraised the market value of

16 the Wilshire, Brooks, and Beacon Loan participation Interests for the quarters ended June 30,

17 2000, at the full cost rather than its true value. CCL billed the plaintiffs for its services an

18 annualized management fee for the quarter, based on the "appraised" market value, rather than a

19 market value that would have been obtained through the application of standard accounting or

20 appraisal procedures. No management fees should have been due because CCL and Old WCC

21 were in substantial breach of their fiduciary duties, and CCL was in substantial breach of its

22 contracts to serve plaintiffs.

23    244.   Moreover, CCL continued to sell participation interests in the Old WCC, Brooks

24 and Beacon Loans priced at the face value of the loans, thereby funding principal and interest

25

    PLAINTIFFS' COMPLAINT      **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law      Attorneys at Law
Claims (28 U.S.C. § 1331)      700 Pioneer Tower
      888 SW Fifth Avenue
      Portland, OR 97204-2021
      503 223 1510

1  payments owed to the plaintiffs and other investors with the plaintiffs' and other investors' own

2  money.

3                                    ROLES OF PROFESSIONALS

4        245.    The allegations in previous sections of this complaint primarily describe the

5  transactions forming the bases for claims for relief, and the roles of the persons and entities that

6  entered into those transactions. Roles of professionals have been referred to from time to time,

7  but this part of the complaint specifically describes those attorneys, appraisers, accountants, and

8  the transactions in which they were involved.

9                                    THE ROLE OF WEISS JENSEN

10        246.    Weiss Jensen participated in or materially aided the sale of securities that

11  consisted of participations in loans to Old WCC in the ways alleged above concerning the WSI

12  Transaction.

13        247.    Weiss Jensen participated in or materially aided the sale and purchase of the

14  Cascade General Class C Preferred Stock in the ways alleged above concerning the WSI

15  Transaction and the Cascade General Loan and Stock Sale.

16                    THE ROLE OF STOEL RIVES AND MARK PETERMAN

17                                    Securities Were Sold

18        248.    Old WCC and CCI sold securities to plaintiffs. The securities are securities

19  because they are "notes," "evidences of indebtedness," "investment contracts," or "certificates of

20  interest or participation" in any of the foregoing. ORS 59.015(19)(a).

21                                    Material Facts

22        249.    Under Oregon law, securities cannot be sold to purchasers by means of untrue

23  statements of a material fact or an omission to state a material fact necessary in order for the

24  statements made, in light of the circumstances under which they were made, not misleading.

25  Oregon law mandates full and truthful disclosure of all material information. Facts or

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1  information is "material" when there is a substantial likelihood that a reasonable investor would

2  consider it important in deciding whether to invest.  Information that is deemed to be "material"

3  in connection with sales of securities includes, but is not limited to, risk factors, use of proceeds,

4  offering price, dilution, plan of distribution, summary about the issuer, compensation and fees to

5  the issuer's managers and its affiliates, conflicts of interest, prior performance of the issuer's

6  managers and its affiliates, management, investment objectives and policies, and a summary of

7  all promotional and sales material.

8  **DEFENDANTS STOEL RIVES AND MARK PETERMAN**

9  250.    Defendant Stoel Rives is a partnership that is registered as a limited liability

10  partnership under the laws of the State of Oregon.  Stoel Rives renders legal services.  Defendant

11  Peterman is a lawyer.  Peterman was a partner in, or employee of, defendant Stoel Rives.  At all

12  times, he was acting within the scope of his authority or his employment, and he was pursuing

13  the interests of Stoel Rives.

14  251.    The securities were sold to plaintiffs by means of untrue statements and

15  omissions.

16  252.    Plaintiffs were told that in the collateralized note program, loans

17          a.      Were made to a borrower;

18          b.      Were secured by an assignment of the borrower's receivables or contract

19          rights;

20          c.      Were made in conformity with prescribed advance rates and interest

21          requirements;

22          d.      Had typical maturities between two and five years;

23          e.      Would provide a return based upon a spread above the prime interest rate;

24          f.      Were insured, except in the case of certain "selected borrowers" who were

25          "allowed" to "over-secure contract receivables," and that in such instances the

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    borrower was required at closing to "assign to the lender cash collateral in the

2    amount of 15% of the principal balance of the loan," and the "cash collateral is

3    held until final repayment of the loan, however, if required, [it] can be used at

4    lenders discretion during the loan term to satisfy payment defaults while the

5    collateral is being liquidated to retire the principal balance."

6    253.   Plaintiffs were told that in the collateralized note program,

7    a.   There was "active management of financing relationships;

8    b.   There was "analysis of credit history of borrower," that there was "analysis of

9    credit reports, tax returns and financial statements of borrower[s],"

10    c.   There was a "[p]roprietary computer driven analysis of borrowing base for

11    insured loans";

12    d.   The loans were secured by "qualified receivables from creditworthy payors,"

13    e.   There were "appropriate personal and/or corporate guarantees for each loan,"

14    f.   There was "appropriate diversification across industry sectors," that there was

15    "appropriate portfolio diversification";

16    g.   There were "[r]egulatory scheduled third party audit[s]";

17    h.   There were "appropriate security interest[s] in all collateral for each loan,"

18    i.   There was a "90% loan to value against qualified receivables," that the amount of

19    the loan was only "up to 90% of the qualified receivables";

20    j.   "Payments generally received from payors through lender controlled lock-box."

21    k.   Initially that "cash collateralized accounts require additional cash collateral

22    (generally in the form of certificates of deposit) in the amount of 15% of the

23    loan," and later that, "additional collateral equal to 15% of the loan balance is

24    required in the form of cash, marketable securities or cash equivalent collateral.

25    Ultimate loan to value, therefore, does not exceed 76.5% for those loans with cash

PAGE 67 of 122         PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2021
503 223 1510

1    or cash equivalent collateral, and that credit insurance may be provided in lieu of

2    this additional collateral."

3    The foregoing statements were untrue or misleading.

4    Participation and Material Aid/Further Untrue Statements and Omissions

5    254.    Stoel Rives and Peterman were lawyers for Old WCC. Stoel Rives and Peterman

6    participated and materially aided in the sales of the securities. Stoel Rives and Peterman

7    participated and materially aided by, among other things, preparing documentation in connection

8    with the sales of the securities. This documentation included the agreements identified in the

9    paragraph following.

10    255.    CCI, as agent for participant plaintiffs, and Old WCC entered into a series of

11    agreements. These agreements include the following:

12    a.    Loan and Security Agreement, dated June 10, 1994;

13    b.    Second Loan and Security Agreement, dated June 27, 1994;

14    c.    Third Loan and Security Agreement, dated July 7, 1994;

15    d.    February 1995 Loan and Security Agreement, dated February 21, 1995;

16    e.    Master Loan and Security Agreement-1995-1, dated July 6, 1995;

17    f.    First Amendment to Master Loan and Security Agreement-1995-1, dated July 21,

18    1995;

19    g.    Second Amendment to Master Loan and Security Agreement-1995-1, dated

20    October 1, 1995;

21    h.    Third Amendment to Master Loan and Security Agreement-1995-1, dated

22    December 26, 1995;

23    i.    Restated and Amended Master Loan and Security Agreement-1995-1

24    (Incorporating First, Second, and Third Amendments), dated July 6, 1995;

25

PLAINTIFFS' COMPLAINT    **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law    Attorneys at Law
Claims (28 U.S.C. § 1331)    700 Pioneer Tower
    888 SW Fifth Avenue
    Portland, OR 97204-2021
    503 223 1510

1        j.   Fourth Amendment to Restated and Amended Master Loan and Security

2            Agreement-1995-1, executed April 11, 1996;

3        k.   Fifth Amendment to Restated and Amended Master Loan and Security

4            Agreement-1995-1, dated May 23, 1996;

5        l.   Sixth Amendment to Master Loan and Security Agreement-1995-1, dated March

6            31, 1997;

7       m. Restated and Amended Master Loan and Security Agreement-1995-1

8            (Incorporating ___ First, Second, and Third Amendments), dated July 6, 1995;

9        n.   Letters, dated March 31, 1997, April 2, 1997, December 30, 1997, and May 7,

10            1998;

11       o.   Seventh Amendment to Master Loan and Security Agreement-1995-1, dated

12            October 15, 1998;

13     256.   In the Loan and Security Agreement, dated June 10, 1994, the Third Loan and

14 Security Agreement, dated July 7, 1994; the February 1995 Loan and Security Agreement, dated

15 February 21, 1995; and the Master Loan and Security Agreement-1995-1, dated July 6, 1995, as

16 amended, Old WCC "convenanted"

17     •     That it would maintain a tangible net worth at least equal to $1,000,000, and net

18 income of $100,000 per quarter for three out of every four quarters;

19     •     That it would deliver financial statements and that the financial statements were

20 prepared in accordance with generally accepted accounting principles.

21     •     That it would maintain an "acceptable" loan servicer rating from Duff & Phelps,

22 which was deemed to be "SA-3."  (This provision was modified in the Sixth Amendment.)

23     257.   No one disclosed to plaintiffs that Old WCC, in fact, did not have a tangible net

24 worth of at least $1,000,000.  No one disclosed that the only reason that Old WCC's financial

25 statements showed a tangible net worth of at least $1,000,000 was that so-called loans to

    PLAINTIFFS' COMPLAINT    **ESLER, STEPHENS & BUCKLEY**
    RICO and Supplemental State Law    Attorneys at Law
    Claims (28 U.S.C. § 1331)    700 Pioneer Tower
        888 SW Fifth Avenue
        Portland, OR  97204-2021
        503 223 1510

1   Wiederhorn and Mendelsohn were reported on Old WCC's balance sheet as assets, when under

2   generally accepted accounting principals, the so-called loans should have been reported as

3   shareholder distributions.  In addition, no one disclosed to plaintiffs that Old WCC did not have a

4   net income of $100,000 per quarter.  No one disclosed that the only reason that Old WCC's

5   financial statements showed net income of $100,000 per quarter was that 11% interest on the so-

6   called loans was being accrued as income on the income statements, when under generally

7   accepted accounting principals, the so-called loans should not have been reported as income.  No

8   one disclosed to plaintiffs that a loan servicer rating of SA-3 was not a rating that would be

9   acceptable to plaintiffs.  No one disclosed to plaintiffs that a loan servicer rating from Duff &

10   Phelps of SA-3 means "Average servicing capability and below investment grade financial

11   condition. A master servicer and structural enhancements will be required for an investment

12   grade structured financing."

13        258.    Deloitte & Touche and its partner, Samuel Lance White, were Old WCC's auditor

14   and prepared its income tax returns.  As is explained in In Re Samuel L. White, SEC Release No.

15   42879 (June 1, 2000),

16           [O]n September 26, 1996, White was indicted by a grand jury in the
            United States District Court for the Southern District of New York.  As
17           superseded prior to White's trial, the indictment charged White with
            felony charges of securities fraud, bank fraud, conspiracy, and false
18           statements arising from White's involvement with Normandy America and
            Bagdasarian.  In November 1997, following a trial, a jury found White
19           guilty on all charges.  On June 30, 1999, the court imposed a final
            judgment sentencing White to imprisonment for 57 months and ordering
20           him to pay $6,475,898 in restitution. [United States v. Samuel Lance
            White, No. 96 Cr. 869 (S.D.N.Y.).]

21

22        259.    Not only was none of the foregoing disclosed to plaintiffs as it occurred, it was

23   not thereafter disclosed to plaintiffs as they purchased additional securities, even though it was

24   material information, it being a part of risk factors, use of proceeds, offering price, dilution, plan

25   of distribution, summary about the issuer, compensation and fees to the issuer's managers and its

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1   affiliates, conflicts of interest,  prior performance of the issuer's managers and its affiliates,

2   management, investment objectives and policies, and a summary of all promotional and sales

3   material.

4        260.    The Loan and Security Agreement provides that Old WCC will deliver a legal

5   opinion by defendant Stoel Rives.

6        261.    The Second Loan and Security Agreement, dated June 27, 1994, was entered into

7   as a part of the WSI transaction.  In the case of the Second Loan and Security Agreement, one set

8   of documentation presented the transaction as one thing when, in fact, it was something else.

9   The Second Loan and Security Agreement said that Wilshire Credit Corp. was the borrower.  It

10  said that the "Application of Proceeds" was to pay certain loan expenses described in Section

11  5.20 (there is no such section), and then "remainder in a single advance to" Old WCC.  It said the

12  amount that was to be advanced to Old WCC was $3,645,000.  It said that in the event of a

13  default, "Lender's rights and remedies shall be limited to exercising Lender's rights and

14  remedies against the Collateral."  It said "Collateral means each of the items of collateral

15  described at Section 1.3.1."  There is no such section.  Section 1.3, however, said Old WCC

16  granted Lender a security interest in Old WCC's Accounts Receivable, all Collateral (as that

17  term is defined in the First Loan Agreement), all proceeds of the preceding, and all of Old

18  WCC's interest in the Lock Box or Collection Account.  On or about June 28, 1994, a financing

19  statement was filed with the Secretary of State of Oregon indicating the existence of a security

20  interest in the very same collateral that was security for the First Loan Agreement.  The

21  promissory note dated June 27, 1994, provides essentially the same thing.

22       262.    What is not disclosed in the Second Loan and Security Agreement, the financing

23  statement, or the promissory note, is that there was a "side agreement" quite different from what

24  was memorialized in the other documents.  On June 22, 1994, Peterman of Stoel Rives sent a

25  letter to William Schaub of CCI.  (Interestingly, Peterman did not indicate he had sent a copy of

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1   the letter to CCI's lawyers.)  In the letter he indicates that contrary to what is stated in the Second

2   Loan and Security Agreement, the true application of proceeds was to go to Astoria Metals, and

3   that, in addition, Old WCC was to be "indemnified from any claim that may arise from the

4   structure of the loan which is being requested by Capital Consultants, Inc.  Peterman enclosed a

5   form of letter he asked be signed.  The form of letter provides a warranty by CCI that "Capital's

6   loan to Wilshire, and Wilshire's loan of the proceeds thereof to Astoria Metals, does not and will

7   not violate any applicable law."  The form provides that the obligations of Old WCC, contrary to

8   what is stated in the Second Loan and Security Agreement, are only with "recourse to a

9   promissory note executed by Astoria Metals" and the provisions of the letter govern

10  "notwithstanding any other terms of the Loan and Security Agreement, the Loan Amendment

11  and any other loan documents, and the terms of this letter shall supersede such other terms."  A

12  letter is substantially this form was signed by Jeff Grayson on June 27, 1994.

13          263.    What is also not disclosed was that Astoria Metals was an affiliate of WSI, Inc.

14  CCI, as agent for participant-plaintiffs, had loaned money to WSI and WSI was in default.  The

15  money that was being nominally loaned to Wilshire to be loaned to Astoria Metals, was to be

16  used, in turn, to pay money back to CCI to create the impression that WSI was paying on the

17  loan.  This, of course, is the essence of a classic Ponzi scheme.  See generally Cunningham v.

18  Brown, 265 U.S. 1 (1924)(describing Charles Ponzi's scheme).  According to closing statements

19  for the loans, Old WCC received $3,645,000 from CCI.  Wilshire, in turn, delivered this money

20  to Astoria Metals, which delivered $576,750 back to Wilshire for what was denominated a "Loan

21  Origination Fee," $6,500 to Stoel Rives as attorney fees, and $3,028,985 to WSI/Astoria Metals.

22  Of the $3,028,985 delivered to WSI/Astoria Metals, $264,477.96 was delivered all the way back

23  to Capital Consultants as "Interest payment due," $20,860 was delivered to Weiss Jensen as

24  attorney fees, and $1,426,000 was transferred to an account at West One Bank.  This $1,426,000

25  was, it appears, delivered to Capital Consultants.

PLAINTIFFS' COMPLAINT                **ESLER, STEPHENS & BUCKLEY**
                                 RICO and Supplemental State Law    Attorneys at Law
                                 Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                                    888 SW Fifth Avenue
                                                                    Portland, OR  97204-2021
                                                                    503 223 1510

1    264.    Thus, Peterman and Stoel Rives participated in and materially aided the creation

2    of one set of documentation that was consistent with the statements made to plaintiff-purchasers,

3    and at the same time, the creation of another set of documentation that rendered the first set of

4    documentation and the statements made to plaintiff-purchasers untrue and misleading.

5                                                     Insurance/Cash Collateral

6    265.    The Loan and Security Agreement, dated June 10, 1994 and the Second Loan and

7    Security Agreement, dated June 27, 1994 provided that Old WCC will "procure and * * * at all

8    times during the period that any of the secured obligations remain to be performed, maintain, a

9    surety bond in an amount equal, from time to time, to not less than fifteen percent (15%) of the

10    outstanding principal balance of the Note, issued by an Acceptable Credit Insurer, payable to

11    Lender (in its full face amount) upon an Event of Default. 5.17.2.  The Second Loan and

12    Security Agreement provided the same thing.  The Third Loan and Security Agreement, dated

13    July 7, 1994 provided that "On or before the Closing Date of each Loan, Borrower shall procure

14    and deliver to Lender (or to a bailee Lender designates) a certificate or certificates of deposit, to

15    be held by Lender (or Lender's bailee) for so long as the Loan is outstanding, such certificate(s)

16    of deposit to be in an aggregate face amount equal, from time to time, to not less than ten percent

17    (10%) of the outstanding principal balance of the Note." 5.17.2.  The February 1995 Loan and

18    Security Agreement, dated February 21, 1995; and the Master Loan and Security Agreement-

19    1995-1, dated July 6, 1995, provided the same thing except that the percentage was 15% rather

20    than 10%.  As noted above, these provisions are somewhat consistent with the statements that

21    were being made to plaintiff-purchasers.

22    266.    Despite the provisions of the Loan and Security Agreement, dated June 4, 1994,

23    and despite the statements to plaintiff-purchasers that were consistent with that provision, there

24    was no bond.  Furthermore, the statements to plaintiff-purchasers created the impression that

25    insurance was the rule, not the exception.  In fact, by 1994 virtually no loans, if any, were

PAGE 73 of 122              PLAINTIFFS' COMPLAINT                ESLER, STEPHENS & BUCKLEY
                            RICO and Supplemental State Law      Attorneys at Law
                            Claims (28 U.S.C. § 1331)            700 Pioneer Tower
                                                                 888 SW Fifth Avenue
                                                                 Portland, OR  97204-2021
                                                                 503 223 1510

1  insured. Furthermore, in the case of Wilshire, it appears no loan was ever insured. This was

2  never disclosed to plaintiffs.

3      267.    On or about December 26, 1995, Old WCC and CCI signed the Third

4  Amendment to the Master Loan Agreement, which provided essentially the same thing as the

5  prior forms of agreement, except it provided that besides CDs, Old WCC may also procure and

6  deliver "U.S. Treasury bills with maturities not more than one year." Third Amendment, § 3, at

7  2. (The footer to the Third Amendment indicates that Stoel Rives prepared it, presumably by

8  Peterman.) Thus, both the statements CCI made to its clients and the Master Loan Agreement

9  provisions provided that the cash collateral is to be held until final repayment of the loan.

10     268.    At the very same time that Stoel Rives was preparing the Third Amendment that

11  said one thing, Stoel Rives was also preparing another document that said something else,

12  something called the Bear Stearns Borrowing Repayment Agreement. This document is signed

13  by Wiederhorn, and no one else. It is dated December 26, 1995, the same date on the Third

14  Amendment to the Master Loan Agreement. Instead of the cash collateral being held until final

15  repayment of the loan, the Bear Stearns Borrowing Repayment Agreement provides that CCI

16  will permit Bear Stearns to lend Old WCC funds using the cash collateral as collateral for the

17  loans to Old WCC. Furthermore, Old WCC commits to repay the loans to Bear Stearns by

18  January 31, 1996, but only if CCI timely advances more loans to Old WCC.

19     269.    Beginning December 27, 1995, CCI began transferring to an account at Bear

20  Stearns certificates of deposit that CCI had been holding as cash collateral. The funds were used

21  to purchase U.S. Treasury bills. Then, although the account at Bear Stearns was in the name of

22  "Capital Consultants, Inc. as Investment Advisor and Agent for its Clients," the U.S. Treasury

23  bills were then sold to Bear Stearns and the funds from the sales were transferred to Wilshire.

24  Between December 27, 1995 and January 5, 1996, Wilshire sold to Bear Stearns $6,416,207.99

25  of Treasury Bills that Bear Stearns was supposed to be holding for CCI's clients. Later, on

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2021
503 223 1510

1   March 21, 1996, it appears that Wilshire took another $105,269.40 ($722,713.44 - $616,444).  In

2   May 1996, acting pursuant to the repurchase agreement between it and Wilshire, Bear Stearn's

3   forced the repurchase of CCI's clients' collateral and distributed another $4,470,074.44 out of

4   CCI's clients' account.  During this time, it appears Bear Stearns charged the CCI clients'

5   collateral account with $120,210 in accrued interest.  Thereafter, until December 1996,

6   approximately $4,650,000 of Treasury Bills were out of the clients' account and the

7   corresponding funds were in the hands of Wilshire.

8          270.    The Treasury Bills were securities.  No disclosure was made to plaintiff-

9   purchasers that their Treasury Bills were being sold out of the Bear Stearns client collateral

10  account, why they were being sold, or who the proceeds were going to, much less a full and fair

11  disclosure.

12         271.    Thus, although the statements CCI made to its clients and the Master Loan

13  Agreement provisions provided that the cash collateral was to be held until final repayment of

14  the loan, that was not the case.  Not only did Stoel Rives prepare the Bear Stearns Borrowing

15  Repayment Agreement that provided for Wilshire to receive benefit of the cash collateral in

16  advance of the final repayment of the loans, Peterman received copies of correspondence

17  throughout the first part of 1996 dealing with the sale of the U.S. Treasury bills and the transfers

18  of funds to Old WCC.

19         272.    Not only was none of the foregoing disclosed to plaintiffs as it occurred, it was

20  not thereafter disclosed to plaintiffs as they purchased additional securities, even though it was

21  material information, it being a part of risk factors, use of proceeds, offering price, dilution, plan

22  of distribution, summary about the issuer, compensation and fees to the issuer's managers and its

23  affiliates, conflicts of interest, prior performance of the issuer's managers and its affiliates,

24  management, investment objectives and policies, and a summary of all promotional and sales

25  material.

PLAINTIFFS' COMPLAINT            **ESLER, STEPHENS & BUCKLEY**
                              RICO and Supplemental State Law        Attorneys at Law
                              Claims (28 U.S.C. § 1331)              700 Pioneer Tower
                                                                     888 SW Fifth Avenue
                                                                     Portland, OR  97204-2021
                                                                     503 223 1510

1   273.    By early October 1998, Wilshire was in collapse.  Bear Stearns made a margin

2   call on WFSG in the amount of $23 million.  Salomon Brothers and Credit Suisse made margin

3   calls as well.  For its part, Old WCC was in default on the loans and CCI's clients had full rights

4   in the $25.7 million of Treasury Bills that were held by Bear Stearns for plaintiff-purchasers as

5   collateral.  During the middle part of October 1998, s Stoel Rives participated and materially

6   aided by preparing the Seventh Amendment to the Master Loan Agreement, whereby the $19.3

7   million was given to Old WCC and other persons and entities associated with Wilshire.  The

8   Seventh Amendment contains a number of representations and warranties from Old WCC,

9   WREIT, and WFSG regarding their lack of intention to file bankruptcy petitions, their lack of

10  insolvency, and the lack of disbursements to Wiederhorn, Mendelsohn, and their family

11  members.  These statements were untrue and misleading.  WFSG did file bankruptcy.  At least

12  WFSG and Old WCC were insolvent.  Disbursements were made to or for the benefit of

13  Wiederhorn and Mendelsohn.  (The $4,282,069 transferred to Prudential Securities is for the

14  account of Wiederhorn.)

15  274.    To give $19.3 million Old WCC and other persons and entities, plaintiff-

16  purchasers' Treasury Bills were sold out the Bear Stearns client collateral account.  The Treasury

17  Bills were securities.  No disclosure was made to plaintiff-purchasers that their Treasury Bills

18  were being sold, why they were being sold, or who the proceeds were going to, much less a full

19  and fair disclosure.

20  275.    Stoel Rives and Peterman knew that no final repayment of the loans secured by

21  the collateral had been made.  Stoel Rives and Peterman knew that the collateral was not being

22  liquidated to retire the principal balance of those loans.  Stoel Rives and Peterman knew that

23  giving the $19.3 million to Old WCC and other Wilshire entities was a breach of the prior Master

24  Loan Agreement, as amended.  Stoel Rives and Peterman knew that giving the $19.3 million to

25

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1   Old WCC and other Wilshire entities was a breach of CCI's fiduciary duties of loyalty, full

2   disclosure, and care.

3       276.    During the middle part of October 1998, Stoel Rives participated and materially

4   aided by preparing the Eighth Amendment to the Master Loan Agreement.  The agreement was

5   signed October 16, 1998.  Under this agreement, approximately $6 million went to Specialty

6   Finance a company owned by Wiederhorn family members.  Specialty Finance used the $6

7   million to purchase WFSG stock, apparently at $15 per share.  This price exceeds the market

8   price of the stock.  This suggests that the purchase could have been made to manipulate the

9   market price of the stock.

10                          Inability to Service Debt

11       277.    In April 1996, Wilshire and CCI, "as agent for certain participant lenders"

12   executed a Fourth Amendment to the Master Loan Agreement.  In the Fourth Amendment, CCI

13   said it would "fund" on Old WCC's request $75,000,000 by December 31, 1996.  This "funding"

14   implied Old WCC could afford annual interest payments of $9 million at the end of 1996.  In

15   fact, total servicing fee revenue for 1995 for Old WCC was $9.7 million.  If provision were made

16   for evenly amortizing the principal pay down, the annual payment at the end of 1996 would have

17   been $13.3 million, far in excess of the servicing fee revenue Old WCC had realized in 1995.

18       278.    In fact, Old WCC had received $87.3 million by the end of 1996, requiring annual

19   interest payments of $10.7 million.  The actual interest payments owed exceeded Old WCC's

20   actual 1996 servicing fee revenues by $2.9 million.  Under these circumstances, how could Old

21   WCC make interest payments?  By funding them out of future loans: a classic Ponzi scheme.

22   None of this was disclosed to plaintiff-purchasers.

23                WSFG Registration Statement as Containing Minimal Disclosures

24                    That Should Have Been Made to Plaintiff Purchasers

25

PLAINTIFFS' COMPLAINT
                      RICO and Supplemental State Law
                      Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

279.    In late 1996, the principals of Old WCC filed with the SEC a registration statement for the sale of securities in Wilshire Financial Services Group, Inc.  From that registration statement it is clear that much of the business of WFSG was the same as the business of Old WCC.  The WFSG registration statement contains a number of disclosures, including disclosures about risk factors, use of proceeds, offering price, dilution, plan of distribution, summary about the issuer, compensation and fees to the issuer's managers and its affiliates, conflicts of interest, prior performance of the issuer's managers and its affiliates, management, investment objectives and policies, and a summary of all promotional and sales material.

Change of Collateral

280.    As noted above, plaintiff purchasers were told that notes were secured by an assignment of the borrower's receivables or contract rights; that where cash collateral was received that the notes were over-secured by contract receivables, that notes were secured by qualified receivables from creditworthy payors, that there were appropriate personal and/or corporate guarantees for each loan, that there were appropriate security interests in all collateral for each loan, that there was a 90% loan to value against qualified receivables, and that the amount of  loans was only up to 90% of the qualified receivables.

281.    For their part, the loan agreements contain provisions dealing with "Eligible Accounts Receivable" as securing the notes.  The agreements state that accounts receivable "with respect to any Loan, [mean] any and all of [Old WCC's] currently existing and hereafter acquired or arising accounts, accounts receivable, contract rights, and all rights to payment for services rendered or to be rendered that arise from or constitute Servicing Fees or Participation Receivables," in either case given to secure such Loan."  Servicing Fees are defined as amounts payable to Old WCC under Servicing Contracts.  Servicing Contracts are participation and servicing agreements between Old WCC and others under which Old WCC collects Servicing Fees in exchange for "loan portfolio management services (including billing, portfolio

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1  administration and collection services).  Participation Receivables are Old WCC's Participation

2  Interests in the Net Portfolio Receivables.  Old WCC's Participation Interest is its percentage

3  ownership interest in a Portfolio.  A Portfolio is a portfolio of loans.

4      282.    Despite the loan agreements' labeling as accounts receivable "hereafter arising

5  accounts," and "rights to payment for services to be rendered," they were not.  There was no

6  right to payment for services that had not been rendered.  At best, it was a general intangible.

7  Thus those statements to plaintiff purchasers that their notes were secured by accounts receivable

8  was to that extent, untrue and misleading.

9      283.    It appears that on May 26, 1995, Old WCC granted to Cargill Financial Services

10  Corp. a security interest in collateral and that any interest that plaintiff-purchasers had was junior

11  to that interest.  This was not disclosed to plaintiff purchasers.  Furthermore, on July 21, 1995,

12  Peterman and Stoel Rives issued an opinion letter regarding this collateral.  At a minimum, this

13  letter presented an opportunity for them to make a full and truthful disclosure of all material

14  information about the collateral, something mandated by Oregon law.

15      284.    Furthermore, according to the WSFG registration statement, from at least Fall

16  1996, if not earlier, several changes in Old WCC's operation material to plaintiff purchasers

17  were planned.  The registration statement states:

18      285.    In the Reorganization, the Wilshire Private Companies, including Old WCC will

19  not become subsidiaries of the Company or transfer any assets or liabilities to the Company.  Old

20  WCC is not being included in the new public entity due to certain tax considerations and to allow

21  Old WCC to retain sufficient assets and servicing rights to retire the Shareholder Loans made to

22  the Principals to fund acquisitions of, and certain capital contributions to, the Savings Banks.

23  ...Old WCC will cease to acquire new product or servicing for its own account, but will continue

24  to service and liquidate its existing portfolio of loans; provided, however, Old WCC will not

25  compete with the Company for third party servicing.  ...New loan acquisitions and originations

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    will be conducted by WFC.  For a period of two to three years after the closing of the Common

2    Stock Offering and the Notes Offering, while WSC is in the process of obtaining the relevant

3    licensing approvals for its servicing activities, Old WCC will continue to service loans for the

4    Company at market rates. Following such period, WSC will commence servicing loans for the

5    Company and Old WCC, until such time as Old WCC has liquidated its existing portfolio of

6    loans.

7         286.    Note that the Shareholder Loans are defined as money loaned by Old WCC to

8    Wiederhorn and Mendelsohn, not the other way around.  (It should be Wiederhorn and

9    Mendelsohn who should be worried about retaining sufficient assets to retire those particular

10   loans, not the other way around.  Old WCC is being operated solely for the benefit of its

11   shareholders, not its creditors.)  Note also nothing is said about retaining sufficient assets to

12   retire Old WCC's loans owed to plaintiff-purchasers.  Note also that Old WCC is not acquiring

13   any more loan portfolios and its servicing business, the only other potential source of collateral,

14   is to end in two to three years.

15        287.    No disclosure was made to plaintiff-purchasers that Old WCC was not acquiring

16   new loans and that its servicing business was coming to an end in two or three years.  No one

17   disclosed that Old WCC had no new "Participation Receivables" to create security interests in.

18   No one disclosed that effectively the only collateral Old WCC perhaps had to offer for new loans

19   was future rights to payment for services to be rendered.  No one disclosed that to the extent that

20   Old WCC was granting security interests in future rights to payment for services to be rendered,

21   that "future" was to come to an end in two or three years.

22        288.    Between December 31, 1996 and September 30, 1998, plaintiff purchasers

23   purchased another $66,854,750 of Wilshire notes.

24        289.    For its part, not only did Stoel Rives and Peterman participate and materially aid

25   in the sale of securities as already noted, Stoel Rives and Peterman prepared and delivered to

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law          Attorneys at Law
Claims (28 U.S.C. § 1331)          700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1   CCI opinion letters about the collateral.  At a minimum, these letters presented an opportunity

2   for them to make a full and truthful disclosure of all material information about the collateral,

3   something mandated by Oregon law.

4                                    Lack of Diversification

5          290.    Also as noted above, plaintiff-purchasers were told that there was "appropriate

6   diversification across industry sectors," that there was "appropriate portfolio diversification."  In

7   fact, as more and more Wilshire notes were purchased, there was no diversification, much less

8   appropriate diversification or diversification across industry sectors.  No one disclosed that the

9   same servicing contracts were being used to collateralize different loans.  (By September 30,

10  1998, just three service contracts accounted for 47% of the collateral for the Wilshire notes.)

11                                    Sterling Transaction

12         291.    Notes, apparently of meetings held, dated November 17, 1998, state the

13  following:

14         a.    Yesterday, REM [Robert E. Maloney] talked to Wilshire's Bcy Atty.  He (the Bcy

15              Atty said essentially he (they) had not yet revealed this Hand That Feeds You /

16              DOL / CF loan / gtee /.  CCI stock issue to the Bondholders

17         b.    Essentially threatened Bob/CCI that they would reveal it if CCI doesn't do what

18              WFSG / Old WCC wants.

19         292.    Stoel Rives served as Wilshire's bankruptcy attorneys.  Discovery will reveal

20  whether this particular threat was made or witnessed by Stoel Rives.  In either case, the threat

21  was not disclosed to plaintiff purchasers.

22         293.    Thereafter, Stoel Rives participated and materially aided the preparation of the

23  documentation used in connection with the Sterling transaction and the sales and purchases of

24  securities that occurred in that transaction.

25

PAGE 81 of 122          PLAINTIFFS' COMPLAINT              **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law    Attorneys at Law
                        Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                           888 SW Fifth Avenue
                                                           Portland, OR  97204-2021
                                                           503 223 1510

1    294.    Thereafter, Stoel Rives participated and materially aided the restructuring of

2    Wilshire.

3                                Other Transactions

4    295.    Stoel Rives and Peterman participated and materially aided in other transactions,

5    but because Stoel Rives has not produced documents yet, those allegations will follow.

6    296.    Stoel Rives and Peterman also participated and materially aided the WSI/Cascade

7    General transaction, which is more particularly described in the allegations dealing with Weiss

8    Jensen's participation.

9                            Sales in Violation of ORS 59.135

10    297.    For all the foregoing reasons, the securities were also sold in violation of ORS

11    59.135.  ORS 59.115(1)(a).  Stoel Rives and Peterman participated and materially aided in those

12    sales.

13                            Liability under ORS 59.127

14    298.    In those cases where the securities transactions involved sales of plaintiff-

15    purchasers' securities, rather than purchases of securities, those securities were purchased by

16    means of untrue statements and omissions to state material facts necessary in order to make the

17    statements that were made, not misleading.   Stoel Rives and Peterman participated and

18    materially aided in the purchases.

19                            Sales of Unregistered Securities

20    299.    The securities were not registered as required by ORS 59.055.  The securities

21    were sold in violation of ORS 59.115(1)(a).  (Plaintiffs only seek recovery for violations of ORS

22    59.055 from Stoel Rives and Peterman for securities sold within the statute of limitations

23    provided in ORS 59.115(6).)

24                            Aiding Breach of Fiduciary Duty

25

PLAINTIFFS' COMPLAINT
                RICO and Supplemental State Law
                Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    300.    As a registered investment advisor, CCL was a fiduciary.  This is true because of

2    the nature of the relationship between the parties, the terms of the agreements between CCL and

3    its clients, and court decisions, such as SEC v. Capital Gains Research Bureau, Inc., 375 U.S.

4    180 (1963).

5    301.    As a fiduciary and a seller of securities, CCL owed a number of duties.  The rules

6    of the Oregon Department of Consumer and Business Services, Division of Finance and

7    Corporate Securities, and the rules of the NASD and NYSE set forth law applicable to

8    stockbrokers or are important evidence of the standards that govern their conduct.  Vucinich v.

9    Paine, Webber, Jackson & Curtis, Inc., 803 F.2d 454, 461 (9th Cir. 1986)(rules of the New York

10    Stock Exchange and of the National Association of Securities Dealers were highly relevant

11    "because the rules reflect the standard to which all brokers are held"):

12    302.    CCL had a duty to the investors to observe high standards of commercial honor

13    and just and equitable principles of trade.  NASD Rule 2110.

14    303.    CCL had a duty to the investors, when telling the investors to purchase, sell, or

15    exchange a security, to have reasonable grounds for believing that the proposed transaction was

16    suitable for them upon the basis of their other securities holdings and their financial situation and

17    needs.  OAR 441-205-0140; NASD Rule 2310.

18    304.    CCL had a duty to the investors prior to the execution of such transactions, to

19    obtain information concerning the investors' financial status, their tax status, their investment

20    objectives, and such other information used or considered to be reasonable in telling the

21    customer to make the proposed transaction.  NYSE Rule 405.

22    305.    CCL had a duty not to tell the investors to buy speculative low-priced securities

23    without knowledge of, or attempt to obtain, information concerning their other securities

24    holdings, their financial situation, and other necessary data.  OAR 441-205-0130(1).

25

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                                      RICO and Supplemental State Law      Attorneys at Law
                                      Claims (28 U.S.C. § 1331)            700 Pioneer Tower
                                                                          888 SW Fifth Avenue
                                                                          Portland, OR  97204-2021
                                                                          503 223 1510

1    306.    CCL had a duty to act with that degree of care and skill that is standard in

2   Portland, Oregon, by investment advisors and stockbrokers, and, in addition, to exercise any

3   special skill that it had.  Hampton Tree Farms, Inc. v. Jewett, 320 Or. 599, 617, 892 P.2d 683

4   (1995); Lindland v. United Business Investments, 298 Or. 318, 324-25, 693 P.2d 20 (1984).

5    307.    CCL had a duty to make a full and truthful disclosure of material information to

6   the investors regarding all securities sales and purchases.  ORS 59.115; ORS 59.127; ORS

7   59.135; Everts v. Holtmann, 64 Or. App. 145, 152, 667 P.2d 1028 (1983).

8    308.    CCL had a duty to use reasonable efforts to give information that was relevant to

9   affairs entrusted to it and which the investors would need or desire to have.  Porter v. Buckley,

10   127 Or. 22, 27-28, 270 P.905 (1928).

11    309.    CCL had a duty of loyalty, a duty to act for the investors' benefit in all matters

12   connected with their accounts.  Porter v. Buckley, 127 Or. 22, 27-28, 270 P.905 (1928);

13   Hampton Tree Farms, Inc. v. Jewett, 320 Or. 599, 617, 892 P.2d 683 (1995).

14    310.    In acting on its own account or on the account of another in a securities

15   transaction connected with the investors (whether proper or not), CCL had a duty to deal fairly

16   with the investors and to disclose to them all facts that it knew or should have known would

17   reasonably affect his judgment.  Porter v. Buckley, 127 Or. 22, 27-28, 270 P.905 (1928).

18    311.    As summarized by the California Court of Appeal in Duffy v. Cavalier, 215 Cal.

19   App.3d 1517, 1532, 264 Cal. Rptr. 740, 750 (1989), CCL had a fiduciary duty (1) to ascertain

20   that the investor understands the investment risks in the light of his or her actual financial

21   situation; (2) to inform the customer that no speculative investments are suitable if the customer

22   persists in wanting to engage in such speculative transactions without the CCL's being persuaded

23   that the customer is able to bear the financial risks involved; and (3) to refrain completely from

24   soliciting the customer's purchase of any speculative securities which the CCL considers to be

25   beyond the customer's risk threshold.

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    312.    As noted elsewhere in this complaint, CCL breached the fiduciary duties it owed

2    plaintiffs.

3    313.    As described above, Stoel Rives and Peterman acted in concert with CCL.  Stoel

4    Rives and Peterman either did tortious acts in concert with CCL or pursuant to a common design

5    with CCL, or knew that CCL's conduct constituted a breach of duty and gave substantial

6    assistance or encouragement to CCL so to conduct itself; or gave substantial assistance to CCL

7    in accomplishing a tortious result and Stoel Rives' and Peterman's own conduct, separately

8    considered, constituted a breach of duty to plaintiffs.

9    THE ROLE OF O'MELVENY & MYERS AND ROBERT N. ECCLES

10    314.    O'Melveny & Myers and Eccles participated in or materially aided most of the

11    sales of securities at issue in this case and substantially assisted most of CCL's breaches of

12    fiduciary duty described in this complaint.  It participated in or materially aided CCL's sales of

13    securities to its clients from December 20, 1995, to September 20, 2000; it participated in or

14    materially aided the structuring of the Sterling transaction; it participated in or materially aided

15    the formulation of the related Oxbow component of the Sterling transaction; it participated in or

16    materially aided the structuring of the Brooks and Beacon transactions; and it participated in or

17    materially aided the Wilshire restructuring and bankruptcy, including the releases of the

18    Wiederhorn, Mendelsohn, and WREIT guaranties, and the substitution of WFSG Class B stock

19    for the rights that CCL's clients had under the Master Loan Agreement between CCL and Old

20    WCC and related agreements.

21    315.    More specifically, O'Melveny and Eccles participated in or materially aided the

22    sale of securities at issue in this case and the breaches of duties alleged in this complaint in at

23    least the following ways.

24    316.    O'Melveny began its involvement with CCL in 1995, when CCL hired

25    O'Melveny to assist and participate in CCL's defense against charges by the Department of

PLAINTIFFS' COMPLAINT            **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law            Attorneys at Law
Claims (28 U.S.C. § 1331)            700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    Labor that CCL had violated provisions of ERISA that prohibit a fiduciary from self-dealing

2    with assets of a covered plan.  CCL hired O'Melveny because Robert Eccles, an O'Melveny

3    partner, had expertise investments and securities offered to ERISA-governed pension plans and

4    trusts.  The Department of Labor charges resulted in a consent order filed 12/22/95, pursuant to

5    which CCL and Grayson agreed to restore $2,000,000 in management fees that the Oregon

6    Laborers-Employers Pension Plan had paid to CCL, and agreed to pay a civil fine of $180,000.

7    Grayson and CCL obtained $1.7 million, the cash portion of the settlement, by means of the

8    straw man loan by CCL's clients to Old WCC to CF Credit to Grayson, described above.

9        317.    On 12/20/95, O'Melveny and Eccles issued an opinion letter to CCL to be

10   circulated to CCL's current and prospective clients concerning the resolution of the Department

11   of Labor's investigation proceeding that omitted to disclose that the Department had alleged that

12   CCL violated ERISA when it used its discretionary authority to cause the Oregon Laborers-

13   Employers Pension Plan to pay certain fees, that the "settlement" was actually a consent order,

14   that the consent order required the return of $2,000,000 of fees that should never have been

15   collected, that CCL was fined $180,000, and that CCL and Grayson were permanently enjoined

16   from operating and collecting fees under any fee arrangement that would allow them to use their

17   discretion over ERISA assets  to affect the amount of their fees.  Furthermore, although the

18   Eccles letter was dated 12/20/95, by the time it was used to persuade CCL's clients to invest, the

19   SEC had issued an investigation report dated 12/26/95.  In that investigation, the SEC found that

20   many of CCL's practices were improper.  Eccles 12/20/95 letter was not updated to disclose the

21   SEC findings.

22       318.    From early 1996 through September 2000, while CCL was selling securities to,

23   and acting as Investment Adviser for, its clients, O'Melveny was CCL's primary legal adviser on

24   the requirements of federal and state securities laws and the Investment Advisers Act.

25

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                                RICO and Supplemental State Law    Attorneys at Law
                                Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                                   888 SW Fifth Avenue
                                                                   Portland, OR  97204-2021
                                                                   503 223 1510

1      319.    O'Melveny provided securities law advice on compliance with securities

2  registration requirements and the reporting requirements of the Investment Advisers Act, opined

3  that the investments that CCL was selling to plaintiffs and to its other clients were not

4  "securities," assisted CCL in responding to an SEC investigation report issued on December 26,

5  1995, reviewed, revised, and approved CCL's offering materials for the collateralized note

6  program during the first quarter of 1996, responded to an investigation by the securities

7  enforcement section of the Ohio Department of Commerce in November 1998, materially aided

8  CCL in preparing annual reports required to be filed with the SEC beginning in March 1996, and

9  rendered advice on a regular basis to CCL on other general securities law and Investment

10  Adviser Act issues and the interplay between ERISA, the federal and state securities laws, and

11  the Investment Adviser Act.

12      320.    On December 26, 1995, the SEC issued a 12 page report of its investigation of

13  CCL in which the SEC charged CCL with, among other things, violating the anti-fraud

14  provisions of the Investment Advisers Act on a regular basis by overstating in various ways the

15  market value of investments made for its clients.  The SEC report also said that as a result of

16  overstatement of the value of investments, CCL clients paid correspondingly higher acquisition

17  and advisory fees to CCL, that disclosure of how CCL calculates market value of investments

18  was inadequate, that CCL's inadequate reporting to clients about client funds and securities in its

19  possession violated the Investment Advisers Act, and that CCL did not adequately disclose

20  performance figures in its advertising material.  In the first quarter of 1996, O'Melveny advised

21  CCL on how to respond to that investigation report, what internal policies to adopt, and what

22  disclosures to make to plaintiffs and CCL's other clients.  In March 1996, CCL provided

23  O'Melveny for its review a complete copy of CCL's offering materials for its collateralized note

24  program.  In March and April 1996, O'Melveny reviewed, revised, and approved those offering

25  materials, which included a section on CCL's new Investment Valuation Policy and its new

      PLAINTIFFS' COMPLAINT      **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law    Attorneys at Law
Claims (28 U.S.C. § 1331)        700 Pioneer Tower
                                        888 SW Fifth Avenue
                                        Portland, OR  97204-2021
                                        503 223 1510

1    Appraiser Selection and Appraisal Content Policy, both of which were directly precipitated by

2    the SEC investigation.  O'Melveny also reviewed, revised, and approved of the form of

3    disclosure that CCL made to its clients on the reasons for adoption of these new internal Policies.

4    The disclosure was designed to give the impression that CCL had voluntarily adopted these new

5    Policies, and omitted to disclose that the new policies were adopted because the SEC had

6    concluded that CCL had repeatedly violated the anti-fraud provisions of the Investment Adviser

7    Act and had improperly collected fees based on overstated loan values.  The marketing materials

8    that O'Melveny participated in preparing did not disclose any information about the Department

9    of Labor proceeding, the consent order, or the SEC investigation.

10           321.    In December 1996 and in January through April 1997, O'Melveny provided

11   "Securities Law Advice" to CCL on state by state Blue Sky registration requirements, whether

12   compliance with the net capital requirements of the various states was necessary, the registration

13   requirements of various state for investment advisers, various SEC reporting requirements

14   including Form ADV and Oregon's U-4 registration requirements.  During that same period,

15   O'Melveny prepared and revised various investment adviser registration documents.

16           322.    In at least the second half of 1996, if not earlier, O'Melveny authorized CCL to

17   use, or ratified CCL's use of, O'Melveny's and Eccles's name and reputation as CCL's "top

18   legal talent" in offering materials designed to persuade investors to invest in CCL's

19   collateralized note program and its private investment program.

20           323.    In August 1996, O'Melveny advised CCL on how and whether it could enter into

21   a joint venture with a corporation that had issued a security in the form of a collateralized note,

22   which CCL had sold to at least one of CCL's clients.

23           324.    In October 1996, O'Melveny advised CCL on how to minimize CCL's exposure

24   to liability with respect to presenting certain securities to its clients.

25

PLAINTIFFS' COMPLAINT         **ESLER, STEPHENS & BUCKLEY**
                                      RICO and Supplemental State Law    Attorneys at Law
                                      Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                                         888 SW Fifth Avenue
                                                                         Portland, OR  97204-2021
                                                                         503 223 1510

1    325.    In the second half of 1996 and on through most of 1997, O'Melveny and Eccles

2    advised, represented, and defended CCL in connection with a demand and subsequent lawsuit for

3    rescission of investments that CCL sold to two of its clients.  One of the clients alleged that CCL

4    had committed fraud, and both alleged that CCL had breached its fiduciary duties, in connection

5    with the purchase and sale of that investment.  The clients based those allegations in part on a

6    report prepared by an independent investment-monitoring firm.  In late 1997, O'Melveny and

7    Eccles represented CCL in settling those claims, and in preparing a public statement directed at

8    its actual and prospective clients concerning the settlement that was misleading because it did not

9    disclose the nature of the allegations, material facts about CCL's actual or potential liability, the

10    reasons for settlement, or that CCL agreed to pay $6,000,000 to settle the case.

11    326.    In April 1997, O'Melveny provided a detailed analysis of CCL's investment

12    adviser registration and fee payment obligations to the SEC and to the various states as well as

13    licensing and registration requirements for investment adviser representatives.

14    327.    In September 1997, O'Melveny advised CCL concerning "core securities

15    regulatory requirements" for CCL's "innovative investment products."

16    328.    In 1997, O'Melveny provided documentation and assistance necessary for the sale

17    of The Hand That Feeds You loan to Old WCC.  Old WCC financed the "purchase" of the loan

18    from loan proceeds from new CCL clients, and then pledged The Hand That Feeds You loan as

19    part of the collateral securing the loan.  The purpose of that sale was to lull CCL clients into

20    believing that their The Hand That Feeds You securities were safe and performing.

21    329.    In the first half of 1998, O'Melveny reviewed, revised, and approved offering

22    materials for CCL's "Collateralized Notes Limited Partnership I," and advised CCL on

23    suitability issues when making recommendations to its clients to purchase securities like those

24    offered in CCL's collateralized note program and its other programs.

25

PAGE 89 of 122          PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law    Attorneys at Law
                        Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                           888 SW Fifth Avenue
                                                           Portland, OR  97204-2021
                                                           503 223 1510

1    330.    In the second half of 1998, O'Melveny and Eccles prepared the documents

2    whereby CCL employed John Abbott to identify and solicit potential CCL clients and potential

3    purchasers of securities that CCL offers and sells like those of the collateralized note program.

4    Abbott had been chairman or a member of several investment committees of, and a trustee of,

5    many of the ERISA-governed pension and trust funds in CCL's stable of clients.  The contract

6    provided that Abbott would be paid a $50,000 cash payment, $7,500 per month, a sliding scale of

7    incentive commissions starting at 28%, a $70,000 golf club membership, and a promise to pay

8    $270,000 if CCL did not renew the contract after the initial five year term.  The contract had a

9    minimum value of $840,000.  Except as a bribe, there was no reason to pay this much money a

10    value to Abbott.  The fact of the bribe was never disclosed to CCL's clients.  Abbott recently

11    pleaded guilty to taking $195,000 in payoffs from Grayson in connection with his "marketing"

12    activities for CCL.  O'Melveny also provided CCL with guidance on documentation for

13    employing other "third-party solicitors" like Abbott.

14    331.    In November 1998, O'Melveny advised CCL and the Enforcement Section of the

15    Division of Securities of the Ohio Department of Commerce that the securities that CCL had

16    offered and sold, and was continuing to offer and sell, were not securities, and that CCL had not

17    and was not offering and selling them.  O'Melveny provided that advice so CCL could continue

18    to sell the collateralized note program securities in Ohio as it had been in the past without

19    disclosing material information concerning CCL's track record.

20    332.    In January 1999, O'Melveny and Eccles helped prepare, reviewed, and approved

21    a written statement to CCL's clients concerning the Sterling transaction, which characterized the

22    Sterling transaction as a restructuring and sale to a third party of the participations in loans to

23    Old WCC.  This restructuring and sale involved the purchase and sale of the following securities:

24    (a) participations in loans to Old WCC, (b) participations in loans to Sterling, and (c) WFSG

25    stock rights.  The purpose of the statement was to lull CCL's clients who had purchased Old

PAGE 90 of 122          PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                        RICO and Supplemental State Law          Attorneys at Law
                        Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                          888 SW Fifth Avenue
                                                          Portland, OR  97204-2021
                                                          503 223 1510

1   WCC loan participation collateralized note securities into believing that their investments were

2   still safe and performing, and that they would remain safe and adequately secured after Sterling

3   took over making the payments that Old WCC had previously made.  CCL did not want these

4   clients to withdraw their investment funds from CCL because of the sale, and CCL wanted to sell

5   new investments to the same clients.  Accordingly, CCL needed to conceal Old WCC's defaults.

6   To those ends, the statement said that, "Over the term of this lending arrangement [with Old

7   WCC], all payments due under the loan terms were made in full to our clients on a timely basis."

8   The statement omitted to disclose, however, that some of the payments had been made by book

9   entries that capitalized unpaid interest as new loans, and that many of the payments of interest on

10  old loans were financed by, and came directly from, the proceeds from sales of new loan

11  participation securities.  The statement also said that the servicing rights collateral for the loans

12  to Old WCC had been independently appraised by a third party valuation firm who confirmed

13  that there was adequate collateral, but omitted to disclose that the appraisals were improperly

14  conducted, vastly overstated the value of the collateral, and did not take into account that the

15  owner of the loan portfolios being serviced could terminate the servicing rights at any time at

16  will.  The statement omitted to disclose among other things that Sterling did not have the

17  financial resources to perform its obligations, and that Sterling could back out of its obligations

18  at any time without any liability.  The statement said that CCL looked for a sale to a third party

19  that would provide protection to its clients, but omitted to disclose that the Sterling transaction

20  offered little, if any, protection because Sterling had no assets or business operations.  The

21  statement said that Sterling is an investment company associated with an independent NASD

22  broker-dealer that has been in business for 27 years, but omitted to disclose that Sterling, as

23  opposed to the NASD broker-dealer, had no assets or operating history.

24        333.    In the first half of 1999, O'Melveny and Eccles reviewed, revised, and approved

25  the details of the restructure of the Old WCC loans together with the concomitant sale of the Old

PAGE 91 of 122        PLAINTIFFS' COMPLAINT
                      RICO and Supplemental State Law
                      Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1     WCC loans to Sterling, and the details of the transaction between CCL and Brooks Financial,

2     LLC, whereby CCL agreed to loan $50 million to Brooks on the condition that Brooks use part

3     of the proceeds to purchase up to $120 million (CCL to determine the exact amount) of

4     Sterling's position in CCL's clients' loans to Old WCC.  O'Melveny and Eccles gave an oral

5     opinion and then wrote a confirming opinion letter that was necessary to the Brooks $50 million

6     loan transaction.  The purpose of the Brooks loan transaction was to create Brooks collateralized

7     note securities that CCL could sell to its clients.  The Brooks loans, participations in which CCL

8     sold to its clients, were described as being secured in part by 15% cash collateral.

9         334.    In the second half of 1999, in connection with the Sterling/Brooks transactions,

10    O'Melveny and Eccles provided legal advice that CCL used in connection with manipulating the

11    cash collateral account for the Brooks loans so that the cash was "invested" in a "mutual fund"

12    (Oxbow Fund B) that was managed by Sterling's affiliate, Oxbow Partners.  The "mutual fund"

13    consisted of one worthless stock, which the "mutual fund" purchased with the cash from the cash

14    collateral account at an inflated value.  The seller of the stock to the "mutual fund" was an

15    affiliate of Sterling, who invested the proceeds into Sterling.  Sterling then used those proceeds

16    to make part of Sterling's loan payments to CCL.  By these means, the cash loaned to Brooks

17    that Brooks was supposed to use to fund the cash collateral account was actually used to make

18    part of Sterling's loan payments.  None of this was disclosed to plaintiffs or any other CCL

19    clients who subsequently purchased securities from CCL.

20        335.    In March 2000, O'Melveny and Eccles prepared a ten-page opinion letter that

21    confirmed the oral advice that O'Melveny and Eccles had given in mid-1999 concerning the

22    Sterling/Brooks transactions.  O'Melveny opined in effect that if CCL sold participations in

23    loans to Brooks, who would or could use the proceeds of the loans to pay Sterling's obligation to

24    CCL's clients who had purchased participations in loans to Old WCC–the effect of which was

25    that new investments money from CCL's clients would or could be used to pay returns on old

PAGE 92 of 122       **PLAINTIFFS' COMPLAINT**       **ESLER, STEPHENS & BUCKLEY**
                           RICO and Supplemental State Law    Attorneys at Law
                           Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                    888 SW Fifth Avenue
                                                    Portland, OR  97204-2021
                                                    503 223 1510

1    investments made by CCL's clients–then CCL would not have engaged in sham transactions,

2    prohibited by ERISA, which were designed to benefit a party in interest, despite the fact that

3    these transactions were designed "to forestall the potential liability of CC[L] by continuing to

4    assure a return on the investment in [Old] WCC notes."  This opinion was a necessary condition

5    to the offering of Brooks loan participation securities.

6        336.    In April 2000, O'Melveny and Eccles rendered an opinion concerning the

7    Beacon/Sterling transactions, *i.e.*, that it was the same as its opinion concerning the

8    Brooks/Sterling transactions.  This opinion was a necessary condition to the offering of Beacon

9    loan participation securities.

10       337.    In May 2000, O'Melveny and Eccles helped prepare, reviewed, and approved a

11   written statement to Thomas Jagger of the Eighth Electrical Pension Fund concerning

12   Department of Labor investigations, the CF Credit loan to Grayson, the Sterling transaction, and

13   Sterling's performance.  The statement said that, "To date, no notice has been received by

14   Capital of any violation of ERISA or any wrongdoing whatsoever."  The statement omitted to

15   disclose that the Department of Labor had fined CCL $180,000 for wrongdoing and violations of

16   ERISA and that CCL was required by a consent order to repay $2 million to one of its pension

17   fund clients.  The statement omitted to disclose the findings of the SEC investigation that

18   culminated in the 12/26/95 report.  The statement said in essence that there was nothing wrong

19   with CCL, as agent for its clients, having made a loan with CCL client funds to WCC to fund

20   WCC's loan to CF Credit to fund CF Credit's loan to Grayson to pay the $1.7 million required to

21   be paid by the consent order that resulted from the Department of Labor investigation.  The

22   statement also said that Grayson did not know when he borrowed $1.7 million from CF Credit

23   that Old WCC had loaned money to CF Credit.  Those statements were misleading or untrue.

24   The statement provided some information about the purchase of the Old WCC loans by Sterling.

25   The statement omitted to disclose, however, that Sterling did not have the financial resources to

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                              RICO and Supplemental State Law          Attorneys at Law
                              Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                          888 SW Fifth Avenue
                                                          Portland, OR  97204-2021
                                                          503 223 1510

1   perform its obligations, and that Sterling could back out of its obligations at any time without

2   any liability.  The statement said that all interest payments had been made in a timely manner.

3   The statement omitted to disclose, however, that none of the payments were funded by business

4   operations of Sterling, that many of the interest payments were funded from new loans made to

5   Old WCC, Brooks, or Beacon, that cash from the cash collateral account that had been

6   improperly used to make some of the payments, and that the cash collateral account now held

7   worthless securities rather than cash.  The statement said that the Sterling obligation is secured

8   by "the original and any new servicing rights of the company."   The statement, however, did not

9   disclose that Sterling had no original or new servicing rights, or that when Sterling purchased the

10  Old WCC loan, WCC no longer had any original or new servicing rights, or that the value of Old

11  WCC's servicing rights had been historically overstated.  The statement described the Sterling

12  transaction and the WFSG reorganization and the restructure of the Old WCC loan.  The

13  statement did not disclose, however, that at the time of the restructure, Old WCC represented that

14  the maximum amount that CCL's clients could hope to recover on $160 million in indebtedness,

15  which was guarantied by Wiederhorn, Mendelsohn, and WREIT ($35 million) was less than $10

16  million, or that those guaranties had been released.  The statement said that Sterling had

17  "assigned a significant portion of the total loans to another financial entity interested in this

18  investment opportunity."   The statement did not disclose, however, that the reason for the

19  assignment was Sterling's inability to make the payments due was because of its lack of assets

20  and business operations, and that the other financial entity's ability to make its share of the

21  payments was dependent on receiving loans from CCL's clients.  The statement said that Moss

22  Adams Advisory Services made financial calculations for the purchase agreement between CCL

23  and Sterling, and that based on the limiting assumptions listed in Moss Adams' report, the net

24  present value of the Sterling purchase agreement ranged from $165.7 million to $177.2 million.

25  The statement omitted to disclose, however, that all that Moss Adams did was calculate the

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                                          RICO and Supplemental State Law    Attorneys at Law
                                          Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                                            888 SW Fifth Avenue
                                                                            Portland, OR  97204-2021
                                                                            503 223 1510

1   present value of the payments Sterling would make if it chose to do so, there was no basis for the

2   assumptions, and that Sterling's ability to terminate the purchase agreement at will, coupled with

3   Sterling's lack of financial resources, meant that the net present value of the Sterling purchase

4   agreement was close to zero.

5                 THE ROLE OF CONSILIUM AND MOSS ADAMS LLP

6       338.    Beginning in June 1994, Consilium, Tapanan, Stephen Olson, and Shawn Olson

7   undertook to perform appraisals required by the Master Loan Agreement and predecessor

8   agreements in accordance with the appraisal criteria specified in the Master Loan Agreement and

9   in accordance with all professional appraisal standards.

10       339.    Beginning in December 1997, Moss Adams and the Olsons undertook to perform

11   appraisals required by the Master Loan Agreement and predecessor agreements in accordance

12   with the appraisal criteria specified in the Master Loan Agreement and in accordance with all

13   professional appraisal standards.

14       340.    Consilium, Moss Adams, Tapanan, Stephen Olson, and Shawn Olson are referred

15   to as the Moss Adams group.

16       341.    The Moss Adams group undertook a fiduciary relationship between themselves

17   and those who relied on their findings, including plaintiffs.

18       342.    Plaintiffs placed special trust and confidence in the Moss Adams group.

19       343.    The Moss Adams group understood that CCL was an investment adviser acting as

20   agent for Taft-Hartley trust funds, union general funds, and individual investors.

21       344.    The Moss Adams group knew that CCL had entered into the Master Loan

22   Agreement on behalf of clients and was subject to certain restrictions on collateral concentration

23   and loan amounts.

24

25

PAGE 95 of 122        PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1       345.    The Moss Adams group knew that the appraisal requirements in the Master Loan

2   Agreement were for the protection of the purchasers of loan participations, and that CCL's

3   management fees were based on the appraisals.

4       346.    Consilium, Tapanan, and the Olsons delivered to CCL appraisals of collateral that

5   Old WCC pledged to secure loans in or about June 1994, January 1995, August 1995, August

6   1996, January 1997, May 1997, September 1997, and November 1997.

7       347.    In or about November 1997, Consilium principals Elmer and Stephen Olson

8   entered into an Agreement for Combination of Practices with Moss Adams.  Pursuant to that

9   agreement, the Olsons came to work for Moss Adams, and they brought with them their

10  knowledge from the Consilium engagements.  Elmer and the Olsons characterized the

11  combination of practices as a "merger."  By virtue of the merger, Moss Adams knew all that the

12  Olsons knew about prior improper appraisal practices.

13      348.    By letter dated December 17, 1997, Shawn Olson proposed to continue to provide

14  appraisal services similar to those previously provided by Consilium in conformance with the

15  terms and conditions of the Master Loan Agreement "based on forecasted net proceeds and the

16  terms of the various servicing agreements."

17      349.    By letter dated January 8, 1998, Moss Adams and Stephen Olson told CCL that

18  Moss Adams, with the addition of Consilium personnel "have and will continue to provide

19  consulting services to CCI and its clients."  They reiterated their "commitment to providing

20  timely and responsive valuation services to CCI and its clients."

21      350.    Moss Adams and the Olsons made the foregoing representations so that they

22  would be engaged to provide appraisal services pursuant to the Master Loan Agreement.

23      351.    By virtue of the combination of practices and merger, as well as their

24  representations to CCL's clients, Old WCC, WFSG, and CCL, Moss Adams is the successor to

25

      PLAINTIFFS' COMPLAINT      **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law      Attorneys at Law
Claims (28 U.S.C. § 1331)      700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1  Consilium and liable for its misconduct.  By virtue of the knowledge of the Olsons and other

2  Consilium personnel who joined Moss Adams, it became aware of what those persons knew.

3       352.    In addition, Moss Adams adopted, approved, ratified, and benefited from

4  Consilium's appraisal work on the Old WCC collateral.

5       353.    Moss Adams and the Olsons delivered to CCL appraisals of collateral that Old

6  WCC pledged to secure loans in or about February 1998, March 1998, July 1998, and August

7  1998.

8       354.    The Moss Adams group knew that all of the above-described appraisal services

9  were being performed for the direct benefit of CCL's clients, for the purpose of facilitating

10  lending transactions, and the sale of loan participations to CCL's clients.

11       355.    In performing their appraisals of Servicing Contracts and expected servicing fees,

12  the Moss Adams group inflated their appraisals by crediting Old WCC with all fess that Old

13  WCC projected over the entire life of each loan that Old WCC was then servicing.  The

14  appraisals should not have been inflated in that way because Old WCC had not been granted

15  servicing rights that would survive termination of any of its servicing contracts or the sale of any

16  particular loan or loan pool to which servicing rights were attached.

17       356.    Moreover, Old WCC only had the right to service referred loans and loan pools

18  for as long as WFSG and its subsidiaries permitted Old WCC to service those loans.  Therefore,

19  Old WCC only had the obligation, but not the right, to perform loan servicing at the option of

20  WFSG.

21       357.    In turn, WFSG was a sub-servicer of WFSG's lenders or their agents.  WFSG'

22  lenders reserved the right to terminate WFSG's services.

23       358.    Furthermore, WFSG and its subsidiaries had no power to guarantee that Old

24  WCC would continue servicing any particular loan or loan portfolio because WFSG and its

25  subsidiaries conveyed or pledged those loans and loan pools to their lenders.

PLAINTIFFS' COMPLAINT        **ESLER, STEPHENS & BUCKLEY**
                              RICO and Supplemental State Law        Attorneys at Law
                              Claims (28 U.S.C. § 1331)        700 Pioneer Tower
                                                            888 SW Fifth Avenue
                                                            Portland, OR  97204-2021
                                                            503 223 1510

1      359.    The Moss Adams group failed to fulfill their agreements and undertakings to

2   perform and deliver competent accurate appraisal services and comply with all applicable

3   professional appraisal standards in at least the following ways:

4          a.    They failed to adequately investigate or disclose the nature of the collateral they

5               were appraising;

6          b.    They failed to understand the nature of the collateral;

7          c.    They failed to engage in ethical appraisal practice;

8          d.    They assumed facts that they knew or in the exercise of reasonable care should

9               have known were not true;

10         e.    They subordinated plaintiffs' interests to those of other clients or persons with

11              whom they had done business;

12         f.    They failed to understand or disclose that their appraisal services were not

13              independent due to conflicts of interest in performing services for CCL, CCL's

14              clients, Old WCC, and WFSG;

15         g.    They prepared appraisals that were materially inaccurate and misleading;

16         h.    They failed to consider or disclose that there was no market for the servicing

17              contracts;

18         i.    They failed to consider or disclose that Old WCC was pledging the same

19              collateral as security for multiple loans;

20         j.    They appraised certain loans and the servicing of such loans at full value even

21              though they knew or in the exercise of reasonable care should have known that

22              such loans were sham loans;

23         k.    They materially overestimated loan servicing fees in light of the fact that the

24              servicing contracts were subject to unilateral termination;

25

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                                      RICO and Supplemental State Law          Attorneys at Law
                                      Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                                        888 SW Fifth Avenue
                                                                        Portland, OR  97204-2021
                                                                        503 223 1510

1      l.  They failed to perform independent analysis, but instead relied on projected

2          income figures that Old WCC prepared;

3      m.  They failed to consider or disclose that Old WCC's servicing rights were tied to

4          loans or loan pools purchased by WFSG or its subsidiaries on margin and were

5          pledged or were not owned by WFSG;

6      n.  They failed to consider or disclose the actual historical and financial performance

7          of Old WCC.

8    360.  The Moss Adams group' appraisals and other communications to CCL and CCL's

9  clients, including plaintiffs, were false and misleading in the following respects:

10     a.  They misrepresented the value of the Servicing Contracts pledged by Old WCC;

11     b.  They assumed facts that they knew or in the exercise of reasonable care should

12         have known to be untrue;

13     c.  They misrepresented that Old WCC was a servicer of loans without disclosing

14         that it could be terminated at any time;

15     d.  They misrepresented that Old WCC owned loan servicing rights that would

16         survive any sale of the underlying loan or loan pool;

17     e.  The omitted to state that the Old WCC's loan servicing for WFSG and its

18         subsidiaries was non-exclusive;

19     f.  They omitted to state that neither WFSG nor its subsidiaries were obligated to use

20         Old WCC to service any loan;

21     g.  They misrepresented that they performed appraisals in accordance with accepted

22         standards;

23     h.  They misrepresented that their appraisals were independent'

24     i.  They misrepresented that their appraisals were accurate and did not contain

25         misstatements or misleading omissions relating to the value of the collateral;

PAGE 99 of 122        PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                      RICO and Supplemental State Law   Attorneys at Law
                      Claims (28 U.S.C. § 1331)         700 Pioneer Tower
                                                        888 SW Fifth Avenue
                                                        Portland, OR 97204-2021
                                                        503 223 1510

1      j.  They omitted to state that there was no market for the Servicing Contracts that

2         served as collateral;

3      k.  They omitted to state that old WCC was pledging the same collateral for multiple

4         loans;

5      l.  They appraised certain loans and the servicing of such loans at full value even

6         thought they knew or in the exercise of reasonable care should have known that

7         such loans were sham loans;

8      m.  They misrepresented the value of the loan servicing fees in light of the fact that

9         the servicing contracts were subject to unilateral termination;

10      n.  They omitted to state the degree of their reliance on projected income figures

11         prepared by Old WCC, and their failure to perform an adequate independent

12         analysis;

13      o.  They omitted to state that substantially all servicing rights held by Old WCC were

14         tied to loans or loan pools purchased on margin that were not owned by WFSG;

15      p.  They falsely represented that the appraisers reviewed appropriate documents;

16      q.  They omitted to state that they were using a special definition of "market value";

17      r.  They omitted to state the shortening of Old WCC's revenue stream as a result of

18         the Loan Servicing Agreement;

19      s.  They omitted to state the actual historical and financial performance of Old WCC.

20    361.   The Moss Adams group knew, or in the exercise of reasonable, should have

21 known that their appraisals and other communications with CCL's clients were false and

22 misleading.

23    362.   The Moss Adams group knew or should have known that CCL would

24 communicate the substance of their appraisals and other communications to CCL's clients to

25

      PLAINTIFFS' COMPLAINT      **ESLER, STEPHENS & BUCKLEY**
                           RICO and Supplemental State Law    Attorneys at Law
                           Claims (28 U.S.C. § 1331)           700 Pioneer Tower
                                                         888 SW Fifth Avenue
                                                         Portland, OR  97204-2021
                                                         503 223 1510

1    advise them whether their funds were invested prudently and whether to continue to invest.  The

2    Moss Adams group approved of such communication.

3    363.    CCL did communicate the substance of their appraisals and other communications

4    to CCL's clients to advise them whether their funds were invested prudently and whether to

5    continue to invest.

6    364.    CCL's clients reasonably relied on the appraisals.

7    365.    During all relevant times Moss Adams undertook to perform annual audits of

8    CCL in accordance with generally accepted auditing standards, and was fully informed of CCL's

9    business and its relationships with Old WCC and its affiliates.

10    366.    Moss Adams understood that CCL was an investment adviser, and that Moss

11    Adams's audit reports would be filed with the United States Securities and Exchange

12    Commission ("SEC") pursuant to the SEC's rules and regulations.  Moss Adams understood that

13    CCL could not be licensed as an investment adviser, and therefore could not, or would not, be in

14    a position to, sell participations in loans or other securities to its clients.  As a result, during the

15    time Moss Adams provided audit reports that CCL filed with the SEC to maintain its investment

16    adviser license, Moss Adams materially aided all sales of securities by CCL and the Graysons to

17    plaintiffs and CCL's other clients.

18    367.    Moss Adams understood that plaintiffs and CCL's other clients the public would

19    rely on the audit reports that Moss Adams prepared because they were filed with the SEC, they

20    were necessary for CCL to maintain its investment adviser status, and should accurately disclose

21    actual or potential financial problems.

22    368.    In its audit reports, Moss Adams undertook to advise plaintiffs, CCL's other

23    clients, the public, and the regulators of difficulties that CCL might encounter in connection with

24    its investments on behalf of plaintiffs and other Investors.

25

PLAINTIFFS' COMPLAINT        **ESLER, STEPHENS & BUCKLEY**
                                    RICO and Supplemental State Law        Attorneys at Law
                                    Claims (28 U.S.C. § 1331)        700 Pioneer Tower
                                                                    888 SW Fifth Avenue
                                                                    Portland, OR  97204-2021
                                                                    503 223 1510

1       369.    Moss Adams failed to fulfill its agreements and undertakings to perform and

2  deliver competent and accurate audit services and reports and to comply with all applicable

3  professional audit standards.  Without limitation, it failed in one or more of the following

4  respects:

5         a.  Although it undertook to inform plaintiffs, CCL's other clients, the public, and the

6            regulators regarding difficulties that CCL might incur with respect to its

7            investments of its clients' funds, it failed to do so in a timely or accurate manner.

8         b.  It failed to adequately investigate the company that it was auditing.

9         c.  It failed to engage in competent audit practice.

10        d.  It failed to engage in ethical audit practice.

11        e.  It failed to apply generally accepted auditing and accounting standards and

12           procedures.

13        f.  It failed to discover or disclose material deficiencies in CCL's internal controls.

14        g.  It subordinated the interests of plaintiffs, CCL clients, and the public to the

15           competing interests of other Moss Adams clients or persons and entities with

16           whom some of them conducted business.

17        h.  It failed to understand or failed to disclose that its audit services were not

18           independent, due to its conflicts of interest in performing services for CCL,

19           WFSG, WCC, the Graysons, Sterling and other individuals and entities with

20           competing interests.

21        i.  It prepared financial statements and audit reports of CCL that were materially

22           inaccurate and contained misstatements and omissions of material facts relating to

23           the financial condition of CCL, particularly its exposure to liability to its clients.

24        j.  It failed to disclose in audit reports CCL's improper loan or loans, collateral

25           concentration, and lack of diversification within the collateralized note program.

      PLAINTIFFS' COMPLAINT      **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law      Attorneys at Law
Claims (28 U.S.C. § 1331)      700 Pioneer Tower
      888 SW Fifth Avenue
      Portland, OR  97204-2021
      503 223 1510

1        k.   It failed to discover or failed to report Old WCC's material defaults and breaches

2            of the Master Loan Agreement, including, without limitation, Old WCC's failure

3            to apply loan proceeds to general operating capital, Old WCC's distributions of

4            loan proceeds to Wiederhorn, Mendelsohn and other insiders, Old WCC's failure

5            to pledge adequate collateral, Old WCC's pledging of the same collateral as

6            security for multiple loans, and Old WCC's consistent failure to operate on a

7            profitable basis.

8     370.   In addition, Moss Adams's audit reports were false and misleading in the

9  following respects:

10       a.   They failed to inform CCL's clients, the public, and the regulators regarding

11           difficulties that CCL might incur with respect to its investments of its clients'

12           funds in a timely or accurate manner.

13       b.   The audit for the period ended December 31, 1998 misrepresented that "It was

14           determined in late 1998 that CCI's borrower might encounter difficulties in the

15           future due to the fact that the borrower's publicly traded sister company, which

16           had significant transactions with this borrower, filed for financial reorganization";

17       c.   The audit for the period ended December 31, 1998 misrepresented that that CCL

18           "identified several potential buyers for its existing loans to this borrower";

19       d.   The audit for the period ended December 31, 1998 misrepresented that, "On

20           February 1, 1999, CCI, as agent for its clients, entered into a purchase agreement

21           with a new third-party whereby such third-party agreed to acquire 100% of CCI's

22           previously made pools of loans at par over time";

23       e.   The audit for the period ended December 31, 1998 misrepresented that "all

24           monthly payments due under the terms of the [foregoing] purchase agreement

25           have been made through October 29, 1999";

      PLAINTIFFS' COMPLAINT        **ESLER, STEPHENS & BUCKLEY**
RICO and Supplemental State Law    Attorneys at Law
Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                          888 SW Fifth Avenue
                                          Portland, OR  97204-2021
                                          503 223 1510

1     f.  They misrepresented that they applied generally accepted auditing standards and
2        procedures;

3     g.  They misrepresented that there were no material deficiencies in CCL's internal
4        controls;

5     h.  They misrepresented that they were independent;

6     i.  They misrepresented that they were accurate and that the financial statements
7        were accurate and not misleading;

8     j.  They omitted to disclose CCL's improper loans, collateral concentration, and lack
9        of diversification in the collateralized note program;

10    k.  They omitted to disclose Old WCC's material breaches of the Master Loan
11       Agreement;

12    l.  They omitted to disclose that CCL had not earned the income it claimed to have
13       earned on its financial statements because the management fee it had charged
14       were based on overstated appraisals of market value of the loan participations;

15    m.  They omitted to disclose the probability of loss contingencies.

16                THE ROLE OF McCARTER & ENGLISH AND SETH TAUBE

17    371.   McCarter & English, LLP, a New Jersey limited liability partnership

18 ("McCarter"), and Seth Taube, one of its partners, represented Dan Dyer, Oxbow Capital

19 Partners, LLC, a Washington limited liability company, Sterling Capital, LLC, a New Jersey

20 limited liability company, and Oxbow Capital 1999 Fund B, LLC, a New Jersey limited liability

21 company, from at least January 1999 until at least September 20, 2000.

22    372.   McCarter and Taube participated in or materially aided the sales of Brooks and

23 Beacon securities from January 1999 to September 20, 2000.  They participated in or materially

24 aided the structuring the Sterling transaction; they participated in or materially aided the

25 formulation and structuring the Oxbow Fund B component of the Sterling transaction to provide

      PLAINTIFFS' COMPLAINT        **ESLER, STEPHENS & BUCKLEY**
                          RICO and Supplemental State Law    Attorneys at Law
                          Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                888 SW Fifth Avenue
                                                Portland, OR  97204-2021
                                                503 223 1510

1   a mechanism to conceal the misuse of the Brooks and Beacon cash collateral accounts; they

2   participated in or materially aided increasing the investment of CCL clients in the CJM Planning

3   loan to provide funds to create the appearance of a payment on the Sterling Master Loan

4   Purchase Agreement; and they participated in or materially aided the structuring of the Brooks

5   and Beacon transactions.

6        373.   More specifically, McCarter and Taube participated in or materially aided the sale

7   of Brooks and Beacon securities in at least the following ways.

8        374.   McCarter and Taube's involvement began when Sterling was formed as a shell

9   limited liability company to give the appearance that CCL had sold the Old WCC loans to a third

10   party in an arm's length transaction for face value.  By late 1998, Old WCC was insolvent, most

11   of the 15% cash collateral had been taken from the Bear Stearns cash collateral account, and

12   CCL and the Graysons knew that if the Wilshire companies went bankrupt, little, if any, of the

13   more than $160 million of CCL's client funds invested in participations in loans to Old WCC

14   would be recovered.  Although Old WCC was in default under the terms of the Master Loan

15   Agreement, CCL and the Graysons knew that if CCL declared the default, CCL's clients would

16   discover CCL's and the Grayson's prior misconduct, described above.  CCL and the Graysons

17   wanted to conceal their track record, so they decided to create the fiction that someone would

18   "purchase" the Old WCC loans from CCL's clients for the full $160 million owed.

19        375.   CCL continued to charge plaintiffs and its other clients a 3% fee on the $160

20   million Sterling Loan obligation from January 1, 1999, until September 20, 2000, even though its

21   value was less than $6.5 million.

22        376.   In mid-1998, Dyer and Oxbow Partners borrowed $10 million from CCL clients

23   to acquire CJM Planning Corporation, a New Jersey stockbroker that specialized in selling

24   securities to prospects by telephone.  McCarter and Taube represented CJM Planning in that

25   transaction.

      PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

377. Shortly after the Oxbow/CJM Planning loan, Wiederhorn and Mendelsohn or their representatives told CCL and the Graysons that (a) Old WCC was not able to perform its obligations to CCL's clients as they became due, and that (b) Old WCC intended to restructure its loans in connection with WFSG's reorganization and to merge with WFSG in a series of transactions that would leave the old WCC loans with no guarantors and collateral worth less than $6.5 million. CCL and the Graysons understood that that if they did not go along with the restructure and reorganization and release the guarantors and the collateral, that Old WCC's defaults and insolvency would become known. These facts were never disclosed to CCL's clients.

378. To create the appearance that the restructure and reorganization would have no harmful effect on CCL's clients who purchased participations in loans to Old WCC, CCL and the Graysons persuaded Dyer, Oxbow Capital Partners, and Sterling to "purchase" the Old WCC loans for face value, which was approximately $160 million, pursuant to an agreement that placed no obligation on Sterling to perform. These facts were never disclosed to CCL's clients.

379. McCarter, Taube, Dyer, Oxbow Capital Partners formed and organized Sterling as a shell limited liability company, and prepared and negotiated the agreement between Sterling and CCL by which Sterling agreed to buy the Old WCC loan obligations (hereinafter referred to as the "Master Loan Purchase Agreement"). Sterling had no assets, no prior business, and no present or prospective ability to make the payments under the Master Loan Purchase Agreement. These facts were never disclosed to CCL's clients.

380. The Term Sheet that preceded the Master Loan Purchase Agreement provided expressly that:

381. If Sterling fails to pay any monthly installment or final payment on the dates due, this agreement shall be automatically terminated without any notice required, and without any

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2021
503 223 1510

1   further liability to Sterling, including without limitation any liability to make any further

2   payments to CCI.  In that event Sterling shall retain all rights to all loans previously acquired, but

3   shall not be entitled to acquire any additional interest in the Loans or collateral and agrees that

4   CCI shall retain all amounts previously paid as security, i.e. the 15% portion of monthly

5   payments and other collateral described in Section 6 as liquidated damages.

6      382.    The Master Loan Agreement incorporated that term.  Thus, while the Master Loan

7   Purchase Agreement was called an "Agreement," it placed Sterling under no obligation to

8   perform–it was really an option agreement.  This was never disclosed to CCL's clients.

9      383.    McCarter and Taube participated in or materially aided the preparation and

10  registration for sale of Oxbow Capital 1999 Fund I, LLC ("Oxbow Fund I").  CJM Planning was

11  supposed to market Oxbow Fund I securities to raise money to fund Sterling's payments

12  pursuant to the Master Loan Purchase Agreement.  The offering materials for Oxbow Fund I did

13  not disclose the issuer's intent to use investors' funds to make Sterling's payments pursuant to

14  the Master Loan Purchase Agreement.

15     384.    The Master Loan Purchase Agreement called for Sterling to pay $2.5 million per

16  month to CCL as agent for its clients.  By March 31, 1999, Sterling had not, however, made any

17  payments.  CJM Planning and Oxbow Fund I had not raised enough money to fund the payments

18  that Sterling should have made.  To create the appearance that Sterling could and would perform,

19  CCL as agent for its clients loaned $2 million to Oxbow Partners on April 11, 1999.  On April

20  12, 1999, Oxbow Fund I, on Sterling's behalf, paid $1 million to CCL.  McCarter and Taube

21  participated in or materially aided this transaction.  These facts were never disclosed to CCL's

22  clients.

23     385.    As a part of the Master Loan Purchase Agreement, Sterling agreed to keep

24  confidential (a) all nonpublic information about the Old WCC loans, and (b) any information

25  related to CCL, which information was defined to include information relating to CCL's past

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    administration of the Old WCC loans, its past course of action on collection of the Old WCC

2    loans, its evaluation and judgment of any kind related to the Old WCC loans, and its method of

3    sale of the Old WCC loans to Sterling.  This confidentiality agreement was intended to prevent

4    CCL's past and prospective investors from learning the truth about CCL's track record.  Sterling

5    and McCarter and Taube agreed (a) to cooperate with CCL and CCL's counsel in the defense of

6    any claims made against CCL involving or relating to the Old WCC loans, and (b) not to assist

7    anyone in suing CCL based on any claim in any way related to the Old WCC loans.

8          386.    By the end of May 1999, Sterling had made no payments on the Master Loan

9    Purchase Agreement except for the $1 million payment made in its behalf by Oxbow Fund I.  In

10    May, McCarter and Taube participated in or materially aided the negotiation, structuring, and

11    documentation of a series of agreements, in which CCL, as agent for its clients, agreed to loan

12    Brooks up to $50 million, and Sterling agreed to sell to Brooks $108 million of the Old WCC

13    loans it was purchasing from CCL for exactly the same price that Sterling was supposed to pay

14    CCL.  In return for the promise of the loan from CCL, Brooks agreed to use a part of the loan

15    proceeds of its CCL loan each month to pay for its portion of the Master Loan Purchase

16    Agreement.  Like Sterling, Brooks could stop making payments any time.  At the same time,

17    CCL reduced the monthly payments to be made pursuant to the Master Loan Purchase

18    Agreement to $1.5 million, which barely paid interest.

19          387.    McCarter and Taube helped structure and prepare an agreement between Sterling

20    and Brooks that provided in part that Brooks would pay for the portion of the Old WCC loans it

21    agreed to purchase from Sterling "from a fund to be established in connection with a

22    $50,000,000 Master Loan and Security Agreement."  That agreement was between Brooks and

23    CCL as agent for its clients.  McCarter, Taube, Dyer, Sterling, Brooks, CCL, and the Graysons

24    intended that CCL would raise money from its clients to fund the Brooks loan, a part of which

25

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1  would then be used to make the payments due under the Master Loan Purchase Agreement.

2  These facts were never disclosed to CCL's clients.

3      388.    The Sterling/Brooks agreement was signed on June 4, 1999.  On June 7, 1999,

4  CCL paid $4,390,000 of its clients' funds to Brooks, and Brooks in turn, and as agreed, made a

5  payment back to CCL from the loan escrow of $1,033,333.

6      389.    After the Sterling/Brooks agreement was signed, CCL as agent for its clients

7  made monthly loans to Brooks that funded Brooks' payments of about $1 million per month.  All

8  of the payments that Brooks made were actually funded by CCL clients.  These facts were never

9  disclosed to CCL's clients.

10     390.    Despite the Brooks machinations, Sterling was still unable to pay its portion of the

11 monthly payments due under the Master Loan Purchase Agreement, about $500,000 a month.  In

12 order to fund the Sterling portion, McCarter and Taube participated with, or materially aided,

13 Dyer, Oxbow Partners, and Sterling in the formation of a new venture capital fund, Oxbow

14 Capital 1999 Fund B, LLC.  McCarter and Taube prepared the disclosure materials, and

15 authorized the use of its name in connection therewith.

16     391.    The June 4, 1999, Master Loan and Security Agreement between CCL and

17 Brooks required Brooks to maintain cash collateral of 15% of the amount of the outstanding loan

18 at all times.  This was a standard requirement of all loans made under the collateralized note

19 program, and was a feature that CCL and the Graysons highlighted to their clients.  CCL and the

20 Graysons advised their clients who purchased participations in Brooks loans that the cash

21 collateral would be in certificates of deposit, short-term treasury bills, or other, liquid

22 investments.  Oxbow Fund B was created for the purpose of giving Brooks and Sterling a means

23 of using the cash collateral that was supposed to have been preserved to make part of Sterling's

24 payments back to CCL.

25

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

ESLER, STEPHENS & BUCKLEY
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    392.    To set up the raid on the cash collateral, in July 1999, CCL and the Graysons

2  agreed that Brooks could invest the cash collateral in Oxbow Fund B securities.  Oxbow Fund B

3  then invested the cash collateral proceeds it received from the Brooks cash collateral account in

4  Sterling.  Sterling then paid part of the cash collateral proceeds back to CCL pursuant to the

5  Master Loan Purchase Agreement.  To illustrate, on October 13, 1999, CCL, as agent for its

6  clients, paid $6,066,000 to Brooks, which in turn paid CCL $1,054,981.34 for its portion of the

7  Master Loan Purchase Agreement, and paid $600,000 to the cash collateral account.  Then,

8  Brooks paid $600,000 to Oxbow Fund B.  Oxbow Fund B then invested $600,000 in Sterling,

9  who then used part of that money to make its portion of the payment due under the Master Loan

10  Purchase Agreement.  Oxbow Fund B was created to give the appearance that Brooks, and later

11  Beacon, were in compliance with the 15% cash collateral loan requirement.  These facts were

12  never disclosed to CCL's clients.

13    393.    In late 1999 or early 2000, McCarter and Taube participated in, or materially

14  aided, the formation and organization of Beacon, which was a new entity that would continue the

15  same pattern of transactions between CCL and Sterling that Brooks had engaged in.  Beacon

16  signed a Master Loan Agreement with CCL dated January 3, 2000.  From that point until the

17  Receiver was appointed on September 20, 2000, CCL made loans to Beacon, part of which were

18  paid back to CCL under the Master Loan Purchase Agreement.  As with Brooks, 15% of the

19  loaned amounts was supposed to be cash collateral, but instead was invested in Oxbow Fund B

20  and became the source of Sterling's payments under the Master Loan Purchase Agreement.

21  These facts were never disclosed to CCL's clients.

22    394.    The losses that CCL's clients sustained because of their purchases of

23  participations in the Brooks and Beacon loans were $80 million.

24                    THE ROLE OF BEAR STEARNS

25

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                         RICO and Supplemental State Law          Attorneys at Law
                         Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                      888 SW Fifth Avenue
                                                      Portland, OR  97204-2021
                                                      503 223 1510

1   395.   Section 5.17.2 of the Master Loan Agreement required Old WCC to deliver to

2   CCL or CCL's bailee a pledge of cash collateral in the amount of fifteen percent (15%) of the

3   outstanding principal balance:

4           On or before the Closing for each Loan, Borrower shall procure and

5           deliver to Lender (or to a bailee Lender designates) a certificate or

6           certificates of deposit, to be held by Lender (or Lender's bailee) for so

7           long as the Loan is outstanding, such certificate(s) of deposit to be in the

8           aggregate face amount equal, from time to time, to not less than fifteen

9           percent (15%) of the outstanding principal balance of the Note evidencing

10          such Loan.

11  396.   Under Section 9.2(h) of the Master Loan Agreement, CCL was authorized to sell,

12  resell, use, assign, transfer, issue, or otherwise dispose of the cash collateral pledged by old

13  WCC in the event of default by old WCC.  Bear Stearns undertook to act as the bailee for CCL

14  and the Investors with respect to the cash collateral pledged by old WCC.

15  397.   Bear Stearns agreed to transact business with respect to the cash collateral account

16  only with CCL.  Pursuant to Certificates of CCL's corporate secretary delivered to Bear Stearns

17  from time to time, Bear Stearns knew that the only authorized signatories on the cash collateral

18  account were designated employees or officers of CCL.

19  398.   Bear Stearns knew that CCL was acting as a fiduciary to the Investors and that the

20  pledges of cash collateral to CCL and CCL's security interest in the pledged cash collateral were

21  assets of the Investors, which included ERISA trusts.

22  399.   Bear Stearns charged and received substantial fees for its services to CCL.  These

23  fees were paid with Investors' funds.

24  400.   In the Third Amendment to the Master Loan Agreement, Old WCC and CCL

25  amended section 5.17.2, to specify that the cash collateral could be held in an account maintained

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                                          RICO and Supplemental State Law   Attorneys at Law
                                          Claims (28 U.S.C. § 1331)         700 Pioneer Tower
                                                                            888 SW Fifth Avenue
                                                                            Portland, OR  97204-2021
                                                                            503 223 1510

1    by CCL's bailee, i.e., Bear Stearns, and could include U.S. Treasury bills in addition to

2    certificates of deposit:

3              On or before the Closing for each Loan, Borrower shall procure and deliver to

4                   Lender (or to a bailee or bailee account Lender designates) a certificate or

5                   certificates of deposit, or U.S. treasury bills with maturities not more than

6                   one year to be held by Lender (or Lender's bailee) for so long as the Loan

7                   is outstanding, such instrument(s) to be in a total aggregate face amount

8                   equal, from time to time, to not less than fifteen percent (15%) of the then

9                   outstanding principal balance of the Note evidencing Loans under this

10                  Agreement.

11             401.    Bear Stearns failed to adequately supervise Daniel Hoffman, Phil Cedar, and

12   other of its employees and officers with responsibility for the cash collateral account.  Without

13   authorization or approval from CCL, Bear Stearns loaned money to Old WCC and took a

14   security interest in the contents of the cash collateral account as collateral for such loan.  When

15   CCL learned of Bear Stearns' unauthorized conduct in December 1995, CCL required Old WCC

16   to repay the loan to Bear Stearns.  In addition, in January 1996, CCL notified Bear Stearns that

17   any future deposits to the cash collateral account may not be borrowed against.

18             402.    Despite its agreements with CCL, and CCL's instructions, in February 1996, Bear

19   Stearns removed over $100,000 from the cash collateral account to satisfy Old WCC obligations

20   to Bear Stearns, without notifying CCL.  When CCL learned of these unauthorized actions of

21   Bear Stearns in March 1996, CCL complained to Bear Stearns and demanded that the removed

22   monies be restored to the cash collateral account.

23             403.    In May 1996, contrary to its agreements with CCL, and without CCL's

24   knowledge or authorization, Bear Stearns removed approximately $5,000,000 in securities from

25   the cash collateral account to satisfy Old WCC's borrowing obligations to Bear Stearns, and

PLAINTIFFS' COMPLAINT            **ESLER, STEPHENS & BUCKLEY**
                            RICO and Supplemental State Law            Attorneys at Law
                            Claims (28 U.S.C. § 1331)            700 Pioneer Tower
                                                                 888 SW Fifth Avenue
                                                                 Portland, OR  97204-2021
                                                                 503 223 1510

1  wired an additional $4,450,000 from the cash collateral account to Old WCC.  When CCL

2  learned of these unauthorized actions in May 1996, CCL demanded that the cash and securities

3  transferred out of the cash collateral account be restored.

4       404.    On or about October 15, 1998, WFSG had margin calls from its creditors in

5  excess of $40 million and was required to make payments to its creditors in full.  These margin

6  calls included a margin call by Bear Stearns to WFSG in the amount of $23,000,000.  WFSG

7  was unable to make those payments.  In addition, Old WCC and affiliates had incurred an

8  additional obligation to pay in excess of $4,200,000 to Bear Stearns and another brokerage for

9  which Bear Stearns acted as a clearing broker, Friedman, Billings & Ramsey.  In addition, Old

10  WCC and its affiliates were obligated to the Office of Thrift Supervision to immediately return

11  to the First Bank of Beverly Hills, a bank owned by WFSG and controlled by Wiederhorn and

12  Mendelsohn, in excess of $15,000,000 that had been withdrawn from the bank.

13       405.    On or before October 15, 1998, Old WCC had become in default under the Master

14  Loan Agreement and failed to cure its defaults, and CCL agreed to release some funds from the

15  cash collateral account to Old WCC.  However, Bear Stearns assumed further control and

16  authority over the cash collateral account by refusing to allow any monies to be released from it

17  unless the obligations to Bear Stearns and Friedman, Billings & Ramsey were first paid.  This

18  was contrary to its agreements with CCL and applicable laws and rules.

19       406.    CCL and Old WCC agreed in the Seventh Amendment to the Master Loan

20  Agreement dated October 15, 1998, to release $19,300,000 of cash collateral from the cash

21  collateral account to Old WCC, with $4,282,069.90 being transferred to Bear Stearns and

22  Friedman, Billings & Ramsey, $14,500,000 to be transferred to the First Bank of Beverly Hills,

23  and $517,930.10 to be used to satisfy Old WCC's general obligations.  Bear Stearns then

24  released $19,300,000 of cash collateral from the Cash Collateral Account, with $4,282,069.90

25

PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1    being transferred to Bear Stearns and Friedman, Billings & Ramsey, and the remainder being

2    transferred to Old WCC and the First Bank of Beverly Hills or both.

3        407.    Bear Stearns failed to disclose to the Investors that $19,300,000 from the Cash

4    Collateral Account had been given away.  The release of $19,300,000 from the Cash Collateral

5    Account significantly harmed the Investors.

6                                   FIRST CLAIM FOR RELIEF

7                                              (RICO)

8                                    (Against Barclay Grayson)

9        408.    Plaintiffs reallege the preceding paragraphs.

10       409.    Plaintiffs are "persons" as defined by 18 U.S.C. § 1961(3).

11       410.    Barclay Grayson is a "person" as defined by 18 U.S.C. § 1961(3).

12       411.    The following are alternative enterprises within the meaning of 18 U.S.C. §

13   1961(4) and 18 U.S.C. § 1962(c) ("Alternative Enterprises"), all of which engaged in, and their

14   activities affected, interstate commerce:

15           a.   Wiederhorn, Mendelsohn, Old WCC, CCL, Grayson, and Barclay Grayson.

16           b.   Wiederhorn, Mendelsohn, Old WCC, CCL, Grayson, Barclay Grayson, Brooks,

17                Beacon, and Gamwell.

18           c.   Grayson, Barclay Grayson, and CCL.

19           d.   CCL.

20       412.    Barclay Grayson was employed by, and associated with, the Alternative

21   Enterprises, and he conducted or participated in the conduct of the Alternative Enterprises'

22   affairs through a pattern of racketeering activity.

23       413.    The racketeering activity consisted of mail fraud, wire fraud, and fraud in the sale

24   of securities.  In March 2000, Barclay Grayson pleaded guilty to mail fraud.

25

PLAINTIFFS' COMPLAINT                **ESLER, STEPHENS & BUCKLEY**
                                    RICO and Supplemental State Law        Attorneys at Law
                                    Claims (28 U.S.C. § 1331)              700 Pioneer Tower
                                                                          888 SW Fifth Avenue
                                                                          Portland, OR  97204-2021
                                                                          503 223 1510

1    414.    From 1993 through 2000, Barclay Grayson, with the help of others, having

2    devised or intending to devise schemes and artifices to defraud (including a scheme or artifice to

3    deprive plaintiffs and others of the intangible right to honest services), or for obtaining money or

4    property by means of false or fraudulent pretenses, representations, or promises, and to sell

5    securities, caused mail matter, especially lulling letters, lulling reports, and correspondence and

6    documents necessary to complete the secret transactions described above, to be sent and

7    delivered by the Postal Service.

8    415.    As a result, plaintiffs sustained damages in the amount of the consideration they

9    paid for the securities they purchased and the amount of the management fees they paid.

10    416.    Plaintiffs are entitled to recover threefold the damages they sustained, plus

11    prejudgment interest at the applicable rates, plus reasonable attorney fees.

12                              SECOND CLAIM FOR RELIEF

13          (Participating or Materially Aiding Unlawful Sales of Securities - ORS 59.115)

14    417.    Plaintiffs reallege the preceding paragraphs.

15    418.    The private investments that CCL, the Graysons, Old WCC, Wiederhorn,

16    Mendelsohn, Brooks, Beacon, and Gamwell offered and sold to plaintiffs, including the

17    collateralized note program, the Old WCC loans, and the Brooks and Beacon loans, are securities

18    as defined by ORS 59.015(19).

19    419.    The sales of the securities were unlawful because the securities were not

20    registered.

21    420.    The sales of the securities were unlawful because CCL, the Graysons, Old WCC,

22    Wiederhorn, Mendelsohn, Brooks, Beacon, and Gamwell were not licensed to sell securities.

23    421.    The sales of the securities were unlawful because the securities were sold to

24    plaintiffs by means of untrue statements and misleading omissions, including those described

25    above and the following:

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                              RICO and Supplemental State Law          Attorneys at Law
                              Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                                888 SW Fifth Avenue
                                                                Portland, OR  97204-2021
                                                                503 223 1510

1   a. Plaintiffs' funds would be prudently invested.

2   b. Plaintiffs' funds would be properly diversified.

3   c. The portion of plaintiffs' funds invested in the collateralized note program would

4     be fully secured.

5   d. The assets used to secure the portion of plaintiffs' funds invested in the

6     collateralized note program had been valued by an independent and unbiased

7     appraiser, following standards and ethics in the appraising industry.

8   e. CCL had stringent investment guidelines and provided a detailed analysis of its

9     borrowers before lending funds under the collateralized note program.

10   f. The collateralized note program was subject to review by a committee comprised

11     of CCL professionals from various backgrounds.

12   g. The funds invested in the collateralized notes would be under constant review by

13     CCL for collateral values and market information to keep CCL advised about

14     plaintiffs' investment performance in these investments.

15   h. (By omission)  CCL had loaned trust fund money to the wife of one of the

16     appraisers held out by CCL to be making independent appraisals of the collateral

17     securing the trust fund money invested in the collateralized note program.

18   i. (By omission)  Certain collateralized notes were in default as a result of

19     insufficient collateral or the borrower's failure to make a timely payment.

20   j. (By omission)  Jeffrey Grayson received a $5 million line of credit from CF

21     Credit that came from plaintiffs' money invested in Old WCC.

22   k. (By omission)  Grayson's $5 million line of credit was transferred to an affiliate

23     of Old WCC, which was CCL's largest borrower.

24   l. (By omission)  Sterling Capital, LLC, failed to make payments under its

25     agreement as scheduled.

   PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1   m. (By omission)  Sterling breached the agreement.

2   n. (By omission)  CCL made payments to service providers out of cash collateral

3     accounts, money that was intended to be used solely as security for certain loans.

4   o. (By omission)  CCL made payments out of cash collateral accounts, money that

5     was intended to be used solely as security for certain loans, to make interest

6     payments for CCL's debtors in the collateralized note program.

7   p. (By omission)  Many of CCL's borrowers in the collateralized note program were

8     related through common ownership, amounting to a lack of diversification of the

9     trust funds.

10   q. (By omission)  CCL agreed to a prepackaged bankruptcy in which the

11     restructuring of WFSG, Old WCC, and other Wilshire entities would extinguish

12     personal guarantees and loan obligations of Mendelsohn and Wiederhorn in

13     exchange for releases of loan obligations and personal guarantees Grayson.

14   r. (By omission)  Wiederhorn and Mendelsohn, the principals of CCL's largest

15     borrower, were depleting assets of the borrowing entity.

16   s. (By omission)  Old WCC had entered into an agreement that would extinguish the

17     security for the collateralized notes as well as Old WCC's revenue used to service

18     the interest in principal payments to CCL.

19   t. (By omission)  CCL had performed no due diligence or other analysis of WFSG's

20     bankruptcy reorganization from October 1998 through June 1999.

21   u. (By omission)  The cash collateral account was released to Old WCC, thereby

22     reducing plaintiffs' security.

23   v. The Old WCC loans, which became the Sterling loans, were current, and that

24     CCL anticipated no problems with these loans.

25

   PLAINTIFFS' COMPLAINT
RICO and Supplemental State Law
Claims (28 U.S.C. § 1331)

**ESLER, STEPHENS & BUCKLEY**
Attorneys at Law
700 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2021
503 223 1510

1      w.  (By omission)  The lack of CCL's investigation, analysis, and due diligence of

2          Brooks Financial, LLC, and Brooks' inability to repay the loans allegedly

3          purchased.

4      x.  (By omission)  Plaintiffs' new money went directly to Sterling and came back to

5          CCL in the form of principal or interest on the Old WCC/Sterling loans.

6      y.  (By omission)  Old WCC no longer provided security in the form of an interest in

7          underlying loan pools.

8      z.  (By omission)  The conversion of collateral into WFSG stock was at the election

9          of CCL, when CCL knew that there was a specific calculation causing any

10         conversion to be contingent on WFSG's certain performance.

11     aa. (By omission)  The audited financial statements that Moss Adams prepared, and

12         which CCL submitted to the Securities Exchange Commission for 1994-1998,

13         were materially inaccurate in that they did not state CCL's liability to its Investors

14         or its true income.

15     422.  The sales of the securities were unlawful because, in connection with the sale of

16  securities to plaintiffs, and as detailed above, CCL, the Graysons, Old WCC, Wiederhorn,

17  Mendelsohn, Brooks, Beacon, and Gamwell employed devices, schemes and artifices to defraud

18  plaintiffs, made untrue statements of material fact and misleading omissions to plaintiffs, and

19  engaged in acts, practices, and courses of business that operated as a fraud or deceit upon

20  plaintiffs.

21     423.  Barclay Grayson, Stoel Rives, and Peterman participated in or materially aided

22  the sale of some or all of the unlawfully sold securities.

23     424.  Barclay Grayson, Stoel Rives, and Peterman are jointly and severally liable with

24  CCL and the Graysons.

25

PAGE 118 of 122          PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                         RICO and Supplemental State Law    Attorneys at Law
                         Claims (28 U.S.C. § 1331)          700 Pioneer Tower
                                                            888 SW Fifth Avenue
                                                            Portland, OR  97204-2021
                                                            503 223 1510

1    425.    Pursuant to ORS 59.115(2), plaintiffs are entitled to recover from defendants

2    Barclay Grayson, Stoel Rives, and Peterman the amount of the consideration they paid for the

3    securities, plus the management fees they paid to CCL.

4    426.    Pursuant to ORS 59.115(2), plaintiffs are entitled to prejudgment interest on the

5    consideration paid for the securities and the management fees they paid to CCL at the applicable

6    rates from the date of plaintiffs' purchases and payments until paid.

7    427.    Pursuant to ORS 59.115(10), this court should award plaintiffs their reasonable

8    attorney fees incurred in this action.

9                              THIRD CLAIM FOR RELIEF

10                    Contributing Tortfeasor:  Breach of Fiduciary Duty

11    428.    Plaintiffs reallege the preceding paragraphs.

12    429.    CCL, the Graysons, and Bear Stearns, and each of them, took control of the

13    plaintiffs' money.  Plaintiffs depended on CCL, the Graysons, and Bear Stearns to prudently

14    invest that money and protect their cash collateral.  Plaintiffs reposed a special confidence in

15    CCL, the Graysons, and Bear Stearns, and they were bound to act in good faith and with due

16    regard to the interests of plaintiffs.

17    430.    CCL, the Graysons, and Bear Stearns breached the fiduciary duties they owed to

18    plaintiffs by failing to invest the trust funds prudently, by participating in or materially aided the

19    diversion of cash collateral, by breaching the Investment Agreements, by placing their own

20    interests above those of plaintiffs, by charging management fees based of false or inaccurate

21    market values, and by misleading plaintiffs.

22    431.    Stoel Rives and Peterman are jointly liable with CCL, the Graysons, and Bear

23    Stearns because of one or more of the following:

24

25

PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                              RICO and Supplemental State Law      Attorneys at Law
                              Claims (28 U.S.C. § 1331)            700 Pioneer Tower
                                                                  888 SW Fifth Avenue
                                                                  Portland, OR  97204-2021
                                                                  503 223 1510

1          a.   They acted in concert with, or pursuant to a common design with, CCL, the

2               Graysons, and Bear Stearns to breach fiduciary duties that CCL, the Graysons,

3               and Bear Stearns owed to plaintiffs;

4          b.   They knew or in the exercise of reasonable care should have known that CCL's

5               and the Graysons conduct breached the fiduciary duties they owed to plaintiffs,

6               and gave substantial assistance and encouragement to CCL, the Graysons, and

7               Bear Stearns to breach the fiduciary duties they owed to plaintiffs;

8          c.   They gave substantial assistance to CCL, the Graysons, and Bear Stearns in

9               accomplishing the breaches of fiduciary duties, and their own conduct, separately

10              considered, constituted a breach of duty that they owed to plaintiffs.

11     432.    As a result, plaintiffs sustained foreseeable damages in the amount of their

12   investments in CCL's private investment program and the management fees they paid.

13     433.    Plaintiffs, having exercised reasonable care, discovered this misconduct within

14   the applicable statute of limitations as extended by any tolling agreements.

15                               FOURTH CLAIM FOR RELIEF

16                             Contributing Tortfeasor:  Negligence

17     434.    Plaintiffs reallege the preceding paragraphs.

18     435.    CCL and the Graysons breached of the duty they owed plaintiffs to exercise care

19   consistent with the standard of care expected of investment advisers in one or more of the

20   following ways:

21         a.   They failed to invest plaintiffs' funds prudently.

22         b.   They failed to perform proper due diligence.

23         c.   They failed to inform plaintiffs of significant losses as a result of the imprudent

24              investment at a time when plaintiffs could have prevented further losses and

25              recovered most or all of their losses.

PAGE 120 of 122          PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                         RICO and Supplemental State Law   Attorneys at Law
                         Claims (28 U.S.C. § 1331)         700 Pioneer Tower
                                                           888 SW Fifth Avenue
                                                           Portland, OR  97204-2021
                                                           503 223 1510

1          d.   They failed to adhere to plaintiffs' investment guidelines.

2     436.   Stoel Rives and Peterman are jointly and severally liable with CCL and the

3    Graysons because of one or more of the following:

4          a.   They acted in concert with, or pursuant to a common design with, CCL and the

5               Graysons to breach duties of care that CCL and the Graysons owed to plaintiffs;

6          b.   They knew or in the exercise of reasonable care should have known that CCL's

7               and the Graysons conduct breached duties of care they owed to plaintiffs, and

8               gave substantial assistance and encouragement to CCL and the Graysons to

9               breach the duties of care they owed to plaintiffs;

10         c.   They gave substantial assistance to CCL and the Graysons in accomplishing the

11              breaches of duties of care, and their own conduct, separately considered,

12              constituted a breach of duty that they owed to plaintiffs.

13    437.   As a result, plaintiffs sustained foreseeable damages in the amount of their

14   investments in CCL's private investment program, plus the management fees they paid.

15    438.   Plaintiffs, having exercised reasonable care, discovered this misconduct within

16   the applicable statute of limitations as extended by any tolling agreements.

17        WHEREFORE, plaintiffs demand judgment as follows:

18        For the consideration paid for their loan participations in loans to Old WCC plus

19   prejudgment interest from the dates the Old WCC loans became past due from Wiederhorn,

20   Mendelsohn, WFSG, and WREIT up to the limits of their guaranties;

21        For plaintiffs' attorneys fees and costs pursuant to 18 U.S.C. § 1964(c) and ORS

22   59.115(10);

23        For such further equitable and other relief as this court deems just; and

24   ///

25   ///

PAGE 121 of 122        PLAINTIFFS' COMPLAINT          **ESLER, STEPHENS & BUCKLEY**
                       RICO and Supplemental State Law   Attorneys at Law
                       Claims (28 U.S.C. § 1331)         700 Pioneer Tower
                                                         888 SW Fifth Avenue
                                                         Portland, OR  97204-2021
                                                         503 223 1510

1      For treble damages pursuant to 18 U.S.C. § 1964(c).

2      Pursuant to Fed.R.Civ.P. 38, plaintiffs hereby demand trial by jury.

3      DATED this 25th day of September, 2001.

4

5                                          ESLER, STEPHENS & BUCKLEY

6

7

8                          By: _____

9                              Kim T. Buckley, OSB No. 78158
                               John W. Stephens, OSB No. 77358
10                             Michael J. Esler, OSB No. 71056
                               Of Attorneys for Plaintiffs
11

12    C:\WORD DOCS\CCL COMPLAINT STOEL RIVES.doc

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' COMPLAINT            **ESLER, STEPHENS & BUCKLEY**
                                         RICO and Supplemental State Law            Attorneys at Law
                                         Claims (28 U.S.C. § 1331)                  700 Pioneer Tower
                                                                                    888 SW Fifth Avenue
                                                                                    Portland, OR  97204-2021
                                                                                    503 223 1510